UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATIONWIDE LIFE INSURANCE COMPANY,
a foreign corporation,
       Plaintiff/Counter-Defendant,

vs.                                Case No.  11-cv-12422-AC-MKM
                                        Hon. Avern Cohn

WILLIAM KEENE, JENNIFER KEENE,
MONICA LYNNE LUPILOFF, NICOLE RENEE
LUPILOFF and NICOLE RENEE LUPILOFF,
PERSONAL REPRESENTATIVE OF THE ESTATE
OF GARY LUPILOFF, DECEASED,
       Defendants,

**Nationwide's Response to the Lupiloff Defendants' Motion for Summary Judgment**

and

MONICA LYNNE LUPILOFF, NICOLE RENEE
LUPILOFF and NICOLE RENEE LUPILOFF,
PERSONAL REPRESENTATIVE OF THE ESTATE
OF GARY LUPILOFF, DECEASED,
       Defendants/Counter-Plaintiffs and Cross-Plaintiffs,

vs.

WILLIAM KEENE, JENNIFER KEENE,
Individually, jointly and severally,
       Defendants/Cross-Defendants.
_____/

| | |
|---|---|
| Michael F. Schmidt P25213 | Albert L. Holtz P15088 |
| Nathan Peplinski P66596 | Attorney for Lupiloffs |
| Attorneys for Plaintiff | 3910 Telegraph Road, Suite 200 |
| 1050 Wilshire Drive, Suite 320 | Bloomfield Hills, MI  48302 |
| Troy, MI  48084 | (248)593-5000 |
| (248)649-7800 | |

*Harvey Kruse*
ATTORNEYS & COUNSELORS   A PROFESSIONAL CORPORATION
1050 WILSHIRE DRIVE, SUITE 320, TROY, MICHIGAN 48084-1526   248-649-7800

John H. Bredell P36577  
Attorney for Keenes  
119 N. Huron Street  
Ypsilanti, MI 48197  
(734)482-5000  

Geoffrey N. Fieger P30441  
E. Jason Blankenship P63566  
Co-Counsel for Lupiloffs  
19390 West Ten Mile Road  
Southfield, MI 48075  
(248)355-5555

_____/

### NATIONWIDE'S MEMORANDUM OF LAW IN RESPONSE TO THE LUPILOFF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

#### Introduction

This case stems from the murder of Gary Harmon Lupiloff, who was shot dead in his driveway on July 13, 2010. Plaintiff Nationwide Life Insurance Company issued a life insurance policy with Gary Harmon Lupiloff as the named insured. Nationwide received conflicting claims for the insurance policy benefits from the defendants following the murder. Subsequent investigation revealed that defendant William Keene was the primary suspect in the murder and that the policy may have been obtained with the intended purpose of William Keene eventually murdering Gary Harmon Lupiloff to collect the insurance proceeds.

The underlying facts are not at issue in this motion. ***The sole issue is whether, as a matter of law, Nationwide is precluded from rescinding the policy on the basis of it being an illegal contract created with the intent to murder Gary Harmon Lupiloff because the policy contains an incontestability clause***. This certainly is not the intended purpose of an incontestability clause, and such a conclusion would be legally, logically, and morally repugnant. Michigan law is

HARVEY KRUSE   A PROFESSIONAL CORPORATION  
ATTORNEYS & COUNSELORS  
1050 WILSHIRE DRIVE, SUITE 320, TROY, MICHIGAN 48084-1526   248-649-7800

-1-

clear that incontestability clauses are intended to create a statute of limitations in order to force the insurer to investigate potential misrepresentations or false statements in an insurance application and not sit on its hands collecting premiums only to begin its investigation of the underlying facts once a claim occurs. This purpose would not be served by applying the incontestability clause to cases such as this involving a murder plot from the inception of the policy because, in such cases, there is no investigation that the insurer could do to find out about the plot until the murder occurs. An incontestability clause is not applied in such cases because doing so would only reward the murderer who waits until after the contestability time runs to commit the murder.

### Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "We consider all facts and inferences drawn from the evidence in the light most favorable to the non-moving party." *Vaughn v Lawrenceburg Power Sys*, 269 F3d 703, 710 (CA 6, 2001).

### Michigan Law is Well Established that a Murderer Cannot Recover Under the Insurance Policy of His Victim

The Michigan Estate and Protected Individuals Code (EPIC) contains MCL 700.2803, which is referred to as the "slayer statute". The statute provides that a

person who "feloniously and intentionally" kills a decedent *forfeits all benefits* from the decedent's estate. MCL 700.2803(1). The statute further provides that a "killer cannot profit from his or her wrong." MCL 700.2803(5). The definitions contained in EPIC make clear that the slayer statute is applicable to insurance policies. MCL 700.1104(k). "Michigan law provides that [a] named beneficiary of a bond, life insurance policy, or other contractual arrangement who feloniously and intentionally kills or aids and abets the killing of the principal obligee or the individual upon whose life the policy is issued is not entitled to any benefit . . . ." *Estate of Curtis v Prudential Ins Co*, 839 F Supp 491, 494 (1993), citation omitted. The Michigan slayer statute is the codification of long standing common law: "It would be a reproach to the jurisprudence of the country, if one could recover insurance money payable on the death of a party whose life he had feloniously taken." *New York Mut Life Ins Co v Armstrong*, 117 US 591, 600; 6 S Ct 877; 29 L Ed 997 (1886).

Therefore, the law is clear that, if William Keene murdered Gary Harmon Lupiloff, William Keene forfeited the right to recover under the insurance policy. The question presented in the Lupiloff defendant's motion is whether the incontestability clause in the insurance policy still requires that Nationwide pay the policy proceeds to someone other than William Keene even if the policy was obtained with the goal of murdering Gary Harmon Lupiloff. As explained below,

-3-

an incontestability clause does not create such a requirement.  Instead, the policy is void from its inception if obtained as part of a plan to murder the insured.

## **The Purpose of the Incontestability Clause is to Force the Insurer to Investigate**

Michigan law requires that a life insurance and annuity policy contain an incontestability clause.  MCL 500.4014 provides:

> There shall be a provision that the policy . . . shall be incontestable after it shall have been in force during the lifetime of the insured for 2 years from its date, except for non-payment of premiums and except for violations of the policy relating to naval and military services in time of war, and at the option of the company provisions relative to benefits in the event of total and permanent disability and provisions which grant additional insurance specifically against death by accident may also be excepted.[1]

This requirement has long been a part of Michigan law, dating back at least to 1917.  See *Becker v Illinois Life Ins Co*, 227 Mich 388, 392; 198 NW 884 (1924), noting that incontestability clauses were required by Act No. 256 Pub. Acts 1917.  The Michigan appellate courts have been addressing the purpose of incontestability clauses for decades.  In *Bogacki v Great-West Life Assurance Co*, 253 Mich 253; 234 NW 865 (1930), the Court stated that the incontestability provision statute was not intended to condone fraud, but was intended merely to operate as a statute of limitations for raising defenses that the insurer could investigate after the application:

-4-

> The statute condones no fraud; it merely operates in the nature of a statute of limitations. The law tolerates no fraud, yet frequently permits time to operate as a bar to its assertion.
>
> * * *
>
> It is not a stipulation absolute to waive all defenses and to condone fraud. On the contrary, it recognizes fraud and all other defenses but it provides ample time and opportunity within which they may be, but beyond which they may not be, established. It is in the nature of and serves a similar purpose as statutes of limitations and repose, the wisdom of which is apparent to all reasonable minds. It is exemplified in the statute giving a certain period after the discovery of a fraud in which to apply for redress on account of it and in the law requiring prompt application after its discovery, if one would be relieved from a contract infected with fraud. [*Id*. at 256-258, citation omitted.]

The Court further noted that the rule is intended to make sure insurance companies act rather than sitting back and collecting premiums:

> "This and kindred laws are wise statutes of limitation. Insurance companies should not be permitted with shut eyes to receive in silence the profits of their contracts and to grow articulate only when called upon to pay." [*Id*. at 258, quoting *Harris v Provident Relief Ass'n*, 141 Va 659, 674; 126 SE 696 (1925).]

In *In re Certified Question*, 413 Mich 57; 318 NW2d 456 (1981), the Michigan Supreme Court again explained that the incontestability provision was intended to be a statute of limitations for investigation of representations making up the contract:

> The two-year limit permits full investigation by an insurance company of any matters which formed part of the decision to make the contract. In effect, the statute permits an insurance

---

[1] MCL 500.4432 provides a similar incontestability clause requirement for group life insurance policies.

-5-

company to continue to investigate or to wait to further investigate, for a full two years. Once the time limit is passed the insurer may no longer, in general, avoid the policy. This statute balances the concerns of insureds that years after the application date an insurance company would refuse to pay benefits and desire to avoid contracts, no matter how old, if there was a material misrepresentation at the time the contract was made. [*Id*. at 66-67.]

In *Druillard v Metropolitan Life Ins Co*, 107 Mich App 608; 310 NW2d 15 (1981), the plaintiff argued that the insurance company had an immediate duty to investigate potential misrepresentations in an application and that the failure to investigate waived any right to rescind the policy. The Court of Appeals rejected this noting that the incontestability statute provided the time that insurers were able to investigate applications:

> In addition, the Michigan incontestability statute recognizes that an insurer has the right, within the statutorily prescribed time, to assert any available defense against the insured. The fact that an insurer may raise the issue of misrepresentation as to health within two years from the date on which the policy is issued conclusively refutes plaintiff's contention. [*Id*. at 614-615.]

The Sixth Circuit reached the same conclusion regarding the purpose of the incontestability statute when applying Michigan law in *Equitable Life Assurance Society of the United States v Poe*, 143 F3d 1013, 1019 (CA 6, 1998):

> Moreover, we believe the Incontestability Clause is more appropriately viewed not as an endorsement of fraud but as a mechanism offering repose in the nature of a statute of limitations.

The Michigan Court of Appeals more recently followed *Bogacki* to reiterate that the purpose of the incontestability statute was to work as a statute of

**HARVEY KRUSE**
ATTORNEYS & COUNSELORS    A PROFESSIONAL CORPORATION
1050 WILSHIRE DRIVE, SUITE 320, TROY, MICHIGAN 48084-1526   248-649-7800

limitations to prompt the insurer's investigation of potential fraud in the application:

> An incontestability clause is equivalent to a private contractual statute of limitations. *Bogacki v Great-West Life Assurance Co*, 253 Mich 253, 256-260; 234 NW 865 (1931); 16 Williston, Contracts (4th ed), § 49:92, p 664. Contrary to defendant's untenable assertions, incontestability clauses were specifically designed to require an insurer to complete its investigation and challenge the veracity of the insured's pre-contractual statements within a given time period or forever lose the power to avoid the contract for material misrepresentation. [*Buckner v Old Republic Life Ins Co*, 2006 Mich App Lexis 731 (unpublished, Docket No. 262730), (Docket # 111-4, p 3).]

This view of an incontestability clause as a statute of limitations intended to prompt investigation by an insurance company dates back to the nineteenth century:

> It is not a stipulation absolute to waive all defenses and to condone fraud. On the contrary, it recognizes fraud and all other defenses but it provides ample time and opportunity within which they may be, but beyond which they may not be, established. It is in the nature of and serves a similar purpose as statutes of limitations and repose, the wisdom of which is apparent to all reasonable minds. It is exemplified in the statute giving a certain period after the discovery of a fraud in which to apply for redress on account of it and in the law requiring prompt application after its discovery, if one would be relieved from a contract infected with fraud.
> 
> * * *
> 
> No doubt the defendant held it out as an inducement to insurance by removing the hesitation in the minds of many prudent men against paying ill-afforded premiums for a series of years when in the end and after the payment of premiums, the death of the insured and the loss of his and the testimony of others, the claimant instead of receiving the promised insurance may be met by an expensive lawsuit to determine that the insurance which the deceased has been paying

for through many years, has not and never had an existence except in name. [*Wright v Mut Benefit Life Ass'n of America*, 118 NY 237, 243; 23 NE 186 (1890).]

Given this well established purpose of the incontestability clause/statute, it makes no sense to use it to bar the insurer from rescinding the policy because it was obtained for the purpose of murdering the insured. In a typical fraud case, the insured or the beneficiary has misrepresented an existing fact, such as the insured's medical condition, the insured's age, or the beneficiary's insurable interest. Such misrepresentations can be investigated by the insurer at the time of the application by reviewing medical records, obtaining birth records, or confirming the relationship between the beneficiary and the insured. On the other hand, a beneficiary having an intent to murder the insured in the future is not something that an insurer can investigate at the time of the application. In most situations, the beneficiary obtaining the policy is only the first step in the murder plot. He only takes further steps toward completion of his murder plan once his reward for the murder through the insurance policy is established. Under the circumstances, the investigation by an insurance company could never unearth the plot unless the beneficiary was foolish enough to confess his future plans when asked by the insurer.

The application of the incontestability clause to murder cases would only serve to set a safe harbor date at which point the beneficiary knows that he may

-8-

now start actively implementing his murder plot without worry of the insurance policy becoming void. This would have a particularly negative impact where the beneficiary could name a contingent beneficiary related to him who is not involved in the murder plot.

The Michigan Legislature merely meant to create a statute of limitations for an insurer to investigate *existing* fraud in an application by enacting the incontestability provision statute. It did not mean to create a safe harbor for murderers so that they would be more likely to collect under the insurance policy on their intended target. As Justice William O. Douglas noted, "common sense often makes good law." *Peak v United States*, 353 US 43, 46; 77 S Ct 613; 1 L Ed 2d 631 (1951). Common sense dictates to deny the motion in this case as it would be unethical to bind Nationwide to a policy no one would ever enter knowing the true intentions of the beneficiary and where there was nothing that Nationwide could do to discover those intentions within the two years set by the incontestability clause. "Justice may be 'blind' but it is not stupid. Impartial fairness and equality is what the blindfold represents." *Enterprise Products Co v Bd of Supervisors*, 729 So2d 790, 795 (Miss, 1998).

The Michigan Supreme Court explained long ago that an incontestability provision is not intended to create coverage where it would not otherwise exist. In *Rasmussen v Equitable Life Assurance Society*, 293 Mich 482; 292 NW 377

**HARVEY KRUSE**
ATTORNEYS & COUNSELORS   A PROFESSIONAL CORPORATION
1050 WILSHIRE DRIVE, SUITE 320, TROY, MICHIGAN 48084-1526   248-649-7800

-9-

(1940), the eligibility requirement for coverage was that the insured be under the age of 40, but the insured was actually 42 or 43 at the time of application. The insurer did not find this out until after the incontestability limitations period ran. The plaintiff attempted to argue that this meant that the insurer was bound to provide coverage. The Michigan Supreme Court rejected this, noting:

> The fact that the truth remains unrevealed for the period that would bar other defenses does not bring under coverage a risk expressly excluded by the policy. Nor can the certificate of itself be the source of any contractual rights, for it is not a part of the contract. [*Id*. at 486.]

It has always been the law in Michigan, that contracts for illegal acts are void: "all contracts made in violation of law, or contrary to public policy, are illegal, and consequently void." *Quirk v Thomas*, 6 Mich 76, 101 (1858). The Michigan Supreme Court further explained:

> In this situation, we have consistently held that where an illegal contract is involved, the court will not enforce it or grant relief thereunder . . . . If any part of a consideration is illegal, the whole consideration is void, because public policy will not permit a party to enforce a promise which he has obtained by an illegal act or promise, although he may have connected with the act or promise another which is legal. [*Kukla v Perry*, 361 Mich 311, 324-325; 105 NW2d 176 (1960).]

"It is a well-settled principle of law that all contracts which are founded on an act prohibited by a statute under a penalty are void, although not expressly declared to be so." *Cashin v Pliter*, 168 Mich 386, 390; 134 NW 482 (1912), citation omitted. Allowing profit from an illegal act would only serve to condone

-10-

and encourage that illegal act. *Orzel v Scott Drug Co*, 449 Mich 550, 559; 537 NW2d 208 (1995). This is specifically true in the context of insurance: "It is perfectly true that well-established law in this and other jurisdictions refuses, on grounds of public policy, to allow insurance of illegal activities lest such be encouraged thereby." *Bowman v Preferred Risk Mut Ins Co*, 348 Mich 531; 83 NW2d 434 (1957). In Michigan, courts have a duty to find contracts that violate public policy void: "courts have a duty to refuse to enforce a contract that is contrary to public policy." *Sands Appliance Servs v Wilson*, 463 Mich 231, 239; 615 NW2d 241 (2000). This would be especially true for crimes that are more than merely prohibited by statute but are *malum in se*,[2] like murder.

Applying this law to this case, the insurance contract is void from its inception because it was based on the criminal and immoral purpose of profiting from the murder of the insured. Because the insurance policy is void, its terms are unenforceable. The incontestability provision cannot, in turn, save the contract and create coverage where it would not otherwise exist. *Rasmussen*, 293 Mich at 486. 43 Am Jur 2d Ins § 757 summaries this law:

> The incontestability clause in a life insurance policy is contingent on the formation of a valid contract. An insurance policy that is invalid as being violative of public policy is not validated by an agreement that it be incontestable after a stated time.

Although Michigan appellate courts do not appear to have addressed the

---

[2] Evil in itself. Black's Law Dictionary, 7th Ed.

-11-

specific issue, other jurisdictions have found that an incontestability clause cannot save a policy that was procured with the intent to murder the insured. 27 ALR3d 794 §13[a] explains the general rule:

> Although, generally, the insurer remains liable for the proceeds of a policy even if the beneficiary, who has feloniously killed the insured, is barred from claiming this amount, *this is not the case where the beneficiary or the assignee of the policy obtained the policy fraudulently, that is, with the intention of killing the insured in order to collect the insurance proceeds*. *It has been held . . . that in such an event, the policy is void and the insurer may retain the proceeds*. [Emphasis added.]

The treatise elaborates that the accepted rule is that an incontestability clause does not defeat a defense based on a murder committed by the beneficiary:

> The rule appears generally accepted that a clause in a life insurance policy stating that the policy will be incontestable after a specific period from its issuance is not available to defeat the insurance company's claim that it is not liable to the beneficiary because he feloniously killed the insured. [27 ALR3d 794 § 8[a].]

In *Colyer's Administrator v New York Life Ins Co*, 300 Ky 189, 192; 188 SW2d 313 (1945), the Court explained that a policy obtained with the intent to kill the insured is void from its inception and that no one can recover from it:

> In the case at bar it is clearly established that there was a predetermination on the part of Duncan, before the policy was issued, to kill Colyer. Under such a circumstance there can be no recovery, either on the part of the beneficiary or the estate of the insured, because the contract of insurance was void from its inception.

The Federal Court of Appeals for the Eight Circuit applied the rule allowing the insurer to void the policy to a case similar to the one at hand in *New England*

*Mut Life Ins Co v Null*, 605 F2d 421 (CA 8, 1979). In that case, the insured was seeking investments for his work as an inventor. The beneficiary purported to be an investor and insisted on a life insurance policy to protect his investment. The insured conceded to this demand. In reality, the beneficiary was intending to obtain the policy on the insured and then kill the insured. The Court found that such a policy obtained with an intent to kill would be void so that the insured's estate would not collect in place of the murdering beneficiary: "we rely on the accepted rule that a life insurance policy is void Ab initio when it is shown that the beneficiary thereof procured the policy with a present intention to murder the insured." *Id*. at 424. The estate attempted to argue that the Court should consider the intent of the insured to possibly benefit his estate. The Court concluded that the insured was simply a pawn in the scheme concocted by the beneficiary to murder the insured:

> The appellant's final contention is that the District Court erred in concluding that Calvert, not Victor Null, was the real party to the contract of insurance with New England. Shirley Ann Null argues that the facts of this case render it so unlike those cases from which the rule was derived that the court could not conclude that it applied so as to void the policy. We have addressed those portions of Shirley Ann Null's argument which attempt to establish that Victor Null applied for the insurance for his own purposes, and have indicated our approval of the District Court's findings on that issue. Because he was no more than an instrumentality in the Calverts' scheme, Victor Null was not the real party to the contract. Shirley Ann Null's reliance on her husband's desire to obtain the policy as a ground for distinguishing this case . . . is misplaced because Victor Null's desire was created by the Calverts for the sole purpose of carrying out their plan. [*Id*. at

HARVEY KRUSE
ATTORNEYS & COUNSELORS    A PROFESSIONAL CORPORATION
1050 WILSHIRE DRIVE, SUITE 320, TROY, MICHIGAN 48084-1526    248-649-7800

-13-

425-426.³]

---

³ See also: *Chute v Old American Ins Co*, 6 Kan App2d 412, 417; 629 P2d 734 (1981), overruled in part on other grounds 233 Kan 358 (1983) ("it appears to be a well-established rule of law that an insurer is relieved of all liability under a life insurance policy if it can be proved that the policy was procured by the beneficiary who intended at the time the insurance was secured to murder the insured."); *Lopez v Life Ins Co*, 406 So2d 1155, 1159 (Fla App, 1981), citation omitted ("A life insurance policy is void ab initio if it is shown that the beneficiary procured the policy with an intention to murder the insured. Thus an insurer has the right to claim that a policy so procured is unenforceable, thereby avoiding payment"); *Flood v Fidelity & Guarantee Life Ins Co¸* 394 So2d 1311, 1313-1314 (La App, 1981) ("Life insurance policies are procured because life is, indeed precarious and uncertain. But our law does not and cannot sanction any scheme which has as its purpose the certain infliction of death for, inter alia, financial gain through receipt of the proceeds of life insurance. . . . To sanction this policy in any way would surely shackle the spirit, letter and life of our laws."); *Cerro Gordo Charity v Fireman's Fund American Life Ins Co*, 819 F2d 1471 (CA 8, 1986) (finding a question of fact existed for the jury to determine if the insurance policy should be voided from the inception because the beneficiary had an intent to kill the insured from the inception of the policy despite a contingent beneficiary charity claiming that it should recover in place of the murder); *Minnesota Mut Life Ins Co v Ostrusina*, 1992 US Dist Lexis 16364 (ND Ill, 1992) ("There can be no meeting of the minds to a contract for insurance when a beneficiary overbears the will of an insured in securing insurance coverage with the purpose of terminating the life of the insured to bring about an early pay day."); *Federal Kemper Life Assurance Co v Eichwedel*, 266 Ill App3d 88, 94-95; 639 NE2d 246 (1994), citation omitted, emphasis removed ("if it is established that the beneficiary conceived the idea of murdering the insured prior to the time the insurance was procured and with that thought in mind the beneficiary himself procured the policy[,] the insurance company may defeat liability on the ground of fraud. Under this principle recovery is barred even by the estate of the insured"); *United States v 5201 Woodlake Dr*, 895 F Supp 791, 797 (MD NC, 1995) ("It is clear that when the policy was purchased by Joey and Barbara Caldwell, it was done with the criminal intent to kill Maceo McEachern which would have satisfied at least one of the elements of a civil fraud. In this vein, the policy itself was legally lifeless at the time of its issuance."); *New York Life Ins Co v Ortiz*, 1995 US Dist Lexis 15853 (ED La, 1995) (denying a motion for summary judgment by the estate of the murdered insured because questions of fact existed regarding whether the beneficiary

HARVEY KRUSE
ATTORNEYS & COUNSELORS    A PROFESSIONAL CORPORATION
1050 WILSHIRE DRIVE, SUITE 320, TROY, MICHIGAN 48084-1526   248-649-7800

In *Henderson v Life Ins Co of Virginia*, 176 SC 100; 179 SE 680 (1935), the South Carolina Supreme Court explained that the existence of an incontestability provision does not change this fact. In that case, a purported stepfather took out a policy on the insured with intent to kill him. The stepfather was convicted of the murder. The decedent's estate then attempted to collect on the policy. The Court found the policy void from its inception despite the existence of an incontestability provision:

> While it is generally stated by the courts and text-writers that an insurer is precluded from contesting a policy after the period of contestability has expired, on any ground not excepted therein, it must also be remembered that there is another equally well-established principle of law,-that a court will not lend its aid to enforce a contract void as against public policy. Whenever these two principles become opposed, the interest of society requires that the latter doctrine shall prevail.
>
> Conceding the facts stated in the answers to be true, as we must, the court must inevitably hold that the contracts were void at their inception. This being true, no subsequent event could vitalize the contracts, not even the solemn agreement of the parties themselves.
>
> * * *
>
> The insurance company, by its answers, alleges that the procurement of the policies herein concerned was the first step in a predetermined and foreordained plan and design, formulated, promoted, and effectuated by the said James R. Thomas, with the intent of cheating and defrauding it, against the contemplation of the terms of the contracts in question and in contravention of the state and national laws now obtaining, and in violation of the public policy as announced and maintained by the United States and the State of South Carolina. Suffice it to say, a contract entered into under these circumstances is undoubtedly void as against public policy. This

---

obtained the policy with the intent to murder the insured, which would void the policy from its inception).

-15-

> Court can conceive of no iniquitous and heinous undertaking which would be more against the social order of any civilized country. The public policy of this State and of the United States condemns such malicious and wicked designs, and its Courts will not be made a party thereto by undertaking to enforce contracts having their basis therein. The parties cannot by a stipulation between themselves circumvent this rule of law and society; and the principle of estoppel is without application. [*Id*. at 685.]

In *Columbian Mut Life Ins Co v Martin*, 175 Tenn 517; 136 SW2d 52 (1939), the Court explained that the incontestability clause was simply irrelevant to these cases, because, as discussed above, the insurer could not investigate and find the murder scheme at the time of the application:

> A statute of limitations runs from accrual of the right of action. Martin's fraud against the insurer here was not consummated until he had George murdered more than two years from the date of the policy. After two years and prior to the murder the insurer had no basis upon which to seek rescission or seek cancellation of the contract. No defense to liability on the contract. There was nothing unlawful in Martin's paying the premiums on this policy on George's life payable to George's estate.
> It was not intended by the incontestability stipulation to cut off a right of action or a defense which did not arise until more than two years after the date of the contract. The Legislature had no thought of requiring that a stipulation of such meaning be included in life insurance policies. A Statute of Limitations cannot run against a nonexistent right. [*Id*. at 526-527, citation omitted.[4]]

---

[4] See also *Aetna Life Ins Co v Strauch*, 179 Okla 617, 618; 67 P2d 452 (1937) overruled in part on other grounds 519 P2d 913 (1973), ("if the beneficiary conceived the idea of murdering the insured prior to the time the insurance was procured and with that thought in mind, the beneficiary himself procured the policy, either in person or acting through the insured as an innocent instrumentality so that the insurance policy was in actual fact at its inception a contract between the beneficiary and the insurance company, as distinguished from a contract

-16-

The above quoted precedent is well reasoned and consistent with Michigan law. "It is impossible to hold an insurance company liable for a risk it did not assume." *Auto-Owners Ins Co v Churchman,* 440 Mich 560, 566-567; 489 NW2d 431 (1992). The Michigan Court of Appeals has indicated that this is a fundamental rule in Michigan insurance law: "Perhaps the most fundamental rule of Michigan insurance jurisprudence is that an insurer can never be held liable for a risk it did not assume and for which it did not charge or receive any premium." *Dunn v Detroit Auto Inter-Ins Exchange*, 254 Mich App 256, 270; 657 NW2d 153 (2002), lv den 469 Mich 855 (2003) (citation omitted). No insurance company would have knowingly taken on the risk of entering an insurance contract with a person planning to murder the insured. Such an illegal contract would be void from its inception and unenforceable. The incontestability provision does nothing to change this fact and cannot create coverage for an illegal contract simply by the passage of time. The Lupiloff defendant's motion should be denied as the incontestability provision is not legally a bar to Nationwide declaring the policy void from its inception if it is shown that the murder was planned from the inception of the policy.

The cases cited by the Lupiloff defendants do not support a different result. *Buckner v Old Republic Life Ins Co*, unpublished opinion per curiam of the

between the innocent insured and the company, the insurance company, when the

Michigan Court of Appeals, issued March 16, 2006 (Docket No. 262730) 2006 Mich App Lexis 731 (Motion, p 4) dealt with misrepresentations in the application for insurance about treatment for illnesses. It had nothing to do with a policy obtained with the intent to murder the insured. *Bogacki* (Motion p 5) dealt with whether the insured could make a valid contract given that he was under guardianship as a spendthrift at the time the policy was obtained. *Bogacki*, 253 Mich at 255. Again, the case has nothing to do with a murder plot. In fact, as explained above, *Bogacki* notes that the purpose of the incontestability provision is to work as a statute of limitations. *Id*. at 256-258. *In re Certified Question* (Motion, p 5) again dealt with a misrepresentation in the application regarding the insured's medical condition, not a plot to murder the insured. *In re Certified Question*, 413 Mich at 60. Again, as noted above, *In re Certified Question* is actually contrary to the Lupiloff defendants' position as it explained that the purpose of the incontestability provision was to work as a statute of limitations, which would not be appropriate to apply in a case such as this one. *Id*. at 66-67. *Sun Life Assurance Co v Allen*, 270 Mich 272; 259 NW 281 (1935) (Motion pp 5-6) was another misrepresentation in the application case and dealt with the beneficiaries fraudulently listing a drunken individual as a partner in the firm so as to collect on the policy when the insured's lifestyle inevitably resulted in his death.

---

risk has been matured by the subsequent murder, may defeat liability . . . .")

-18-

The Court did not address whether an incontestability clause would apply to a case like the one at hand.  *Becker* (Motion p 6) again dealt with an alleged misrepresentation in the application for insurance, not a murder plot.  *Becker*, 227 Mich at 392.  And *Travelers Ins Co v Carey*, 24 Mich App 207; 180 NW2d 68 (1970) (Motion p 6) again dealt with an attempt to rescind a policy based on misrepresentations in the application.  None of the cited cases contain a discussion of a policy obtained with the intent to murder the insured.  Therefore, they do not support the Lupiloff defendants' arguments, and their motion should be denied.

| | |
|---|---|
| **CERTIFICATE OF SERVICE**<br>I hereby certify that the foregoing pleading has been electronically filed with the Clerk of the Court on the below listed date via the Electronic Case Filing system, which will send notice of filing to all attorneys of record.<br><br>/s/ Carolyn R. Urbanik<br><br>DATED:   May 23, 2014 | Respectfully submitted,<br><br>BY: /s/Michael F. Schmidt<br>      Michael F. Schmidt P25213<br>      Nathan Peplinski P66596<br>      Harvey Kruse PC<br>      Attorneys for plaintiff<br>      mschmidt@harveykruse.com<br>      npeplinski@harveykruse.com<br>      1050 Wilshire Drive, Suite 320<br>      Troy, Michigan 48084-1526<br>      (248) 649-7800 |