# EXHIBIT 24

MARY ELIZABETH REICH
January 4, 2012

**Page 1**

```
1              UNITED STATES DISTRICT COURT
2              EASTERN DISTRICT OF MICHIGAN
3                    SOUTHERN DIVISION
4   NATIONWIDE LIFE INSURANCE
    COMPANY, a foreign corporation,
5                  Plaintiff/
                   Counter-Defendant,
6         vs.              Case No.
                      11-cv-12422-AC-MKM
7                         Hon. Avern Cohn
    WILLIAM KEENE, JENNIFER KEENE,
8   MONICA LYNNE LUPILOFF, NICOLE
    RENEE LUPILOFF and NICOLE RENEE
9   LUPILOFF, PERSONAL REPRESENTATIVE
    OF THE ESTATE OF GARY LUPILOFF,
10  DECEASED,
                    Defendants,
11      and
12  MONICA LYNNE LUPILOFF, NICOLE
    RENEE LUPILOFF and NICOLE RENEE
13  LUPILOFF, PERSONAL REPRESENTATIVE
    OF THE ESTATE OF GARY LUPILOFF,
14  DECEASED,
                    Defendants/
15                  Counter-Plaintiffs and
                    Cross-Plaintiffs,
16      vs.
17  WILLIAM KEENE, JENNIFER KEENE,
    Individually, jointly and severally,
18                  Defendants/
                    Cross-Defendants.
19
20  The Deposition of MARY ELIZABETH (BETSY) REICH,
21  Taken at 1050 Wilshire Drive, Suite 320,
22  Troy, Michigan,
23  Commencing at 3:18 p.m.,
24  Wednesday, January 4, 2012,
25  Before Lezlie A. Setchell, CSR-2404, RPR, CRR.
```

**Page 2**

```
1   APPEARANCES:
2
3   MICHAEL F. SCHMIDT
4   Harvey Kruse, PC
5   1050 Wilshire Drive
6   Suite 320
7   Troy, Michigan 48084
8   248.649.7800
9   mschmidt@harveykruse.com
10      Appearing on behalf of the
11      Plaintiff/Counter-Defendant.
12
13  ALBERT L. HOLTZ
14  Albert L. Holtz, PC
15  3910 Telegraph Road
16  Suite 200
17  Bloomfield Hills, Michigan 48302
18  248.593.5000
19  aholtz@lipsonneilson.com
20      Appearing on behalf of Monica Lynne Lupiloff, Nicole
21      Renee Lupiloff and Nicole Renee Lupiloff, personal
22      representative of the Estate of Gary Lupiloff,
23      deceased.
24
25
```

**Page 3**

```
1   JEFFREY A. DANZIG
2   Fieger, Fieger, Kenney, Giroux & Danzig, PC
3   19390 West Ten Mile Road
4   Southfield, Michigan 48075
5   248.355.5555
6   jdanzig@fiegerlaw.com
7       Appearing on behalf of Monica Lynne Lupiloff, Nicole
8       Renee Lupiloff and Nicole Renee Lupiloff, personal
9       representative of the Estate of Gary Lupiloff,
10      deceased.
11
12  JOHN H. BREDELL
13  Bredell & Bredell
14  119 North Huron Street
15  Ypsilanti, Michigan 48197
16  734.482.5000
17  jbredell@bredell.com
18      Appearing on behalf of William and Jennifer Keene.
19
20
21
22
23
24
25
```

**Page 4**

```
1   MICHAEL D. FISHMAN
2   Law Office of Michael D. Fishman, PLLC
3   255 East Brown Street
4   Suite 310
5   Birmingham, Michigan 48009
6   248.258.6688
7   fishman@sports-gallery.com
8       Appearing on behalf of the witness.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

MARY ELIZABETH REICH
January 4, 2012

Page 5

TABLE OF CONTENTS

WITNESS                                      PAGE
MARY ELIZABETH (BETSY) REICH

EXAMINATION
BY MR. SCHMIDT:                              6
EXAMINATION
BY MR. DANZIG:                               24
EXAMINATION
BY MR. BREDELL:                              61
RE-EXAMINATION
BY MR. DANZIG:                               75
RE-EXAMINATION
BY MR. BREDELL:                              80

EXHIBITS
EXHIBIT                                      PAGE
(Exhibits retained by counsel.)

DEPOSITION EXHIBIT 1                          8
DEPOSITION EXHIBIT 2                          9
DEPOSITION EXHIBIT 3                         12
DEPOSITION EXHIBIT 4                         13
DEPOSITION EXHIBIT 5                         14

Page 6

1  Troy, Michigan
2  Wednesday, January 4, 2012
3  3:18 p.m.
4          MARY ELIZABETH (BETSY) REICH,
5  was thereupon called as a witness herein, and after
6  having first been duly sworn to testify to the truth,
7  the whole truth and nothing but the truth, was
8  examined and testified as follows:
9
10         MR. SCHMIDT: Let the record show this is
11 the deposition of Mary Elizabeth Reich taken pursuant
12 to Notice under the Federal Rules of Civil Procedure
13 to be used for the purposes provided therein.
14         EXAMINATION
15 BY MR. SCHMIDT:
16 Q.  Ms. Reich, I'm going to ask you some questions about a
17     lawsuit filed by Nationwide Insurance Company.  Please
18     listen to the question.  If you understand it, answer
19     it.  If you don't, let me know and I can repeat or
20     rephrase it.  Is that understandable?
21 A.  Yep.
22 Q.  And please give a verbal answer to every question so
23     the court reporter can take it down, and try to stay
24     away from words like uh-huh, so either say yes, no, or
25     some other complete answer.  Is that understandable?

Page 7

1  A.  Yes.
2  Q.  Will you please tell us your name?
3  A.  Mary Elizabeth Betsy Reich.
4  Q.  And your current employer?
5  A.  Huntington Insurance.
6  Q.  And that's located in what city?
7  A.  Birmingham.
8  Q.  And approximately how long have you worked there?
9  A.  It'll be two years this March 1st.
10 Q.  And is that an independent insurance agency?
11 A.  It is.
12 Q.  Prior to that had you been employed by Nationwide
13     Insurance Company?
14 A.  Correct.
15 Q.  And what was your job for Nationwide?
16 A.  I was an agent.
17 Q.  And where was your office?
18 A.  It was in Birmingham, Bloomfield and Birmingham.
19 Q.  Different locations?
20 A.  Yes.
21 Q.  Now this case pertains to a lawsuit concerning a life
22     insurance policy that was issued on the life of Gary
23     Lupiloff.  Do you recall selling an insurance policy
24     to Gary Lupiloff, insuring Gary Lupiloff?
25 A.  Yes.

Page 8

1         MARKED FOR IDENTIFICATION:
2         DEPOSITION EXHIBIT 1
3         3:20 p.m.
4  BY MR. SCHMIDT:
5  Q.  Let me hand you what's been marked as Exhibit 1.  Can
6      you tell us what that document is?  It's titled
7      something.  What's it titled?
8  A.  New Account Suitability Form.
9  Q.  And is that a document that you recall using as a
10     Nationwide agent?
11 A.  I don't recall but it's obviously a form of
12     Nationwide's.
13 Q.  This occurred back in 2003 or so?
14 A.  I don't recall.  I was looking to see if there was a
15     date.
16         MR. BREDELL: You don't have extra copies
17 of exhibits?
18         MR. SCHMIDT: No, I don't.
19         MR. BREDELL: I just want to see it.
20         MR. SCHMIDT: You guys got all these
21 things.
22         MR. BREDELL: I just wanted to see which
23 one you're looking at.
24         MR. FISHMAN: Here you go.
25         MR. BREDELL: Thank you.

MARY ELIZABETH REICH
January 4, 2012

Page 9

1    MARKED FOR IDENTIFICATION:
2    DEPOSITION EXHIBIT 2
3         3:21 p.m.
4 BY MR. SCHMIDT:
5 Q.  Then I'll hand you what's marked as Exhibit 2, and can
6      you tell us what that is?
7 A.  It says New Account Suitability Form Addendum.
8 Q.  Okay.  And once again, do you recall that being a
9      Nationwide form that you were familiar with or not?
10 A.  I don't recall, but it appears to be a Nationwide
11     form.
12 Q.  Is that your handwriting on there?
13 A.  It is.
14 Q.  And going back to Exhibit Number 1, is anything on
15     that your handwriting?
16 A.  Yes.
17 Q.  I think there's an attachment to Exhibit 1?
18 A.  Yes.
19 Q.  The last page, which these have Bates Numbers on them,
20     the last page being Bates Numbered 411, the last page
21     of Exhibit 1.  Can you tell us, if you recall, what
22     that document is?
23 A.  That would be an attached -- it's a summary sheet
24     describing the purpose of the life insurance policy.
25 Q.  Okay.  So if you recall from this transaction, was

Page 10

1      this kind of a different kind of a transaction for a
2      life insurance policy than you normally would be
3      involved with?
4 A.  Could you rephrase that?  I don't --
5 Q.  Well, the fact that you have two people that are
6      apparently unrelated wanting to purchase a life
7      insurance policy, is that something that was normal or
8      different?
9 A.  It's not -- I wouldn't say abnormal but it's
10     different.
11 Q.  Okay.  In those situations did Nationwide require some
12     additional documentation as to what the transaction is
13     about for their underwriting purposes?
14 A.  Correct, yes.
15 Q.  And is that why the new account suitability forms
16     would be filled out for that situation?
17 A.  No.  Those would be filled out with every situation.
18 Q.  How about that memo that's Page 411; is that something
19     that would be pertaining to that type of a situation?
20 A.  It appears that that is something additional that they
21     did ask for, yes.
22 Q.  All right.  Do you recall whether there was actually
23     some type of a legal type document that you had to
24     obtain from either Mr. Lupiloff or Mr. Keene regarding
25     their transaction to send to Nationwide Underwriting?

Page 11

1 A.  Yes.
2 Q.  And you have not seen a copy of that lately?
3 A.  No.
4 Q.  And do you have any recall, would you have obtained
5      that either -- do you remember who you got that
6      document from?
7 A.  I do not.
8         MR. DANZIG:  Want to identify what the
9      document was?
10        THE WITNESS:  I can't other than it was a
11     legal written document.
12 BY MR. SCHMIDT:
13 Q.  And your understanding was that was supposed to
14     explain the business deal between Mr. Lupiloff and
15     Mr. Keene?
16 A.  Correct, the arrangement for needing life insurance.
17 Q.  You don't have any records from your job as a
18     Nationwide agent, do you?
19 A.  No.  Everything had to be supplied back to them.
20 Q.  Okay.  So is it your understanding that after
21     Nationwide received this documentation, they said to
22     go ahead and proceed to have an application prepared
23     for this policy?
24 A.  This would have gone in with the application.
25        MARKED FOR IDENTIFICATION:

Page 12

1        DEPOSITION EXHIBIT 3
2             3:24 p.m.
3 BY MR. SCHMIDT:
4 Q.  Okay.  Let me hand you what's marked as Exhibit 3 and
5      ask if you can tell me what that is?
6 A.  This would be -- this looks like the application.
7 Q.  Okay.  And is that signed by Mr. Lupiloff?
8 A.  I can see it's all filled out by him, it's his
9      writing, and it is signed by him, yes.
10 Q.  You're able to recognize his handwriting?
11 A.  Yeah.
12 Q.  And what's the date of the application; is it dated?
13 A.  It's dated November looks like -- looks like
14     November 11th, 2003.
15 Q.  And the type of policy that was being applied for,
16     what was it?
17 A.  It was a term policy.
18 Q.  A term life policy?
19 A.  A term life insurance policy, yes.
20 Q.  And on whose life was it being issued?
21 A.  The insured life was Gary Lupiloff, Gary Harmon
22     Lupiloff.
23 Q.  And Gary Harmon Lupiloff was a client of yours as an
24     insurance agent?
25 A.  Yes.

MARY ELIZABETH REICH
January 4, 2012

Page 13

1  Q.  And you knew him before this transaction?
2  A.  Yes.
3  Q.  Had you sold him any other insurance before this?
4  A.  I don't recall if before this -- I don't recall.
5      Other insurance was sold to him, but I don't recall if
6      it was prior to this.
7          MARKED FOR IDENTIFICATION:
8          DEPOSITION EXHIBIT 4
9          3:26 p.m.
10 BY MR. SCHMIDT:
11 Q.  Now let me show you Exhibit 4, if you can tell me what
12     that is?
13 A.  I don't know the front sheet what that is, but this
14     appears to be a copy of the actual policy.
15 Q.  And that's the policy issued on the life of Gary
16     Lupiloff?
17 A.  That's what it says, correct.
18 Q.  Included on that policy, the page as a matter of fact
19     you have it opened to right there, Page 304, does that
20     show the premiums for that policy?
21 A.  That does.
22 Q.  And it shows his age at the issuance was 46 years old?
23 A.  Yes.
24 Q.  And it looks like for the first 10 years, the premium
25     was $1,000 --

Page 14

1  A.  $1,030.
2  Q.  And that was each year for the first 10 years?
3  A.  Yes.
4  Q.  And after that it goes up?
5  A.  It spikes up based on your age.
6  Q.  And from then on it spikes up every so often higher
7      and higher. By age 71, how much is that?
8  A.  So at age 71, it would have been $52,915.
9  Q.  For a year?
10 A.  Correct.
11 Q.  And then by 78 it's $106,480?
12 A.  Yep.
13 Q.  Now were you aware there came a time when Mr. Lupiloff
14     advised that he wanted to change the beneficiary and
15     the ownership of the policy?
16 A.  Can you restate that?
17 Q.  Did there come a time when you learned that --
18 A.  It was two questions.
19 Q.  Okay, good. Was there a time that came that you
20     learned that Mr. Lupiloff or Mr. Keene wanted to
21     change the ownership of the policy?
22 A.  Yes.
23         MARKED FOR IDENTIFICATION:
24         DEPOSITION EXHIBIT 5
25         3:29 p.m.

Page 15

1  BY MR. SCHMIDT:
2  Q.  Let me hand you what's been marked as Exhibit 5, and
3      when that happened, who approached you, if you recall,
4      was it Mr. Lupiloff or Mr. Keene, about changing the
5      ownership?
6  A.  I don't recall who made the first approach.
7  Q.  Okay. But you do recall talking to both Mr. Keene and
8      Mr. Lupiloff about that?
9  A.  Yes.
10 Q.  And in Exhibit Number 5 there, we have several
11     documents. Do you recall which document was first,
12     the change of beneficiary or the change of ownership?
13 A.  I don't recall but it would have made sense to be the
14     change of ownership.
15 Q.  The change of ownership form is Page 175?
16 A.  Yes.
17 Q.  And that changes the owner of the policy from
18     Mr. Lupiloff to Mr. Keene?
19 A.  Correct.
20 Q.  Do you recall discussing that with Mr. Lupiloff before
21     that occurred?
22 A.  Yes.
23 Q.  And what was your discussion with Mr. Lupiloff about
24     that?
25 A.  Just the typical protocol would be to explain what the

Page 16

1      ramifications were of changing ownership.
2  Q.  Such as?
3  A.  You no longer control the policy.
4  Q.  So would you say -- did you give him information
5      advising him not to do it or just telling him what the
6      problems would be if he did do it?
7  A.  I don't recall other than to say that I would
8      typically with any client, I would advise against it.
9  Q.  And in response to your discussion, did Mr. Lupiloff
10     advise that he still wanted to proceed?
11 A.  Correct.
12 Q.  And that form, Page 175, that's signed by
13     Mr. Lupiloff?
14 A.  Correct.
15 Q.  Okay. And then there's another form that's part of
16     the exhibit. It's actually a two-page form, 170 and
17     171. That's the change of beneficiary?
18 A.  Correct.
19 Q.  And the beneficiary, the primary beneficiary is
20     William Keene?
21 A.  Correct.
22 Q.  And the contingent beneficiary is Jennifer Keene?
23 A.  Correct.
24 Q.  And that document is signed by Mr. Lupiloff?
25 A.  Correct.



MARY ELIZABETH REICH
January 4, 2012

Page 17

1  Q.  And it's also signed by you?
2  A.  Correct.
3  Q.  And the change of beneficiary, that's dated 4-4-07,
4      the signatures?
5  A.  4-4-07.
6  Q.  And that's the same day that the change of ownership
7      is dated?
8  A.  Correct.
9  Q.  So do you recall that all happening at the same time?
10 A.  I do not.
11 Q.  And then you would have eventually sent those to
12     Nationwide, correct?
13 A.  Correct.
14 Q.  The first page of Exhibit 5, Page 169, is that the fax
15     from you to Nationwide Underwriting?
16 A.  That's correct.
17         MR. DANZIG:  Mike, 169 did you say?
18         MR. SCHMIDT:  Yes.
19         MR. DANZIG:  Thank you.
20 BY MR. SCHMIDT:
21 Q.  And that's sending them the two different forms?
22 A.  Correct.
23 Q.  The change of beneficiary and the change of ownership
24     forms?
25 A.  It says six pages, so I'm guessing correct.

Page 18

1  Q.  Do you know if sometime -- let me ask you this.  Do
2      you know who was paying the premiums on that policy up
3      until that time, if you know?
4  A.  Two different people.
5  Q.  Who was paying them?
6  A.  Mr. Lupiloff was paying and Mr. Keene had paid some.
7      So I'm not sure who paid how much.
8  Q.  Who would have kept the record as to who was paying
9      that, though?
10 A.  Nationwide.
11 Q.  The agent office or Nationwide's office?
12 A.  Nationwide.  The bill is sent directly, you know, to
13     the client, and they send it in or call it in or
14     whatever they do.
15 Q.  Okay.  Did there come a time that you're aware of
16     where the payor of the policy was changed to Mr. Keene
17     on Nationwide's records?
18 A.  I don't recall when, but I do know that it had
19     changed.
20 Q.  And it was changed so that Keene was then the person
21     who was paying the premiums?
22 A.  Correct, but I'm not sure at that point how much was
23     paid.
24 Q.  According to Nationwide's records, that happened on --
25     the change was on October 9, '07.  Does that sound

Page 19

1      right to you or not?
2  A.  I don't know.
3  Q.  You have no idea?
4  A.  He did that directly, I believe, through Nationwide.
5  Q.  So you weren't part of that transaction?
6  A.  Correct.
7          MR. DANZIG:  Which change are you referring
8  to, Mike?
9          MR. SCHMIDT:  Change of payor.
10         MR. DANZIG:  Thank you.
11 A.  I don't recall being part of that transaction.
12 BY MR. SCHMIDT:
13 Q.  During the course of this policy when it was in force,
14     did you ever get any calls from Mr. Keene asking if
15     the premiums were being paid?
16 A.  Yes.
17 Q.  How often would you get those?
18 A.  About once a month.
19 Q.  And that's something you would have to check for him?
20 A.  No.  We told him we couldn't advise him of that.
21 Q.  You would direct him who to call for that?
22 A.  You know, it would be myself or my staff.  I know when
23     I spoke with him, I would say, you know, we could not
24     tell him that.
25 Q.  Would you tell him who to call?

Page 20

1  A.  Because he was not the owner of the policy at that
2      time, and if it was  -- you know, I think protocol
3      with Nationwide is if it cancelled, I imagine the
4      beneficiary gets notified.  I don't even know.
5  Q.  Okay.  Do you know if he called you after he became
6      the owner to see if the premiums were being paid?
7  A.  I don't recall.
8  Q.  Did you ever -- let me ask you, did you hear about
9      Mr. Lupiloff being murdered?
10 A.  Yes.
11 Q.  And how did you hear that?
12 A.  I received a call from one of my prior staff who saw
13     it on the news.
14 Q.  At that time were you still working for Nationwide?
15 A.  I was not.
16 Q.  Did you receive a call from Mr. Keene in regard to
17     Mr. Lupiloff being murdered?
18 A.  Yes.
19 Q.  When did you get that call?
20 A.  That same next morning I guess it was.
21 Q.  And did you speak to Mr. Keene or was it a voicemail?
22 A.  I received a voicemail, and then I called him back.
23 Q.  And do you recall what Mr. Keene had to say about
24     whatever?
25         MR. HOLTZ:  I was just unclear when the



MARY ELIZABETH REICH
January 4, 2012

Page 21

1    next morning was. Was it the morning after the murder
2    or the morning after the call?
3  BY MR. SCHMIDT:
4  Q.  When you say next morning, what --
5  A.  I'm not certain if it was the morning after the murder
6    occurred. I got a call simultaneously that I took
7    first from a staff person telling me that he had just
8    been murdered the night before, so I'm guessing. But
9    again, I don't know what the exact date was.
10  Q.  Your best memory is it would have been the day after
11    the murder?
12  A.  It was very close if it wasn't the day after.
13  Q.  Okay. And do you recall what the message was from
14    Mr. Keene?
15  A.  I don't recall the full message.
16  Q.  And do you recall what the phone call was about? Did
17    you call him back?
18  A.  I called him back. He had left me a message. I
19    called him back. He was essentially letting me know
20    that Gary had been killed, and he wanted to remind me
21    about the life insurance policy and wanted to meet
22    with me to go through the process.
23  Q.  And what did you tell him?
24  A.  I told him I was no longer the agent on the policy,
25    and I referred him to the new agent who was servicing

Page 22

1    my book at that time.
2  Q.  And do you recall who the new agent was?
3  A.  Yes, Robert Pliskow, P-L-I-S-K-O-W.
4  Q.  Did you ever speak to Mr. Pliskow about Mr. Keene
5    calling him up or about the policy?
6  A.  Did I what?
7  Q.  Did you follow up with Mr. Pliskow at all about that
8    issue?
9  A.  I did. I called Mr. Pliskow and let him know he would
10    be receiving a call, and I can't recall, but I believe
11    he said he already heard from him.
12  Q.  Did you have any further contact with Mr. Keene after
13    that?
14  A.  Yes.
15  Q.  What other contact did you have?
16  A.  He's called me several times.
17  Q.  About what?
18  A.  I don't recall entirely. He's called me to inquire
19    about the process and just to fill me in on, you know,
20    his, you know, talking about, you know, what his take
21    on the whole situation is and etcetera, etcetera.
22  Q.  And would those calls have been around the time of the
23    murder or after that time?
24  A.  Well, obviously after.
25  Q.  But how many, like -- okay -- that was July 13 of

Page 23

1    2010. So would it have been just a month or two
2    later, six months later, or what are we talking about?
3  A.  I don't recall how often. There were numerous calls.
4  Q.  How many calls approximately were there?
5  A.  Oh, gees, I can't recall.
6  Q.  More than 10?
7  A.  Yes.
8  Q.  More than 20?
9  A.  I don't recall.
10  Q.  Have you had any calls from anyone on behalf of the
11    Lupiloff Family Estate?
12  A.  No.
13  Q.  Other than the document we discussed a while ago, this
14    legal document that you recall you obtained from
15    Lupiloff or Keene about their transaction, did you
16    ever see any other documents regarding their business
17    transactions other than that document?
18  A.  No.
19  Q.  And your best memory of the transaction or situation
20    would be that memo that you did as part of Exhibit 1,
21    Page 411; that's your best, a summary of your best
22    memory of what their transaction was?
23  A.  Correct.
24       MR. SCHMIDT: Okay. That's all the
25    questions I have. Thank you.

Page 24

1            EXAMINATION
2  BY MR. DANZIG:
3  Q.  Ms. Reich, my name is Jeffrey Danzig, I represent the
4    Lupiloff Estate, and I have some questions for you.
5    What I'd like to do is first go over some of the
6    things that have already been discussed and then maybe
7    ask you some new questions.
8       As an agent for Nationwide Insurance
9    Company, I assume there's some routine protocols that
10    you engage in when you bind over a life insurance
11    policy, especially a term life policy, correct; you go
12    through certain routines.
13  A.  For insurance policies.
14  Q.  All insurance policies?
15  A.  Yes.
16  Q.  And when there are change requests for those policies,
17    there is certain other protocols that you follow,
18    correct?
19  A.  There would be, yes.
20  Q.  Is it your experience that when a change of ownership
21    or a change of beneficiary request takes place, that
22    there would be a home office endorsement from the
23    company?
24  A.  What do you mean by home office endorsement?
25  Q.  They approve it, they endorse it, they sign off on it?

MARY ELIZABETH REICH
January 4, 2012

Page 25

1   A.   Certainly.
2   Q.   Okay.  And should that happen on both the change of
3        ownership as well as the change of beneficiary?
4   A.   Yes.
5   Q.   Okay.  Are you aware after looking at the forms that
6        we've shown you or counsel has shown you today whether
7        or not there was an endorsement from Nationwide on the
8        change of ownership and the change of beneficiary
9        forms?
10  A.   I don't recall.
11  Q.   If you look at Exhibit 5, can you tell me whether or
12       not on the change of ownership there's a company
13       endorsement?
14  A.   These are just the applications, so no.
15  Q.   There is a location in each form, just look at the
16       change of ownership form for a minute, there's a
17       location for home office only, correct?
18  A.   Correct.
19  Q.   That's usually where a signature appears of a company
20       representative endorsing the change, correct?
21            MR. SCHMIDT:  I object.  There's no
22       foundation she knows how that works.
23  A.   I don't know once I send something in what happens.
24  BY MR. DANZIG:
25  Q.   As an agent for Nationwide, you're not familiar with

Page 26

1        how the home office endorses and confirms policy
2        changes; is that what you're saying?
3   A.   I'm not aware of what steps they take.
4   Q.   I'm not asking you what steps they take.  I'm asking
5        you whether or not they endorse changes in policies
6        that you put through for your clients?
7            MR. SCHMIDT:  Same objection.  I don't
8        think there's any foundation she knows how that works.
9            MR. DANZIG:  Objection is noted counsel.
10  BY MR. DANZIG:
11  Q.   I'll take your answer.
12  A.   I would say that because we have to have paperwork
13       signed, that would imply that they would have to make
14       an approval.  Otherwise -- that's all I would know.
15  Q.   Can I see the document, please?
16  A.   Sure.
17  Q.   Would you look at the change of beneficiary
18       designation form that was filled out and signed by you
19       and tell me on Bates Number 0171 whether there's an
20       endorsement that appears in the proper location where
21       you would normally expect one on that document?
22            MR. SCHMIDT:  Same objection.  There's no
23       foundation she knows how that works.
24            MR. DANZIG:  I'm not asking her how it
25       works.

Page 27

1   BY MR. DANZIG:
2   Q.   I'm asking you if there appears to be an endorsed
3        signature on that document at the bottom of the page?
4            MR. FISHMAN:  She got the question.
5            MR. DANZIG:  I'm just clarifying it.
6   A.   I don't even know where it would be on this particular
7        form.
8   BY MR. DANZIG:
9   Q.   I'll show you.  It says in a box on the bottom of the
10       page:  Agreed to for Nationwide Life Insurance
11       Company, Nationwide Life and Annuity Insurance Company
12       by Thomas Barnes, Secretary.
13            And then to the right of that box, there's
14       a signature.  Did I state that fairly?
15  A.   Yes.
16  Q.   Do you see the signature?
17  A.   I do.
18  Q.   Does that appear to be an endorsement by the secretary
19       of Nationwide?
20            MR. SCHMIDT:  Objection, no foundation she
21       knows what it's on there for.
22            MR. DANZIG:  I just asked whether it
23       appears to be a signature of the individual stated.
24            MR. SCHMIDT:  There's no foundation she
25       would know whether that's his signature or not.  This

Page 28

1        is not part of her job.
2   A.   I do not know whose signature that is.
3   BY MR. DANZIG:
4   Q.   Okay.  Notwithstanding the fact that you don't know
5        whose signature that is, is that the location where
6        there is typically an endorsement by the company?
7            MR. SCHMIDT:  No foundation.
8   BY MR. DANZIG:
9   Q.   You can answer.
10  A.   After that paperwork is filled out by me, we do not
11       receive anything back, so I would not see if it was
12       endorsed or not.
13  Q.   Okay.  Notwithstanding the fact whether you get a
14       document back and see whether it's endorsed or not,
15       are you telling me that you're not aware of whether or
16       not Nationwide, the home office endorses changes in
17       policies that you put through?
18  A.   They have to make approval of changes in policies.
19  Q.   That's my point, and by approving, you'd normally see
20       someone -- strike that.
21            By approving, you would think that someone
22       signs off on it in one way or another?
23  A.   I don't know how they do that.
24  Q.   Okay.  You would agree with me, would you not, that
25       when looking at the change of beneficiary designation

**BIENENSTOCK**
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

MARY ELIZABETH REICH
January 4, 2012

Page 29

1 and the change of ownership designation, there's a
2 signature of endorsement in the beneficiary change but
3 not one in the ownership change; is that fair?
4         Do you understand my question?
5 A. I do.
6 Q. Okay, good. I wanted to make sure it was clear.
7         MR. SCHMIDT: No foundation. She doesn't
8 know where it goes or if it's supposed to be there or
9 not. I don't know how she could answer that question.
10 BY MR. DANZIG:
11 Q. Would you agree there's a signature of endorsement on
12 the change of beneficiary but not one on the change of
13 ownership?
14 A. On these particular forms, you're correct.
15 Q. Okay. Does that make sense to you as an agent for
16 Nationwide that there would be an endorsement on one
17 where there's a change of beneficiary request but not
18 one on the change of ownership request?
19         MR. SCHMIDT: I'm just going to object.
20 There's no foundation that that's an endorsement. She
21 doesn't even know what that is. You're making her
22 assume something she doesn't know what that is or what
23 that's talking about.
24         MR. DANZIG: So your objection is noted.
25         MR. SCHMIDT: I object to the form of the

Page 30

1 question.
2         MR. DANZIG: Good.
3 BY MR. DANZIG:
4 Q. Can you tell me, does it make sense to you?
5 A. I don't think this is a matter of what makes sense or
6 not. I don't know what their process is.
7 Q. You said previously, I think you said it this way, it
8 makes sense that the change of ownership would come
9 first and then a change of beneficiary would come
10 second?
11 A. Or simultaneously.
12 Q. Does it make sense to you that change of ownership
13 might have to take place before you change a
14 beneficiary?
15 A. It doesn't have to.
16 Q. If you're changing ownership, does it make sense that
17 it would go one and then the other?
18 A. It doesn't have to.
19 Q. Okay. In this instance do you believe that it was
20 simultaneous?
21 A. I don't recall.
22 Q. You were present on April 7th of 2007 when these
23 changes were made, right?
24 A. I was.
25 Q. Where were you at the time?

Page 31

1 A. I don't recall which office.
2 Q. You were in one of your offices?
3 A. We were in, yeah, in an office.
4 Q. Okay. It could be any office. What I'm wondering is
5 if you were in one of your offices?
6 A. It could have been Gary's office as well.
7 Q. Okay. Where was Gary's office?
8 A. I don't recall at that point which office he was in,
9 if it was Pontiac or -- he had several locations over
10 the years.
11 Q. Let's go back.
12 A. I'm over 50. I'm sorry.
13 Q. It's okay. So am I and I do the same thing.
14         The original application was in 2003 for
15 this term life insurance policy, right?
16 A. Yes.
17 Q. And I think you were asked whether or not you knew
18 Gary Lupiloff before this term life insurance policy
19 was applied for, and I think you said you did?
20 A. Yes.
21 Q. Would it be fair to state that you had binded some
22 insurance for him in the past, maybe some auto
23 insurance?
24 A. I don't recall if it was prior to this or not.
25 Q. But you knew him?

Page 32

1 A. Oh, yeah.
2 Q. In a business sense?
3 A. Yeah, I knew him because of his business as well.
4 Q. Okay. And would you recall knowing him in relation to
5 your work as an agent for Nationwide having done some
6 business with him in the past?
7 A. Again, I don't know what came first as far as policies
8 with him.
9 Q. Okay. So you're not sure whether or not you bound any
10 previous policies for Gary Lupiloff before 2003?
11 A. I don't remember.
12 Q. Okay. But you think you knew him before 2003?
13 A. Oh, I did know him.
14 Q. And did you like him?
15 A. Yeah.
16 Q. Did you get along with him?
17 A. Sure.
18 Q. It was a cordial, congenial relationship?
19 A. Uh-huh.
20 Q. Yes?
21 A. Yes.
22 Q. Got along with him?
23 A. Yes.
24 Q. Okay. When you had conversations with him, your
25 conversations were smooth and easy?



MARY ELIZABETH REICH
January 4, 2012

Page 33

1  A.  Yes.
2  Q.  Meaning you didn't have arguments or fights about
3      differences of opinion?
4  A.  No.
5  Q.  Okay.  And you gave him advice as an agent as one
6      normally would when he needed it?
7  A.  Well, again, I don't know what prior to that we had
8      partaken in for insurance.
9  Q.  Okay.  Now when this transaction came about in 2003,
10     you felt as an agent this was an unusual transaction,
11     it was different?
12 A.  Different.  It's not unusual because obviously
13     Nationwide had forms to allow it.
14 Q.  Okay.  But it was different, and tell me how it was
15     different in your mind.
16 A.  Different because it's a business transaction, is the
17     basis for the life insurance, and so not two related
18     persons.  To me that was different.  It's not husband
19     and wife.  It's not, you know, parents and children.
20 Q.  So the fact that the term policy of life insurance was
21     being bound as a business transaction amongst
22     unrelated persons made it different?
23 A.  Yes.
24 Q.  Okay.  And the company underwriting required
25     additional verification of the nature of their

Page 34

1      relationship?
2  A.  Correct.
3  Q.  They wanted some verification before approval,
4      correct?
5  A.  That would be my understanding, yes.
6  Q.  Because the company, as far as you knew, didn't want
7      to bind the policy until they had assurances that this
8      was on the up-and-up, true?
9  A.  They have to show insurable interest.
10 Q.  And basically, if you would agree or disagree with me,
11     the company is doing its due diligence as far as
12     whether or not it would be appropriate to bind this
13     policy over between these two individuals?
14 A.  That's their job, I guess.
15 Q.  You would agree that's what they're doing?
16 A.  Underwriter's position.
17 Q.  Would you agree with me that if the change of
18     ownership is taking place, the company should likely
19     do its due diligence to determine and verify that this
20     is an appropriate transaction, do you agree?
21         MR. SCHMIDT:  No foundation she knows what
22     underwriting does.
23         MR. BREDELL:  Or appropriate for who?  I
24     guess I object to the form of the question.
25 BY MR. DANZIG:

Page 35

1  Q.  Okay.  Do you understand my question?  They're making
2      objections, and you can answer if you understand the
3      question.
4  A.  Rephrase it.
5  Q.  Sure.  I started with the underwriting process and
6      wanting verification of the nature of their
7      relationship.  Now that years later the policy is
8      intending to change in terms of ownership and
9      beneficiary, would you agree that standard format
10     would be the company would want to also exercise due
11     diligence and make sure this transaction is
12     appropriate?
13         MR. SCHMIDT:  Same objection, no foundation
14     she knows how that works.
15 A.  I called the underwriter.  They provided the forms
16     that needed to be filled out, and I don't know what
17     they do beyond that to make, you know, sure that
18     that's all they need.
19 BY MR. DANZIG:
20 Q.  How many years were you an agent for Nationwide?
21 A.  For 14 years.
22 Q.  And in those 14 years, you never learned about the
23     company's desire for due diligence and due process in
24     --
25 A.  I think that's textbook requirement of life insurance

Page 36

1      that you should have insurable interest, and they have
2      their own procedures that I'm not -- for underwriting
3      a person's health, for everything.  So that's not part
4      of my job.  I just provide what they require me to
5      provide.
6  Q.  In your 14 years of experience as an agent for
7      Nationwide, did you learn that they like to do things
8      a certain way, and they would require you to do
9      things, certain things in a certain way, or was it
10     just --
11 A.  In my 14 years at Nationwide, the forms, the
12     procedures, the protocol changed several times.  So
13     where they were in that particular year could have
14     been different the next year.
15 Q.  Okay.  Had you ever met Bill Keene in person before
16     the change request was made?
17 A.  Yes.
18 Q.  In person or on the phone or both?
19 A.  In person, on the phone, both.
20 Q.  What was the context in which you met him in person?
21 A.  He had stopped in my office in the very beginning of
22     the whole process.
23 Q.  When you first met him, did you have a cordial
24     relationship with him?
25 A.  Yes.

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

9 (Pages 33 to 36)

MARY ELIZABETH REICH
January 4, 2012

Page 37

1 Q. Did you have any difficulties with him in any way?
2 A. No, just that he was constantly calling, and we
3    weren't allowed to really share with him the
4    information.
5 Q. Because he wasn't the owner?
6 A. Correct.
7 Q. And you'd want to share the information with the owner
8    as opposed to a beneficiary at that time?
9 A. Correct. He would call to ask various questions and
10    things that I could not share with him.
11 Q. When Gary Lupiloff first applied for the policy, did
12    he tell you that one of his interests was in
13    protecting his children as contingent beneficiaries?
14 A. Yes.
15 Q. Was that a significant concern of his in terms of the
16    life insurance policy he was binding over?
17 A. I don't recall how significant but it was a concern as
18    stated in the memo.
19 Q. And it stated what in the memo that you're referring
20    to? I don't know what memo you're referring to. In
21    the document that's right in front of you?
22 A. Yes, it was, you know, attached, the initial intent.
23 Q. That's the exhibit, the back exhibit to Exhibit 1,
24    correct?
25 A. Page 0411.

Page 38

1 Q. Thank you. And it indicates there that it is his
2    desire to have his children as the contingent
3    beneficiaries, correct?
4 A. Uh-huh.
5 Q. Yes?
6 A. Yes.
7 Q. That's also on the application that he made out,
8    correct?
9 A. That's correct.
10 Q. And it's also on the formal application, Exhibit 3,
11    where he signed the application in writing where he
12    indicated his children were going to be the contingent
13    beneficiaries, correct?
14 A. Correct.
15 Q. Do you recall anything in particular that Gary
16    Lupiloff would have said to you about his children and
17    his desire to insure their interests?
18 A. No.
19 Q. Other than the fact that it appears on these documents
20    that we've referenced, there is nothing extraneous
21    that you recall independently of the documents in that
22    regard?
23 A. No.
24 Q. I want to understand the context -- strike that.
25    I want to show you a document. This is

Page 39

1    dated October 19, 2006. It's on Nationwide
2    letterhead, it's Bates 225, and if I can stand over
3    you for a moment. I'll let you read it first.
4    First of all, it's a letter that's cc'd to
5    you as the agent, correct?
6 A. Yes, I see that.
7 Q. And it's dated October 19th, 2006?
8 A. Yep.
9 Q. At face value does it appear to be a request or
10    response to a request for information about
11    beneficiaries on the policy?
12 A. Correct.
13 Q. Someone, perhaps Mr. Lupiloff or somebody else, is
14    making an inquiry about who the beneficiaries are?
15 A. Correct, it appears that way.
16 Q. Do you recall this document?
17 A. No.
18 Q. Do you recall receiving the document?
19 A. No.
20 Q. This is prior to the change request in 2007 of April,
21    correct? The change request I'll tell you was in
22    April of 2007.
23    MR. SCHMIDT: 4-4-07 it's dated.
24 A. Oh, I'm sorry, you're right, yep.
25 BY MR. DANZIG:

Page 40

1 Q. So about six months before the change request,
2    information is coming to Mr. Lupiloff about who the
3    beneficiaries are on this policy, correct?
4 A. Right.
5 Q. Do you have any recollection of the events surrounding
6    this document?
7 A. I do not.
8 Q. From what you knew of Gary Lupiloff, was he someone
9    who might forget who the beneficiaries were of his own
10    life insurance policy?
11 A. He could have called and we could have looked those
12    up.
13 Q. Right.
14 A. Yeah.
15 Q. Does it strike you as unusual that someone is making
16    an inquiry about who the beneficiaries are of this
17    policy six months before a change request is going to
18    be made?
19 A. I would guess so.
20 Q. When you were approached by Gary Lupiloff -- strike
21    that.
22    Do you know who first approached you
23    regarding a change request?
24 A. I do not recall.
25 Q. It could have been either/or; you're not sure as you

MARY ELIZABETH REICH
January 4, 2012

Page 41

1    sit here today who made or initiated the request?
2    **A.  Who made the first request, no.**
3    Q.  It could have been either/or, Mr. Keene or
4      Mr. Lupiloff?
5    **A.  Correct.**
6    Q.  You're not sure as you sit here today?
7    **A.  I don't remember who first broached the subject.**
8    Q.  Okay.  And wherever this meeting took place, there was
9      a meeting on April 4th, 2007, whereby the change
10     request for both ownership and beneficiary was placed
11     into action by way of forms filed and signed?
12   **A.  Signed.**
13   Q.  And as you sit here today, you simply can't recall
14     where that took place?
15   **A.  I don't recall.**
16   Q.  Did you have any private conversations with Gary
17     Lupiloff before the change requests were put into
18     effect?
19   **A.  Define "private".**
20   Q.  Did you have a conversation in any location where
21     Mr. Keene wasn't present where you were advising
22     Mr. Lupiloff of what the effect of the change would
23     be?
24   **A.  Yes.**
25   Q.  Okay.  Do you recall Mr. Keene being separate and

Page 42

1    apart from that conversation?
2    **A.  Yes.**
3    Q.  Do you recall where that took place?
4    **A.  There were several conversations.  I don't recall**
5      **where they took place.**
6    Q.  Were any of those conversations before the meeting of
7      April 4th, 2007?
8    **A.  Yes.**
9    Q.  So is it then fair to state that you were appraised of
10     a change request before the actual date of April 4th,
11     2007?
12   **A.  Oh, yes.**
13   Q.  And how long had you known that that was going to take
14     place?
15   **A.  I don't recall.**
16   Q.  A month, six months, a year?
17   **A.  I don't recall.**
18   Q.  Okay.  Do you have a belief that it was longer than a
19     month, if you know?
20   **A.  I don't recall.**
21   Q.  Okay.
22   **A.  It could have been, it could not have been.  I don't**
23     **really recall.**
24   Q.  Okay.  Do you have an understanding as to who made the
25     first request to you, whether it was Mr. Lupiloff or

Page 43

1    Mr. Keene?
2    **A.  I don't remember.**
3    Q.  Do you recall speaking with Mr. Lupiloff on the phone
4      before your meeting of April 4th, 2007?
5    **A.  Certainly.**
6    Q.  Do you recall him expressing to you his desire to
7      retain his kids as contingent beneficiaries?
8    **A.  I don't recall that.**
9    Q.  Do you recall Mr. Lupiloff telling you that he had
10     some concerns with regards to any change request that
11     was going to be made?
12   **A.  He had no concerns regarding the change.**
13   Q.  Okay.  He never expressed to you any concerns over the
14     effectuation of the change of ownership or
15     beneficiary?
16   **A.  No.**
17   Q.  What concerns did you have, if any, because you
18     indicated previously that --
19   **A.  Just simply that you would lose control over the**
20     **policy, as well as who the beneficiaries could be.**
21   Q.  Is that all you said to him?
22   **A.  Yes.**
23   Q.  Did you tell him specifically that his kids would lose
24     out as contingent beneficiaries if he made this
25     change?

Page 44

1    **A.  I don't know how specific.  I don't recall the exact**
2      **words.**
3    Q.  Did it appear to you at any time in any of these
4      conversations over the phone or in person that
5      Mr. Lupiloff was being compelled to make these
6      changes?
7    **A.  What do you mean compelled?**
8    Q.  Forced, coerced?
9    **A.  No, not to my knowledge, no.**
10   Q.  Okay.  No such indications were made or expressed to
11     you by Mr. Lupiloff?
12   **A.  No.**
13   Q.  Were both Mr. Keene and Mr. Lupiloff together in some
14     environment that you don't recall on April 4th, 2007?
15   **A.  No.**
16   Q.  They were both not present on that date?
17   **A.  They were both present separately on that date.**
18   Q.  Okay.  What do you mean separately?  I'm not sure I
19     understand what that means.
20   **A.  They were not in the room together.  I did not meet**
21     **with them each at the same time.**
22   Q.  Okay.  Were they in the same office environment, or
23     was somebody on the phone and someone physically
24     present?
25   **A.  They were both eventually physically present.**



MARY ELIZABETH REICH
January 4, 2012

Page 45

1  Q.  When you say eventually, does that mean one was there
2      before the other?
3  A.  Correct.
4  Q.  Who was there first?
5  A.  But I don't even recall where the signatures took
6      place for Gary.  I don't remember if we did that at
7      his office because we met several times or if it was
8      in my office.  I don't recall that.
9  Q.  Do you recall being --
10 A.  But he was present.
11 Q.  Gary Lupiloff?
12 A.  Yes.  It's protocol to have the person sign in front
13     of me, yes.
14 Q.  Do you know for a fact that that took place?
15 A.  Yes.
16 Q.  That Gary Lupiloff signed this document?
17 A.  Yes.
18 Q.  The change request for ownership and beneficiary?
19 A.  Yes.
20 Q.  Can I have Exhibit 5, please.
21         Did you witness both the change of
22     ownership and the change of beneficiary?
23 A.  Signatures, yes.
24 Q.  Here is the change of beneficiary, and that appears to
25     have your signature on it, correct?

Page 46

1  A.  Yes.
2  Q.  Flip two pages over and you'll see the change of
3      ownership form.  Where is your signature there?
4  A.  I'm not saying I signed it.  I witnessed his
5      signature.
6  Q.  Where did you witness it?
7  A.  Wherever it was we were located that he signed it.
8      Oh, you're saying in a literal sense.  I'm sorry.  I
9      was thinking you meant did I see it.
10 Q.  No.  I meant did you see it and sign it?
11 A.  I misunderstood.  I'm sorry.  I'm not an attorney.
12 Q.  I'm not expecting that.  Listen to my question because
13     I'm looking for a clear answer.
14         You executed a signature as a witness to
15     the change of beneficiary form on April 4th, 2007,
16     attesting to Gary Lupiloff's signature, correct?
17 A.  That's correct.
18 Q.  Did you execute a signature on the change of ownership
19     form reflecting your attestation as a witness to his
20     signature on April 4th, 2007, to that document?
21 A.  No, it's not required.
22 Q.  Why not?
23 A.  It's not on the form for me to do that.
24 Q.  Is it on the form of a change of beneficiary for you
25     to do that?

Page 47

1  A.  Yes.
2  Q.  Show me again.
3         MR. FISHMAN:  Do you want to see it?
4         MR. DANZIG:  Please.
5  BY MR. DANZIG:
6  Q.  And can you tell me what you understand to be the
7      requirement of the change of beneficiary designation
8      form regarding an attestation of a witness?
9  A.  It's my understanding that a person can change the
10     beneficiary if they're the owner of the policy.  These
11     forms all came together at one time from Nationwide's
12     Service Center, and they were required to be all
13     filled out at one time.
14 Q.  You can't change a beneficiary designation if you're
15     not the owner, right?
16 A.  Correct.
17 Q.  And so would it not make sense to you that if you want
18     to change the owner in order to change the
19     beneficiary, there should be a witness for that as
20     well?
21 A.  It may make sense but it's not required.
22 Q.  Okay.  Is it required that Nationwide approve of both
23     of the change of ownership forms --
24 A.  Of course.
25         MR. SCHMIDT:  Objection, she doesn't know

Page 48

1      what their approval is.
2  A.  The process of having a form would imply that there's
3      an approval.
4  BY MR. DANZIG:
5  Q.  Do you know of your own knowledge whether or not
6      Nationwide approved of the change of ownership form
7      changing the owner from Gary Lupiloff to William
8      Keene; do you know that that took place as you sit
9      here today?
10 A.  I don't recall other than paperwork on the screens
11     coming over, it would have, I guess, changed over.
12 Q.  Well, I assume that you submitted it in the proper
13     fashion.  Did you get anything back approving it that
14     you can recall?
15 A.  I don't recall that we would get anything back,
16     perhaps a letter.  I don't recall.
17 Q.  As you sit here today, you're not aware of any
18     approval by Nationwide confirming the change of
19     ownership by a company representative; is that fair?
20 A.  I don't recall.
21 Q.  You don't recall receiving it?
22 A.  Correct.
23 Q.  When Gary Lupiloff signed the change of beneficiary
24     designation, he was in your physical presence?
25 A.  He was.

MARY ELIZABETH REICH
January 4, 2012

Page 49

1   Q.   Was Mr. Keene present at that time, if you recall?
2   A.   Not at the same time but he was present when he did
3        his signature.
4   Q.   Okay. Was Mr. Keene in another room when Mr. Lupiloff
5        signed?
6   A.   No.
7   Q.   So when you say he wasn't physically present, I'm
8        having trouble understanding what that means.
9   A.   They both signed on the same day but not at the same
10       time.
11  Q.   Well, Mr. Keene wouldn't have signed anything
12       regarding the change of beneficiary designation
13       because there is no signature of his on this document,
14       correct?
15  A.   Not if it's not required.
16  Q.   So my question is: Was he physically present at the
17       time that Lupiloff signed the change of beneficiary
18       form?
19            MR. FISHMAN:  Asked and answered.  I think
20       she keeps telling you that they signed on the same day
21       but not the same room.
22            MR. BREDELL:  A different time of day?
23            MR. DANZIG:  Well, that's what I'm trying
24       to figure out.  You guys can keep testifying, but I'd
25       like her to tell me what happened.

Page 50

1            MR. BREDELL:  She's told you four times.
2            MR. DANZIG:  No, she hasn't.
3            MR. FISHMAN:  Yeah, she has.
4            MR. DANZIG:  She doesn't recall exactly
5        where they were.
6            THE WITNESS:  Well, I know for a fact they
7        were not present in the same room at the same time.  I
8        can tell you that.
9   BY MR. DANZIG:
10  Q.   Okay. Now --
11  A.   They weren't even in the same vicinity to my
12       knowledge.
13  Q.   Flip over to the first page of that document, of the
14       change of beneficiary form.  Was that filled out
15       before Lupiloff signed on Page 2?
16  A.   Yep.
17  Q.   Who filled it out?
18  A.   I filled it out.
19  Q.   That's your writing there?
20  A.   That's my writing.
21  Q.   Okay. You recognize it as your own?
22  A.   Yep.
23  Q.   Okay. So you would have filled out that form and then
24       had Gary Lupiloff sign the second page, and then you
25       would have witnessed it after he signed?

Page 51

1   A.   I guess.
2   Q.   That would be the procedure that you followed?
3   A.   I don't recall what came first.
4   Q.   The chicken or the egg?
5   A.   You know, I just know that they were signed by Gary.
6   Q.   Okay. Excuse me for asking this question because it
7        may seem absurd to you based upon your previous
8        answers, but where was Keene when Lupiloff signed that
9        document in front of you?
10  A.   I don't know.  He was not present.
11  Q.   He was in the office somewhere?
12  A.   No.
13  Q.   He wasn't physically present at that time?
14  A.   No.  He came into the office, to my office-office at a
15       separate time.
16  Q.   That day or some other day?
17  A.   That day.
18  Q.   For what purpose?
19  A.   All I know is that he was interested in knowing if the
20       paperwork was done.
21  Q.   He was anxious to hear that Mr. Lupiloff had signed
22       over the ownership and beneficiary designations to
23       him, right?
24  A.   Yes.
25  Q.   And thereafter he continued to be very anxious about

Page 52

1        the nature of his position in relation to this policy,
2        correct?
3   A.   I don't recall hearing from him much after all of this
4        transpired.
5   Q.   Other than the phone calls you got repeatedly after my
6        client died?
7   A.   Correct.
8   Q.   Did you formulate any thoughts of your own about what
9        was going on at that time considering the timing and
10       repetition of the calls?
11  A.   At what time?
12  Q.   After my client died and the next day or so you
13       started getting calls from Keene, did you formulate
14       any thoughts or opinions in that regard about what was
15       going on?
16  A.   I mean, it concerned me.
17  Q.   Why?
18  A.   Because I thought it was odd that he would be calling
19       right away.  He asked if I remembered who he was, and
20       of course I did, you know, because of all that we had,
21       you know, initially gone through and hearing about
22       Gary passing away.  Yes, of course, you know, his name
23       was familiar to me.
24  Q.   Wasn't he calling you before the death to make sure
25       the premiums were being paid as well?  I think you

MARY ELIZABETH REICH
January 4, 2012

Page 53

1   testified to that.
2  A.  **I think at that time he was already paying the**
3   **premiums, so I don't recall him calling me.**
4  Q.  You testified that you received calls from Keene
5   regularly wanting to know if the premiums were being
6   paid?
7  A.  **Pre this all transpiring.**
8  Q.  Right. And so he was very concerned about whether or
9   not these premiums were being kept up by Mr. Lupiloff
10   at the time Lupiloff was paying the premiums?
11  A.  **Correct.**
12  Q.  And then immediately after his death, he wants the
13   policy paid off to his name, correct?
14  A.  **Well, he wanted to know what the process was.**
15  Q.  Right, and he's calling you repeatedly even after you
16   tell him you're not the agent any longer?
17  A.  **Correct.**
18  Q.  He's rather anxious to get the premium -- I'm sorry --
19   the policy benefits paid out to him, was he not?
20  A.  **The subsequent conversations, you know, he knew --**
21   **obviously he was trying to, I think, tell me his side**
22   **of the story and that he wasn't involved and that**
23   **people were investigating him and things like that.**
24  Q.  Would you agree --
25  A.  **It got off of the life insurance, you know,**

Page 54

1   **conversation.**
2  Q.  When you bound the policy and then when the change
3   took place, did it strike you that once Keene took
4   over the premiums and started paying the premiums,
5   that after a certain point of time, there would be a
6   cost benefit that would be more of a cost than a
7   benefit if this term lasted a certain number of years;
8   do you understand what I'm saying?
9  A.  **No.**
10  Q.  If you look at the schedule of payments, after
11   year 10, the policy premiums escalate exponentially?
12  A.  **Sure, that's why it's a 10-year term policy.**
13  Q.  Right. And after a certain point in time, it would
14   make no sense to carry this policy economically, would
15   it?
16  A.  **Correct.**
17  Q.  Because at a certain point in time, you're going to be
18   paying beyond the policy benefit?
19  A.  **Most people do not pay for it beyond that time.**
20  Q.  And at a certain point of time, the rate of return
21   would be detrimental to continue this policy, correct?
22  A.  **Correct.**
23  Q.  And unless the person dies at a certain earlier period
24   of time than later, it would make no sense to carry
25   this policy beyond the 10-year term, correct?

Page 55

1  A.  **Correct.**
2  Q.  Otherwise, you're paying out good money for bad,
3   right?
4  A.  **Correct.**
5  Q.  So it makes sense that unless the person dies within
6   the first 10 years, this policy makes no sense to
7   carry, right, if you're the owner paying on the
8   premiums?
9  A.  **I've only seen one situation where someone was**
10   **terminally ill, so they continued to pay the premiums.**
11  Q.  Other than that, after the 10-year term is up, people
12   shed these policies?
13  A.  **Correct.**
14  Q.  They don't carry them or pay them any longer?
15  A.  **Correct.**
16  Q.  As a habit and routine, that's what happens?
17  A.  **Correct.**
18  Q.  And so when Mr. Lupiloff turns up dead in 2010 shortly
19   before the expiration of the 10-year period, did
20   something come to your mind as to what might have
21   happened?
22  A.  **I didn't make, you know -- obviously my first reaction**
23   **was to be upset and mortified that he had been killed.**
24  Q.  Sure, because you knew him?
25  A.  **Right.**

Page 56

1  Q.  And you did business with him?
2  A.  **Right.**
3  Q.  And then when you pieced some of the evidence together
4   in your own mind, the fact that there was a change of
5   policy ownership and beneficiary, the fact that his
6   kids were removed from the policy --
7         Hold on, let me finish --
8         MR. FISHMAN: Who's testifying now?
9         MR. DANZIG: I'm asking a question,
10   counsel.
11  BY MR. DANZIG:
12  Q.  The fact that he was calling and wondering about
13   whether the premiums were being paid, the fact that he
14   called repeatedly immediately after the death, didn't
15   those things strike you as why this death occurred
16   when it did?
17  A.  **I didn't make the connection to the timing. I was**
18   **concerned that he was calling and asking about the**
19   **life insurance. Certainly one would make that**
20   **connection.**
21  Q.  Did you at any time make that connection and think
22   that Mr. Keene killed Mr. Lupiloff?
23  A.  **I don't know who, you know, would have killed him.**
24   **Would I --**
25  Q.  I'm not asking you if you know who killed him. I

MARY ELIZABETH REICH
January 4, 2012

Page 57

1  asked you whether that thought crossed your mind when
2  you pieced together some of the evidence that we've
3  gone over?
4         MR. FISHMAN:  Can we go off the record.
5         MR. DANZIG:  Sure.
6         (Off the record at 4:17 p.m.)
7         (Back on the record at 4:19 p.m.)
8         MR. DANZIG:  Counsel, are you advising your
9  client after that off-the-record discussion amongst
10  counsel that you are instructing your client not to
11  answer the question?
12         MR. FISHMAN:  That's correct.
13         MR. DANZIG:  So you will not allow her to
14  testify as to her mindset after the fact?
15         MR. FISHMAN:  Correct.
16         MR. DANZIG:  Thank you.
17  BY MR. DANZIG:
18  Q.  You indicated that you filled out the change of
19  beneficiary form.  Did you fill out the change of
20  ownership form as well; is that your writing as well?
21  A.  Yes.
22  Q.  That's your writing as well?
23  A.  Yes.
24  Q.  So as best as you recall, you would have filled out
25  both forms in conjunction with signatures of others;

Page 58

1  in other words, other people signed, you filled out
2  the forms?
3  A.  Right.
4  Q.  Did you ever form any opinions in your mind as to the
5  nature of the relationship between Keene and Lupiloff
6  other than what you saw on paper, and I'm referring to
7  that original document attached to Exhibit 1?
8  A.  I was just aware that Mr. Keene had been an investor
9  in Gary's business.  He had loaned him money.  That's
10  all I knew.
11  Q.  What I'm wondering -- I'm sorry -- go ahead.
12  A.  I did not know of any other -- I don't know how they
13  knew each other.  I don't know anything else about
14  their relationship.
15  Q.  Did you ever have a chance to see them together and
16  talking together as business people sometimes do?
17  A.  No.
18  Q.  You never had them in the same room where you can
19  assess the nature of their relationship?
20  A.  I don't recall.  Maybe initially at the very beginning
21  but I don't recall.
22  Q.  And you don't have any recollections of that at all?
23  A.  No.
24  Q.  Did you like Keene as an individual?
25  A.  I don't have any -- I didn't have any feelings one way

Page 59

1  or another.
2  Q.  Did you think he was a straight-up individual?
3  A.  I didn't have any feelings about it one way or the
4  other.  At the time he was just a client to you, you know,
5  the policy.
6  Q.  Did you ever ask Mr. Lupiloff why he was making the
7  change in 2007, Why are you doing this?
8  A.  Sure.
9  Q.  What did he say?
10  A.  He no longer wanted to pay the premiums.
11  Q.  Any other reasons given?
12  A.  And I explained to him that just having Mr. Keene pay
13  the premiums as a payor was enough, and he said he
14  didn't care.
15  Q.  Anything else that you recall?
16  A.  No.
17  Q.  Do you recall him stating anything about his kids and
18  their relationship as contingent beneficiaries?
19  A.  No, not any further than the initial concern that he
20  wanted them to be.
21  Q.  Were you of the understanding that he knew that
22  Mrs. Keene was going to replace his kids as contingent
23  beneficiary?
24  A.  He knew the beneficiaries were going to be changed,
25  yes.

Page 60

1  Q.  Because of the change of ownership?
2  A.  Yes, and that's why I was advising him, you know, Why
3  are you doing this?  You know, I didn't feel it was
4  necessary.
5  Q.  And obviously you didn't know or were privy to any
6  conversations before he came in the office to execute
7  the documents, correct?
8  A.  Correct.
9  Q.  Ms. Reich, did you have anything other than a
10  professional relationship with Mr. Lupiloff?
11  A.  Professional and he was a friend, and he was involved
12  in a charity with us.
13  Q.  He was involved in a charity that you were involved
14  with?
15  A.  Yes, he donated his time and his screens to running
16  their PSAs.
17  Q.  What was the charity?
18  A.  Childhelp, one word.
19  Q.  Did you ever go out socially with Mr. Lupiloff?
20  A.  No.  Because I knew other friends, his ex-wife and
21  people indirectly, you know, he would have a birthday
22  party and a whole group of us would show up perhaps
23  but that was it.
24  Q.  So you attended social gatherings in his presence but
25  not on a one-on-one basis?

MARY ELIZABETH REICH
January 4, 2012

Page 61

1    A.  **Correct.**
2    Q.  Charitable and social?
3    A.  **Correct.**
4          MR. DANZIG:  Thank you.  I have nothing
5    further.
6          EXAMINATION
7    BY MR. BREDELL:
8    Q.  Is it Reich or Reish?
9    A.  **Reich.**
10   Q.  Is Betsy okay?
11   A.  **Yes.**
12   Q.  Better than ma'am?
13   A.  **Thank you.**
14   Q.  You said you were over 50.  I'm over 50, too.
15         So, Betsy, I just want to sort of
16   generalize this if I can.  So you had known
17   Mr. Lupiloff it sounds like socially and he knew you
18   sold insurance, so that's how he came to you?
19   A.  **Correct.**
20   Q.  Many of us buy insurance out of a phone book, on the
21   internet, and other of us have insurance agents that
22   we know and trust, and your relationship with Gary
23   would be more in the form where he was someone that
24   you knew, you knew him and presumably he trusted you
25   and your advice?

Page 62

1    A.  **I assume so.**
2    Q.  And having that prior relationship, you know, you kind
3    of joked earlier, you said you didn't remember some of
4    the details, you referenced your age, but in reality
5    as professionals, when we have a document put in front
6    of us, we've met with thousands of people, it's hard
7    to remember much about it, but it's a little easier
8    for you in this case because you remember
9    Mr. Lupiloff?
10   A.  **I remember Mr. Lupiloff and I remember Mr. Keene, yes.**
11   Q.  But I guess what I'm saying is unlike many of your
12   clients, you had a relationship outside of just
13   writing the policy; you knew him socially?
14   A.  **Many of my clients did.**
15   Q.  Okay.  And I'm pretty confident the reason why you're
16   here is because there's an allegation that those
17   change of beneficiaries were forgeries; in fact, that
18   was stated in court.  And all these other questions --
19   I mean, that's really why you're here.
20   A.  **Okay.**
21   Q.  And what you knew about the form or who signed it and
22   where you were, I can tell you the reason why you're
23   here is because of that allegation.  It sounds that
24   you're adamant that you knew who Mr. Lupiloff was, you
25   recognized him, it couldn't be an imposter, you knew

Page 63

1    him before and you're adamant as his social
2    acquaintance and his agent that you not only advised
3    him of the consequences, you recommended him
4    professionally not to sign it, and he ignored your
5    advice, said he didn't care, and signed it in front of
6    you; is that a fair statement?
7    A.  **Correct.**
8    Q.  And this talk about the beneficiaries being his
9    children, in reality, the policy is to benefit
10   Mr. Keene and the only way his children would stand to
11   gain would be if both Mr. Keene and Mr. Lupiloff died?
12   A.  **No.  The letter stated, the memo, that as the loan was**
13   **paid down, it would pay off whatever loan was**
14   **outstanding, and the balance should go to the**
15   **children.**
16   Q.  Oh, okay.  That was in the policy?
17         MR. SCHMIDT:  It's in the letter,
18   Mr. Bredell, last page of Exhibit 1.
19   A.  **It wasn't reducing the policy, but you would expect as**
20   **the loan gets paid down, less is owed on it.**
21   BY MR. BREDELL:
22   Q.  But one of the first things that you did, I take it,
23   is you through Nationwide established that Mr. Keene
24   had insurable interest in this policy?
25   A.  **It's not my job to establish that.  It's Nationwide's**

Page 64

1    **job.**
2    Q.  But that was something you specifically looked into,
3    and you had both of them fill out -- you had
4    Mr. Lupiloff fill out forms to establish an insurable
5    interest?
6    A.  **You know, I don't recall what all, but yes, it's part**
7    **of protocol of having insurable interest.**
8    Q.  Okay.  And clearly looking at these forms, you
9    understood there was a loan, you understood they
10   weren't related, you understood the business nature of
11   that information provided to Nationwide, and evidently
12   someone at Nationwide made the assumption that
13   Mr. Keene did have an insurable interest when they
14   issued this policy?
15   A.  **Nationwide makes that decision.**
16   Q.  So when a client -- when an insured doesn't pay their
17   premiums, are you given notice?
18   A.  **Not always right away.  Eventually, you know,**
19   **depending on -- again, we changed computer systems.**
20   **We changed processes all throughout the time period.**
21   **So that form could have come in many different ways,**
22   **so I don't recall how.**
23   Q.  Here's the information that I received, and obviously
24   this is all after the fact, and you would have gotten
25   the information as it occurred.  The information that

MARY ELIZABETH REICH
January 4, 2012

Page 65

1    I received was that Mr. Lupiloff took out this policy
2    for this business purpose after Mr. Keene loaned
3    Mr. Lupiloff money.  Mr. Keene couldn't get any
4    information about the policy because he wasn't a named
5    insured?
6    A.  He wasn't the owner.
7    Q.  Thank you, he wasn't the owner, and so I also
8    understood that there was times when Mr. Lupiloff
9    wasn't making the premium payments.  I'm wondering
10   when you became aware of that, that Mr. Lupiloff was
11   late on some of the premium payments?
12   A.  Late, yes.
13   Q.  Do you know whether he skipped any?
14   A.  I don't recall.
15   Q.  And here's what I've been led to believe, and I just
16   -- and there's really no way you'd know that unless
17   you had some independent information.  I was trying to
18   see whether you can rule it in or rule it out.  I
19   understood that, you know, Mr. Keene loaned this
20   money, he was trying to secure this debt with the
21   policy.  Then I understand Mr. Keene found out that on
22   several occasions Mr. Lupiloff wasn't making the
23   payments, and that's why Mr. Keene was calling you to
24   find out, to get some kind of guarantee that the
25   payments were being made, and eventually Mr. Keene and

Page 66

1    Mr. Lupiloff had a conversation saying, Well, listen,
2    Bill, why don't you just take over the policy, you
3    make the payments, and stop nagging me to make the
4    payments because I don't want to make the payments.
5    Does that sound like a version of what you heard about
6    this change of beneficiary?
7    A.  I don't know what the entire conversation was.
8    Q.  But did you hear any version of that?  By that I mean,
9    did you hear that, A, I think you told me that
10   Mr. Lupiloff didn't want to make the payments; he told
11   you that?
12   A.  He was not excited about making the payments.  I
13   remember that.  But I don't, you know -- do I recall
14   him saying, I'm not making the payments, no, I don't
15   recall that.
16   Q.  And do you know whether the policy ever was in
17   jeopardy of being cancelled?
18   A.  I don't recall.
19   Q.  And is it true that if someone's a beneficiary of an
20   insurance policy with Nationwide at that time, that if
21   a policy is being cancelled or changed, that the
22   beneficiary isn't told?
23   A.  I don't recall.
24   Q.  But certainly if the beneficiary or anybody else calls
25   up and wants to know the status of a policy, the

Page 67

1    company policy is the beneficiary or any stranger to
2    the policy, nonowner, can't be told?
3    A.  Should not be told.
4    Q.  Should not be told.  And so does it seem logical to
5    you that the goal here by Mr. Keene was to make sure
6    that he was going to make the payments, that he could
7    be insured that he would stay the owner of the policy?
8    A.  But I think you could just become a payor, also.
9    Q.  Right, but if you're the payor, the owner could change
10   the beneficiary; isn't that true?
11   A.  Correct.
12   Q.  And so what could happen is if Bill Keene had
13   continued to pay the policy, there would be nothing to
14   prevent Mr. Lupiloff from removing Bill Keene as the
15   beneficiary; isn't that true?
16   A.  If Mr. Lupiloff was the owner?
17   Q.  Right.
18   A.  I would imagine.
19   Q.  And my understanding is before these change orders
20   took place, that Mr. Lupiloff was making the payments
21   and then -- in the records -- it's not a trick
22   question.  I'm not trying to test your memory.  I
23   guess I am trying to test your memory.  The reason why
24   --
25   A.  I think it was a combination of people making payments

Page 68

1    at that point.
2    Q.  The reason for my question was we have some different
3    billing statements and early on ones that are being
4    sent to Gary Lupiloff's address and then later on
5    they're being sent to Bill Keene's address?
6    A.  I think he had requested to become the payor.  I don't
7    recall exactly but that was not done through me.
8    Q.  I understand, I understand.  But as far as you know,
9    if he just -- if Mr. Keene had just become the payor,
10   there would be nothing to prevent Mr. Lupiloff from
11   removing Bill Keene as beneficiary and making Bill
12   Keene's daughters primary -- I'm sorry --
13   Mr. Lupiloff's daughters as primary beneficiary on the
14   policy?
15        MR. SCHMIDT:  I object to the form of the
16   question.  She doesn't have the foundation to know
17   whether that can be done or not.
18   A.  It comes down to you, you know, whatever request goes in,
19   it goes in to be approved by Underwriters, I would
20   guess, or Service Center.
21   BY MR. BREDELL:
22   Q.  In this case, Mr. Keene was advised and he signed the
23   forms because he became the owner, right, of the
24   policy?
25   A.  I was trying to hear your -- say that again.

MARY ELIZABETH REICH
January 4, 2012

**Page 69**

1  Q.  I'm going to ask you a little different question.  If
2      Mr. Lupiloff simply wanted to make a change of
3      beneficiary, you wouldn't have to have the beneficiary
4      come in, right; you can just do that with a form and
5      you can send it off to the home office?
6  A.  Correct.
7  Q.  And so for these people who get mad at one kid or the
8      other and they threaten to take them out of the will
9      and they change the policy, you never have to tell the
10     kid you did that, you forgive the kid when you sober
11     up, you can undo it and the kid never finds out,
12     right?
13 A.  Technically, yes.
14 Q.  You don't have to bring the kid in each time and say,
15     Okay, I'm cutting you out, I'm cutting you in; it's up
16     to the owner's discretion?
17 A.  Correct --
18 Q.  And so even though --
19 A.  -- to make the request.
20 Q.  To make the request.  And so even though you said that
21     Mr. Lupiloff could have simply had Mr. Keene pay the
22     premium, you were speaking as Mr. Keene's (sic) friend
23     and insurance agent in giving that advice, not as
24     Mr. Keene's insurance agent?
25         MR. SCHMIDT:  I think you misspoke.

**Page 70**

1          MR. BREDELL:  Let me start over.  I'm just
2      trying to establish a simple proposition.  I'm
3      obviously making it complicated.
4          MR. SCHMIDT:  You're succeeding.
5          MR. BREDELL:  Thank you.
6  BY MR. BREDELL:
7  Q.  I think I understand that if Mr. Lupiloff kept the
8      policy in his name and made Bill Keene the payor,
9      there would be nothing to prevent Mr. Lupiloff from
10     eliminating Mr. Keene from the policy?
11 A.  I do not know that.
12 Q.  But you can't disagree with my statement?
13 A.  I don't know because I don't know what had to
14     transpire at the Service Center --
15 Q.  Okay.
16 A.  -- in that kind of situation.
17 Q.  All right.  And you were shown a letter dated
18     October 19th, and counsel made it sound unusual that a
19     person would inquire about the status of a
20     beneficiary, and it started off:  We received your
21     request for beneficiary information.
22         And then the next line of that letter says:
23     If you would like to change these designations, please
24     complete the enclosed application and return it in the
25     envelope provided.

**Page 71**

1          So it sounds like it was more than just
2      asking who was on the policy.  This sounds like the
3      first letter to begin the process to make the change;
4      would you agree with that?
5  A.  Somebody made an inquiry.
6  Q.  But more than an inquiry; they also requested
7      information to change?
8  A.  I don't know.
9  Q.  And I notice on that October 19th letter, you did
10     receive a copy of the letter?
11 A.  It says so, yes.
12 Q.  I know, so that means you don't remember, I know.
13 A.  I mean, I don't recall, and frankly, do you always get
14     every letter that's cc'd to you?
15 Q.  No.  I told you that I don't read the stuff addressed
16     to me, not only cc'd to me.
17         MR. SCHMIDT:  That explains a lot of stuff.
18         MR. BREDELL:  It does.  Mr. Schmidt will
19     vouch.
20 BY MR. BREDELL:
21 Q.  When any of this was happening and the letters were
22     coming in, did you ever bump into Gary Lupiloff and
23     ask him, What's going on, Are you switching the
24     policy?  Did you ever have any discussions outside of
25     business?

**Page 72**

1  A.  No, but I mean, had I seen that letter, I would have
2      initiated a conversation with him.
3  Q.  Okay.  So your habit would have been to have --
4  A.  That would be, to me, that would be my typical
5      behavior with anybody, not just Gary but anyone like,
6      Oh, are you planning to do something, and see how I
7      can service them.  But I don't recall -- I don't
8      really recall that letter.
9  Q.  And this policy was taken out in 2006 -- I'm sorry --
10     2003?
11 A.  Yeah.
12 Q.  So the premiums would escalate in 2013?
13 A.  Well --
14         MR. SCHMIDT:  It's right in the policy,
15     counsel.  The schedule is right there, whatever page
16     that is.  Page 304.
17 BY MR. BREDELL:
18 Q.  Did you ever give Mr. Keene a copy of the policy?
19 A.  Did I ever give him a copy?
20 Q.  Yes.
21 A.  Not that I'm aware of, no.
22 Q.  Do you know whether Nationwide sent him a copy of the
23     policy?
24 A.  I have no idea.
25 Q.  And so even though Mr. Keene would call you frequently

**BIENENSTOCK**
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

18 (Pages 69 to 72)

MARY ELIZABETH REICH
January 4, 2012

Page 73

1   to find out the status of the policy, it's your
2   testimony that once he began making the payments,
3   those calls went away; he stopped calling you?
4   A.  I don't recall him calling as frequently, if at all.
5       I don't recall.
6   Q.  So it's possible from the time the change of
7       beneficiary went into effect making Bill Keene the
8       owner of the policy until the time of Gary Lupiloff's
9       death, it's possible you never spoke with Mr. Keene?
10  A.  It's very possible.
11  Q.  And then I know after --
12  A.  You know, there was -- I did speak with him.  I'm
13      sorry.  Yes.
14  Q.  When was that?
15  A.  I don't recall exactly when it was, but he had called
16      asking some questions about Gary's business, which I
17      didn't feel I could share with him --
18  Q.  Oh, okay.
19  A.  -- that I was insuring at the time.
20  Q.  So it wasn't information you would have gained as an
21      insurance agent; it would have been something you
22      might have known --
23  A.  No.  It was about his policies, and I didn't feel he
24      should be privy to information.
25  Q.  And then after the death of Mr. Lupiloff and then at

Page 74

1   the time this litigation was started, I'm assuming you
2   received a lot of calls about those forms, the
3   signature on the forms?
4   A.  From whom?
5   Q.  Mr. Keene.
6   A.  No.
7   Q.  You said he called you a bunch --
8   A.  Not about the signatures.
9   Q.  I know I called you a couple times, and I apologize if
10      it was --
11  A.  Well, until the attorney part all started, but no.
12  Q.  Okay.
13  A.  His calls were not about that.
14  Q.  Okay.  And so those were the -- you said the numerous
15      calls were not about the signature or the beneficiary
16      form?
17  A.  I don't recall them being about that.
18  Q.  Okay.  The one form that you had a question whether
19      you witnessed it versus witnessed it; do you remember
20      that?
21          MR. FISHMAN:  Page 5.
22  A.  Whether I saw it being signed versus did I witness it
23      legally?
24  BY MR. BREDELL:
25  Q.  Yes.

Page 75

1   A.  Okay.
2   Q.  Do you have an independent memory that you observed
3       Mr. Lupiloff sign his name but then after that you
4       then signed your name?
5   A.  On the one where I signed?
6   Q.  Yes.
7           MR. DANZIG:  That's the beneficiary form.
8   BY MR. BREDELL:
9   Q.  The beneficiary form.
10  A.  I witnessed his signature.  I saw him -- I shouldn't
11      use that word -- I saw him sign his name, yes.
12  Q.  All right.
13  A.  Wherever he had to sign his name.
14          MR. BREDELL:  All right.  That's all I
15      have.  Thank you.
16          MR. SCHMIDT:  All done?
17          MR. BREDELL:  Yes.
18          MR. DANZIG:  I just have one or two more
19      just on that matter.
20              RE-EXAMINATION
21  BY MR. DANZIG:
22  Q.  He signed his name on the change of beneficiary
23      designation and then you witnessed it?
24  A.  I don't recall who signed first.  I'm guessing he
25      would have signed first.  That would be protocol.

Page 76

1   Q.  That's why I asked it that way.  Okay.  Now on the
2       contingent owner change of beneficiary, there are two
3       signatures on that document.  One is allegedly
4       Lupiloff's and one allegedly is Keene's.
5   A.  Okay.
6   Q.  Were they in whatever office they were in separately
7       and signing separately, or did they sign together?
8           MR. FISHMAN:  Asked and answered but you
9       can answer.
10          MR. DANZIG:  I don't think so.
11          MR. FISHMAN:  It was.
12  BY MR. DANZIG:
13  Q.  Go ahead.
14  A.  They each signed but not at the same time in the same
15      presence.
16  Q.  And do you recall who signed first?
17  A.  I do not but I'm guessing -- I don't know.
18  Q.  Would it be standard protocol for the owner changing
19      the ownership status to sign first as opposed to the
20      new owner?
21  A.  It would make sense that Gary signed all the paperwork
22      at the same time.
23  Q.  And then does it make sense to you that Keene would
24      have come in wherever you were afterward to sign?
25  A.  Yes.

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

19  (Pages 73 to 76)

MARY ELIZABETH REICH
January 4, 2012

---

Page 77

1  Q.  Does that strike you as the way it went?
2  A.  Yes.
3  Q.  And you still don't know where you were at?
4  A.  I don't recall where because I had met with Gary on
5      this matter in different places several days, you
6      know. I had presented it to him. We talked about it.
7      I asked him to wait and think about it. So I don't
8      recall where we actually ended up signing it at this
9      point.
10 Q.  How many meetings would you say you had with him over
11     these change issues, more than two?
12 A.  Maybe three.
13 Q.  And phone calls as well?
14 A.  Possibly.
15 Q.  So you met with him and talked to him over the phone?
16 A.  Just, yes, regarding explaining the ramifications.
17 Q.  Sounds like an ongoing issue of concern or discussion
18     between you-agent and him-client?
19 A.  Taking the time to -- trying to schedule a time to
20     meet to do the actual signature. But also we were
21     talking about other insurances at the same time.
22 Q.  Did he ever express reservations about engaging in
23     this --
24 A.  No.
25 Q.  -- change?

---

Page 78

1  A.  No.
2  Q.  Never?
3  A.  No.
4  Q.  Did he ever express reservations about changing the
5      contingent beneficiary from his daughters?
6  A.  No.
7  Q.  Did he ever express to you concerns about Mr. Keene?
8  A.  No.
9  Q.  Did he ever tell you he was scared of him?
10 A.  He did not.
11 Q.  Did he ever tell you that he was worried about what
12     might happen to him with regards to this policy?
13 A.  No.
14 Q.  He expressed no concerns, no reservations, no thoughts
15     to you as a friend or agent about the relationship he
16     had with Mr. Keene vis-à-vis this insurance policy?
17 A.  No. He implied it was just -- it was an
18     inconvenience. It was something that he had to do,
19     and he didn't really want to do it, obviously dragged
20     his feet on payments.
21 Q.  Did he ever make it sound like Mr. Keene was forcing
22     this issue on him?
23         MR. BREDELL:  These are all beyond the
24     scope of Cross. You had your chance to examine this
25     witness, so I object to it.

---

Page 79

1         MR. DANZIG:  Thank you.
2  BY MR. DANZIG:
3  Q.  Did you ever come across that thought?
4  A.  I don't think force. I think in the beginning it was
5      a requirement that he needed to have this done, and
6      that's why they came forward with this request.
7  Q.  And last question. What made you believe that he was
8      expressing some requirement that he engage in this
9      process?
10         MR. SCHMIDT:  When you say "this process",
11     you mean --
12         MR. DANZIG:  The change request.
13         MR. SCHMIDT:  She didn't say anything about
14     the change. You're misstating what she said.
15 A.  Oh, no, no. I meant taking out the initial policy,
16     that it was something that was required as a matter of
17     the loan, that there was never -- I never had a sense
18     of any force.
19 BY MR. DANZIG:
20 Q.  Did you get a sense that he was dragging his feet for
21     any reason, Mr. Lupiloff?
22 A.  That he didn't care to -- he didn't want to keep
23     paying it. It was just something he didn't want to
24     pay.
25         MR. DANZIG:  Okay. Thank you.

---

Page 80

1         RE-EXAMINATION
2  BY MR. BREDELL:
3  Q.  In your business do you use the term "informed
4      consent"?
5         Let me explain what I mean by that word. I
6      have clients who make a lot of decisions that may
7      affect their future rights, you know, like signing off
8      on benefits or certain things, and I look at it as
9      part of my job is to make sure that the client -- I
10     assume they're all adults, some of them are
11     intelligent, assuming Gary was, and so I see my job as
12     explaining the ramifications and letting them make an
13     informed decision. It's not really my place to make a
14     decision for them or tell them what's best for them.
15        And so I'm assuming in these meetings that
16     you had, you saw it as your job was to make Gary aware
17     of all the ramifications of his decision, and then if
18     he still wanted to do it, he was your client, he was
19     paying the policy, he was a grown man, it was up to
20     him, and so that's what I call informed consent,
21     making someone aware of the ramifications so they can
22     make an informed decision in knowing all the
23     ramifications. Do you think that's what you did?
24 A.  I think that's what I've expressed, yes.
25         MR. BREDELL:  Okay. That's what I thought,

---

MARY ELIZABETH REICH
January 4, 2012

Page 81

1    too.  Thank you.
2              MR. SCHMIDT:  All set?
3              MR. BREDELL:  Yes.
4              (The deposition was concluded at 4:47 p.m.
5    Signature of the witness was not requested by
6    counsel for the respective parties hereto.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 82

1              CERTIFICATE OF NOTARY
2    STATE OF MICHIGAN  )
3                       ) SS
4    COUNTY OF MACOMB  )
5
6         I, LEZLIE A. SETCHELL, certify that this
7    deposition was taken before me on the date
8    hereinbefore set forth; that the foregoing questions
9    and answers were recorded by me stenographically and
10   reduced to computer transcription; that this is a
11   true, full and correct transcript of my stenographic
12   notes so taken; and that I am not related to, nor of
13   counsel to, either party nor interested in the event
14   of this cause.
15
16
17
18
19
20
21
22         LEZLIE A. SETCHELL, CSR-2404
23         Notary Public,
24         Macomb County, Michigan.
25   My Commission expires: April 17, 2012

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

21 (Pages 81 to 82)

CERTIFICATE OF NOTARY

STATE OF MICHIGAN   )

                       ) SS

COUNTY OF MACOMB   )

         I, LEZLIE A. SETCHELL, certify that this deposition was taken before me on the date hereinbefore set forth; that the foregoing questions and answers were recorded by me stenographically and reduced to computer transcription; that this is a true, full and correct transcript of my stenographic notes so taken; and that I am not related to, nor of counsel to, either party nor interested in the event of this cause.



LEZLIE A. SETCHELL, CSR-2404

Notary Public,

Macomb County, Michigan

My Commission expires: April 17, 2012

BIENENSTOCK

NATIONWIDE COURT REPORTING & VIDEO

www.bienenstock.com