# EXHIBIT 25

Page 1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

NATIONWIDE LIFE INSURANCE COMPANY,

a foreign corporation,

  Plaintiff,

  vs.  Case No. 11-cv-12422-AC-MKM

    Hon. Avern Cohn

WILLIAM KEENE, JENNIFER KEENE, MONICA

LYNNE LUPILOFF, NICOLE RENEE LUPILOFF

and NICOLE RENEE LUPILOFF, PERSONAL

REPRESENTATIVE OF THE ESTATE OF GARY

LUPILOFF, DECEASED,

  Defendants,

  and

MONICA LYNN LUPILOFF, NICOLE RENEE

LUPILOFF and NICOLE RENEE LUPILOFF,

PERSONAL REPRESENTATIVE OF THE ESTATE

OF GARY LUPILOFF, DECEASED,

  Defendants/Counter-Plaintiffs

  and Cross-Plaintiffs,

Page 2

1   vs.

2  WILLIAM KEENE, JENNIFER KEENE,

3  Individually, jointly and severally,

4    Defendants/Cross-Defendants.

5

6 _____

7   The Deposition of WILLIAM KEENE,

8   Taken at 29800 Telegraph Road,

9   Southfield, Michigan,

10   Commencing at 1:43 p.m.,

11   Thursday, November 14, 2013,

12   Before Susan L. Lowry, CSR-2636.

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1    STATE OF MICHIGAN

2  IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

3

4  NICOLE RENEE LUPILOFF, PERSONAL

5  REPRESENTATIVE OF THE ESTATE OF

6  GARY LUPILOFF, DECEASED,

7   Plaintiffs,

8  vs.  Case No. 2013-135055-NZ

9    Hon. Nanci J. Grant

10  WILLIAM KEENE,

11   Defendant.

12 _____

13

14

15   The Deposition of WILLIAM KEENE,

16   Taken at 29800 Telegraph Road,

17   Southfield, Michigan,

18   Commencing at 1:43 p.m.,

19   Thursday, November 14, 2013,

20   Before Susan L. Lowry, CSR-2636.

21

22

23

24

25

Page 4

1  APPEARANCES:

2  MICHAEL F. SCHMIDT

3  Harvey Kruse, PC

4  1050 Wilshire Drive

5  Suite 320

6  Troy, Michigan 48084

7  248.649.7800

8   Appearing on behalf of the Plaintiff.

9

10  ALBERT L. HOLTZ

11  Albert L. Holtz, PC

12  3910 Telegraph Road

13  Suite 200

14  Bloomfield Hills, Michigan 48302

15  248.593.5000

16  AND

17  JEFFREY A. DANZIG

18  Fieger, Fieger, Kenney, Giroux & Danzig, PC

19  19390 West 10 Mile Road

20  Southfield, Michigan 48075

21  248.355.5555 x238

22   Appearing on behalf of Monica Lynne Lupiloff, Nicole

23  Renee Lupiloff and Nicole Renee Lupiloff, Personal

24  Representative of the Estate of Gary Lupiloff,

25  Deceased.

Page 5

```
1    JOHN H. BREDELL
2    Bredell & Bredell
3    119 North Huron Street
4    Ypsilanti, Michigan  48197
5    734.482.5000
6        Appearing on behalf of William Keene and Jennifer
7    Keene.
8
9    ALSO PRESENT:
10   JOSHUA DAVID NUCIAN
11   HAROLD S. FRIED
12   Fried Saperstein Abbatt, PC
13   29800 Telegraph Road
14   Southfield, Michigan  48034
15   248.353.6500
16       Appearing on behalf of William Keene.
17
18
19
20
21
22
23
24
25
```

Page 6

```
1            TABLE OF CONTENTS
2    WITNESS                          PAGE
3    WILLIAM KEENE
4
5    EXAMINATION
6    BY MR. SCHMIDT                    8
7
8            EXHIBITS
9    EXHIBIT                          PAGE
10   (Exhibits retained.)
11   DEPOSITION EXHIBIT 1             54
12   DEPOSITION EXHIBIT 2             57
13   DEPOSITION EXHIBIT 3             63
14   DEPOSITION EXHIBIT 4             92
15   DEPOSITION EXHIBIT 5             93
16   DEPOSITION EXHIBIT 6             96
17   DEPOSITION EXHIBIT 7             97
18   DEPOSITION EXHIBIT 8             98
19   DEPOSITION EXHIBIT 9             101
20   DEPOSITION EXHIBIT 10            103
21   DEPOSITION EXHIBIT 11            106
22   DEPOSITION EXHIBIT 12            109
23   DEPOSITION EXHIBIT 13            111
24
25
```

Page 7

```
1    Southfield, Michigan
2    Thursday, November 14, 2013
3    1:43 p.m.
4
5            WILLIAM KEENE,
6    was thereupon called as a witness herein, and after
7    having first been duly sworn to testify to the truth,
8    the whole truth and nothing but the truth, was
9    examined and testified as follows:
10       MR. SCHMIDT:  Let the record show this is
11   the deposition of William Keene, taken pursuant to
12   notice under the Federal Rules of Civil Procedure, to
13   be used for the purposes provided therein.
14       MR. BREDELL:  Just one housekeeping matter.
15   There is also pending a civil case in the Oakland
16   County Circuit Court with relatives of the Lupiloffs
17   that are the plaintiffs.  Mr. Holt is the attorney in
18   that.  We've agreed that this deposition will be in
19   both cases.
20       I'm going to provide the court reporter
21   with a caption on that case, meaning that after this
22   dep is concluded, whether it's adjourned to a later
23   time or we complete it today, that there will not be a
24   second deposition of Bill Keene, that it can be used
25   in the Oakland County case.  This will be that
```

Page 8

```
1    deposition.
2        (Off the record at 1:44 p.m.)
3        (Back on the record at 1:55 p.m.)
4            EXAMINATION
5    BY MR. SCHMIDT:
6    Q.  Sir, I'm going to ask you some questions that have to
7        do with this lawsuit filed by Nationwide Life
8        Insurance Company against you and several other
9        people.  Please listen to the question.  If you
10       understand it, answer it.  If you don't, let me know.
11       Okay?
12   A.  Yes.
13   Q.  Please give a verbal answer to every question so the
14       court reporter can take it down.  Try to stay away
15       from words like um-um, either say yes, no or some
16       other complete verbal answer.  Is that understandable?
17   A.  Yes.
18   Q.  Sir, would you please tell us your name.
19   A.  William Fraser Keene.
20   Q.  And your date of birth?
21   A.  5-10-66.
22   Q.  And your current address?
23   A.  2704 Brockman, Ann Arbor, Michigan 48104.
24   Q.  How long have you lived there?
25   A.  Seven or eight years.
```

## Page 9

1  Q.  And who do you live there with?
2  A.  My wife, Jennifer, and my two children and a new
3      puppy.
4  Q.  And your children's names are?
5  A.  Julia and Avery.
6  Q.  And Julia's date of birth is?
7  A.  Julia is September 20th.
8  Q.  The year?
9  A.  2005.
10 Q.  Okay.  Avery?
11 A.  Avery -- it's not 2005, 2008.
12 Q.  Who's the '8?
13 A.  Julia.  And Avery is February 25th, and she is two
14     years old.  So she was born two years ago.
15 Q.  So she was born in 2011?
16 A.  Yes.
17 Q.  So Avery is a girl?
18 A.  Both girls.
19 Q.  You graduated from high school?
20 A.  I did.
21 Q.  Which high school?
22 A.  Southfield Lathrup High School.
23 Q.  What year?
24 A.  1984.
25 Q.  Did you go to college?

## Page 10

1  A.  I did.
2  Q.  Where did you go?
3  A.  I went to Michigan State University and the University
4      of Michigan.
5  Q.  Did you get a degree from Michigan State?
6  A.  I did.
7  Q.  What was that?
8  A.  Psychology.
9  Q.  That was a four-year program?
10 A.  I accomplished it in five years.
11 Q.  And what year did you graduate?
12 A.  1989.
13 Q.  Then you went to Michigan?
14 A.  I went to Michigan my junior year of undergrad.
15 Q.  And why was that?
16 A.  I wanted to experience the University of Michigan.
17 Q.  Okay.  So your degree is from Michigan State.
18 A.  Correct.
19 Q.  Any other education after your degree at Michigan
20     State?
21 A.  No.
22 Q.  Is your marriage to Jennifer your only marriage?
23 A.  Yes.
24 Q.  Where were you employed after getting out of college,
25     the first job?

## Page 11

1  A.  My first job out of college was a job at a psychiatric
2      hospital called Kingswood.
3  Q.  Where was that?
4  A.  That is -- I believe that's Ferndale.
5  Q.  Is it still in business?
6  A.  No, it's long gone.
7  Q.  How long were you working there?
8  A.  About a year.
9  Q.  What was your job there?
10 A.  Counselor.
11 Q.  Are you licensed in psychology?
12 A.  No.
13 Q.  Okay.  What was your next job?
14 A.  I worked at a high-fidelity store called the
15     Gramophone.
16 Q.  Where was that located?
17 A.  West Bloomfield.
18 Q.  Is that still there?
19 A.  No.
20 Q.  What did you do there?
21 A.  I sold high-end stereo equipment.
22 Q.  Salesperson?
23 A.  Correct.
24 Q.  How long were you there?
25 A.  About six months.

## Page 12

1  Q.  What was your next job?
2  A.  I worked as an English teacher in China.
3  Q.  How long did you have that job?
4  A.  About six months.
5  Q.  Who was your boss at Gramophone, do you remember?
6  A.  A fellow named Richard Howard.
7  Q.  Who was your boss at the Kingswood Hospital?
8  A.  I don't remember.
9  Q.  This English teacher job, what was that through, some
10     program or something?
11 A.  It was.
12 Q.  What was the program?
13 A.  I worked for the Chinese Overseas Shipping Company.
14 Q.  Where were they located?
15 A.  In Qingdao, China.  Q-I-N-G-D-A-O.
16 Q.  And that was for how long, you said six months?
17 A.  Um-hum.  Yes.
18 Q.  And who was your supervisor for that job?
19 A.  I don't remember.
20 Q.  That was a Chinese operation or a U.S. operation?
21 A.  It was a Chinese operation.
22 Q.  Do you speak any language besides English?
23 A.  Not really, no.
24 Q.  You were teaching English over there?
25 A.  Correct.

## Page 13

1   Q.  What was your next job?
2   A.  I became a pharmaceutical rep for a company called
3       Glyderm. I'll spell it for you. G-L-Y-D-E-R-M.
4   Q.  D --
5   A.  -- E-R-M.
6   Q.  Where are they located?
7   A.  When I worked for them?
8   Q.  Yes.
9   A.  They were in Bloomfield Hills, I believe.
10  Q.  Are they still in business?
11  A.  The company was bought from the owner that I knew, so
12      I believe they are still in business.
13  Q.  Who was your boss there?
14  A.  The owner of the company was Marvin Klein.
15  Q.  K --
16  A.  -- L-E-I-N.
17  Q.  Is he still --
18  A.  He died.
19  Q.  He's dead.  You said it was bought by someone else?
20  A.  It was.
21  Q.  Do you know who bought it?
22  A.  A large pharmaceutical company.
23  Q.  Okay.  How long were you there?
24  A.  Five years.
25  Q.  And you were a sales rep?

## Page 14

1   A.  Yes.
2   Q.  Who was your supervisor?
3   A.  At the end of the company, his name was Martin
4       Davidson.
5       MR. DANZIG:  Off the record.
6       (Off the record at 2:02 p.m.)
7       (Back on the record at 2:03 p.m.)
8   BY MR. SCHMIDT:
9   Q.  Martin Davidson was the supervisor, correct?  Why did
10      you leave that job?
11  A.  The company was bought by a larger company that no
12      longer needed a sales force.
13  Q.  What was your next job?
14  A.  I became a real estate agent.
15  Q.  And what company did you work for, your first one?
16  A.  The first one I believe was called Bloomfield --
17      Bloomfield Hills Realty, I think.
18  Q.  Where was that?
19  A.  In Bloomfield Hills.
20  Q.  Who was your supervisor there?
21  A.  Walt Flood.  F-L-O-O-D, I believe.
22  Q.  What years were you there?
23  A.  I would estimate 1993 to maybe '95.
24  Q.  How long were you there?
25  A.  About five months.

## Page 15

1   Q.  Do you know if they're still in business?
2   A.  I don't believe so.
3   Q.  Where did you go from there?
4   A.  Real Estate One right here in Farmington.
5   Q.  Okay.  Farmington Hills?
6   A.  Yes.
7   Q.  And who was your boss there?  It says manager, Steve
8       Leiban.
9   A.  Yes.
10  Q.  Is that the right place?
11  A.  Yeah.
12  Q.  L-E-I-B-A-N?
13  A.  Yes.
14  Q.  In the interrogatories you've got that as starting in
15      2000.  So is that maybe you were wrong about the other
16      one being in '95, whatever you said, five months in
17      '95?
18  A.  That sounds right.
19  Q.  That you were wrong about the '95?
20  A.  Correct.
21  Q.  Okay.  So how long were you at Real Estate One?
22  A.  I think about five to six years.
23  Q.  Okay.  And your job was a salesperson?
24  A.  Correct.
25  Q.  And why did you leave that job?

## Page 16

1   A.  I decided to work with Re/Max, with their program.
2   Q.  So you went to Re/Max?
3   A.  Um-hum.
4       MR. BREDELL:  Yes?
5   A.  Yes.
6   BY MR. SCHMIDT:
7   Q.  That was in Farmington Hills?
8   A.  Yes.
9   Q.  Who was your boss there?
10  A.  Carol Boji.
11  Q.  And how long did you stay at Re/Max?
12  A.  I think I was there for five or six years.
13  Q.  So that would take us up to 2010 or so?
14  A.  I'm not positive, but I think so.
15  Q.  What was your job after that?
16  A.  I was with the current company I'm now called
17      Community Choice Realty.
18  Q.  Why did you leave Re/Max?
19  A.  Community Choice had a better program for me.
20  Q.  I don't need a long dissertation, but what do you mean
21      a better program?
22  A.  Re/Max charges approximately $1,000 a month to hang
23      your license there, Community Choice only charges $145
24      a month for the same service.
25  Q.  Who was your boss at Community Choice?

Page 17

1  A.  John Evans.
2  Q.  John Evans?
3  A.  Yes.
4  Q.  Where is Community Choice located?
5  A.  On Maple in Birmingham.
6  Q.  So you commuted to there from Ann Arbor?
7  A.  I don't have to go into the office.
8  Q.  Okay.  Are you still at Community Choice?
9  A.  Yeah.
10 Q.  And your job, your position is salesperson?
11 A.  Salesperson.
12 Q.  Does that cover all your employment from college up
13     until now?
14 A.  Yes.
15 Q.  Have you been involved in any lawsuits other than the
16     one that we're here for today?
17 A.  Yes.
18 Q.  What other lawsuits?  You mentioned in the
19     interrogatories the Alvie case.  Do you know what I'm
20     talking about?
21 A.  Oh, Avie case, A-V-I-E, yeah.
22 Q.  So I'm familiar with that one.  That was the Oakland
23     County Court?
24 A.  I believe so, yes.
25 Q.  What happened in that case?  Tried, settled?

Page 18

1  A.  I believe we settled before we went to trial.
2  Q.  And they paid you some money?
3  A.  Yes.
4  Q.  Do you remember what they paid you?
5  A.  I believe it was 2,000 or so dollars a month for
6     approximately a year.
7  Q.  Any other lawsuits you've been in, either suing
8     somebody or getting sued, other than this one and the
9     Avie case?
10 A.  I sued someone a number of years ago.  It had to deal
11     with a road being built.
12 Q.  That's not in interrogatory answers, is it?
13 A.  No.
14 Q.  What court were you in?
15 A.  It took place in South Lyon, so I'm not sure of the
16     court.  I think it was off of Grand River.
17 Q.  A district court, if you know?  You were suing
18     somebody?
19 A.  Yes.
20 Q.  What for?
21 A.  For him to pay his fair share of a road that I built.
22 Q.  And where did you build a road?
23 A.  In South Lyon.
24 Q.  That was a special kind of a project or something?
25 A.  Yes.

Page 19

1  Q.  So what was the claim?  How much money were you suing
2     for?
3  A.  I don't know exact.  I think it was maybe four or
4     $5,000, something like that.
5  Q.  And what happened to that case?  Did you try it or
6     settle it or what?
7  A.  We tried it.
8  Q.  And what happened?  Did you win or lose?
9  A.  I lost.
10 Q.  So you got no money?
11 A.  No.  The fellow ended up paying me $2,000.
12 Q.  And how was that?
13 A.  It was a fair amount of money he thought for having
14     access to a road that I built for him.
15 Q.  So you tried the lawsuit, you lost but he still paid
16     you 2,000 bucks.
17 A.  Correct.
18 Q.  What was his name?
19 A.  I don't remember.
20 Q.  Any other lawsuits you've been involved in?
21 A.  Not that I can remember.
22 Q.  Have you ever made any insurance claims, a stolen car,
23     a house broken into?
24     MR. BREDELL:  You're not including health
25     insurance claims, I take it?  What kind of claim?  Be

Page 20

1     more specific.
2     BY MR. SCHMIDT:
3  Q.  Not including for health insurance.
4  A.  I think I filed a claim for some water damage to a
5     house in Walled Lake.
6  Q.  When was that?
7  A.  I don't remember the year.
8  Q.  A house you owned, or what?
9  A.  I owned.
10 Q.  Is it a house you lived in?
11 A.  I owned and I lived in.
12 Q.  Do you remember who the insurance company was?
13 A.  No, I don't.
14 Q.  Do you remember how much money you got?
15 A.  No.
16 Q.  Was it more than 10,000 bucks?
17 A.  No.
18 Q.  Any other insurance claim that you can recall making
19     other than for health insurance?
20 A.  No.
21 Q.  Did you ever file a workers' comp claim?
22 A.  No.
23 Q.  Have you ever been arrested for anything?
24 A.  No.
25 Q.  Have you ever declared bankruptcy?

5 (Pages 17 to 20)

Page 21

1  A.  Nope.
2  Q.  Any company that you've had ownership interest in ever
3     file for bankruptcy?
4  A.  No.
5  Q.  Do you have any expert witnesses for this case?
6  A.  I believe that's a question for --
7        MR. BREDELL:  Well, I've given you all of
8     the witness lists.
9        MR. SCHMIDT:  Well, you answered has not
10    retained any experts but reserves the right to do so.
11       So as of today do you have any expert
12    witnesses?
13       MR. BREDELL:  No.
14       MR. SCHMIDT:  Pardon me?
15       MR. BREDELL:  No.
16  BY MR. SCHMIDT:
17  Q.  Have you given any statements to anybody about what is
18    involved with this case other than talking to your
19    attorneys?
20  A.  I talked to my father about it.
21  Q.  Was that a written, oral, recorded?  How was it?  Just
22    talking?
23  A.  Just talking.
24  Q.  It wasn't written?
25  A.  (Shakes head.)

Page 22

1  Q.  It wasn't taped or anything?
2  A.  No.
3  Q.  Have you given any written or tape recorded
4     statements?
5  A.  No.
6  Q.  As far as statements that you're aware about the
7     incident, you have the one statement from your
8     neighbor, Susan Smith.  Any other written statements
9     you're aware of?
10  A.  Written statements about this case?
11  Q.  About the incident, correct, this case.
12  A.  I believe there was a witness at the scene of the
13    crime that was listed in the documents.
14  Q.  Mary Colombo?
15  A.  I believe that's her name.
16  Q.  Other than Mary Colombo and Susan Smith, are you aware
17    of any other statements from anybody concerning this
18    incident or that this lawsuit concerns?
19  A.  I can't think of anyone right now.
20  Q.  For your real estate work, is that -- this question
21    pertains to the time period 2002 to 2010 -- was that
22    commercial, residential, or what was it?
23  A.  During that time period, I primarily dealt with
24    residential real estate of one form or another.
25  Q.  When you're working for these real -- like your job at

Page 23

1     Community Choice, are you an independent contractor or
2     an employee, if you know?
3  A.  I'm an independent contractor.
4  Q.  Does that pertain to every real estate job you've had,
5     you've always been an independent contractor?
6  A.  Yes.
7  Q.  And do you have -- do you just work under your own
8     name or do you have a business name that you use?
9  A.  Both.  I have my own personal name and I work under
10    the name of the company, whether it's Community Choice
11    Realty or Re/Max or Real Estate One.
12  Q.  We've reviewed your tax returns, or whatnot, and you
13    had a significant decline in your income from 2006 to
14    2007 to 2008.  Can you explain why that was going on?
15  A.  The market slowed down a little bit.
16  Q.  Well, you went from making 60, 70, 80,000 bucks to
17    losing 8,000 bucks.  What else is that, the market is
18    slowing down?
19  A.  I'm not sure exactly what numbers you're talking
20    about.
21  Q.  Your total income in 2008, reported to the IRS, was a
22    negative $8,686.  It had been $86,600 three years
23    earlier.  So you went from 86,600 in 2005 to 63,400 in
24    2006 to 17,600 in 2007 to losing 8,686 in 2008.  So
25    what is your explanation for that?

Page 24

1  A.  I wrote off a lot of things on my taxes.
2  Q.  What do you mean by that?  What are you writing off on
3     your taxes?
4  A.  A lot of my expenses I get to write off on my taxes.
5     So even though it may not show that I made a lot of
6     money, I think I did just fine.
7  Q.  So are you saying that your overall receipts stayed
8     the same over that period of time, 2005 to 2010 or so?
9  A.  I don't know, I'd have to look at my taxes.
10  Q.  You produced tax returns in this case, in response to
11    our discovery requests, but the ones we got from the
12    IRS were different, had different numbers on them.
13       Can you explain why that would be?
14  A.  No.
15  Q.  Did you know that what you gave us had different
16    numbers than what you filed with the IRS?
17  A.  No.
18  Q.  You had a loss of 49,500 bucks from a company called
19    Pipeline, LLC in 2007.  What was Pipeline, LLC?
20  A.  That was a company owned by Roger Avie.
21  Q.  What was the loss for?
22  A.  Pipeliners gave me, I believe a document called a K1
23    or K2, which allowed me to use their losses in their
24    company to offset gains that I had that year.
25  Q.  In 2008 you had a $21,200 interest expense.  Do you

Page 25

1    know what that was for?
2    A.  Not off the top of my head.
3    Q.  What would you have to look at to refresh your memory
4        about that?
5    A.  I would have to look at my tax documents, I believe.
6    Q.  Well, we asked you today did you bring with you all
7        documents requested and all discovery requests needed
8        in this matter, to bring all documents produced by
9        third parties.  We requested your tax returns.
10            So do you have those with you to look at?
11   A.  No, I don't.
12   Q.  Were you aware this deposition was duces tecum, to
13       bring with you all document requests and all discovery
14       requests made in this case?
15            MR. BREDELL:  I've given them all to you.
16       We've given you all of those.
17            MR. SCHMIDT:  But I'm asking him to find
18       something, he said he's got to look for in there.
19   BY MR. SCHMIDT:
20   Q.  So you don't have them with you?
21   A.  I did not bring any documents with me.
22   Q.  Let me hand you this document, it's called Schedule 2.
23       It's a summary of your tax return information.  In
24       that column entitled -- in the fourth column over,
25       2008 Realtor, do you see that column?

Page 26

1    A.  Yes.
2    Q.  And about halfway down, over to the left of that,
3        expenses, interest 21,207?
4    A.  Um-hum.
5    Q.  Does that refresh your memory, looking at those
6        numbers, as to what that was for?
7    A.  No, I don't know exactly what that number would be
8        for.  I could guess, but I don't know off the top of
9        my head.
10   Q.  All right.  Subject to objection, what's your guess as
11       to what it is?
12   A.  It could be $21,000 of interest that I wrote off on my
13       taxes, which was interest that I paid on the mortgage.
14       But that's my just best guess.
15   Q.  If you look across, this is for every year, from 2006
16       to 2010, you don't have interest in any other year.
17       So that's what I'm just wondering.  But you don't
18       remember why you would have 21,000 in one year and not
19       in any other year?
20   A.  No.
21   Q.  If you look across the top, it's got your gross
22       receipts.
23   A.  Um-hum.
24   Q.  And it's got 152,000 in 2005, 94,000 in 2006, 65,000
25       in 2007, 71,000 in 2008, 46,000 in 2009, 5,000 in

Page 27

1    2009 -- oh, you have two different incomes, 46 and 5,
2    and then 15,000 and 6,000 in 2010.
3    A.  Um-hum.
4    Q.  You told me before that you, I thought you said your
5        receipts stayed the same and you just had higher
6        expenses.
7            Are these numbers right or wrong as far as
8        what your receipts are?
9    A.  Well, without looking at my personal tax records that
10       I've done myself, if these are correct, then in 2010 I
11       made 15,000 bucks.
12   Q.  My earlier question was, was whether your income was
13       going down from 2005 up to 2010, and you said -- I
14       thought what you said was that your income wasn't
15       going down, your receipts weren't going down but your
16       expenses were going up.
17            Does this refresh your memory that maybe
18       you were wrong about that?
19   A.  Well, with regard to 2009 and 2010, the amount of
20       money I made went down substantially.  But for the
21       amount of time and effort that I was putting into
22       work, I would say they are comparable.
23   Q.  What do you mean by that?
24   A.  Well, in 2010 I became a stay-at-home dad, so my hours
25       that I worked went down substantially.

Page 28

1    Q.  And why did you become a stay-at-home dad in 2010?
2    A.  Because my wife gave birth to our child.
3    Q.  And what does your wife do?
4    A.  She's called a physician assistant.
5    Q.  So she gave birth to her child, so then you decided
6        for you to stay home and take care of the children and
7        she goes to work?
8    A.  That's right.
9    Q.  And whose decision was that?
10   A.  It was both of ours.
11   Q.  So why did your income go down in 2009?
12   A.  The market slowed down.
13   Q.  In 2008 you've got a deduction for business use of
14       your house.  Do you see that at the bottom of that
15       schedule in 2008?  The same column as the interest is
16       in.
17   A.  Okay.
18   Q.  The third number from the bottom, $20,083, business
19       use of home.
20   A.  Um-hum.
21   Q.  Do you see that?
22   A.  Yes.
23   Q.  Why do you have that only in 2008?
24   A.  When I did my taxes, I didn't always include that in
25       every year.  So I included it in 2008, but I didn't

Page 29

```
1        include it in the other years.
2   Q.   Is there any reason why in 2008 you did it and no
3        other years?
4   A.   No.
5   Q.   Did your use of your own differ in 2008 from what you
6        did in the other years as far as business goes?
7   A.   No.
8   Q.   Did you do your own taxes or did you have someone help
9        you?
10  A.   Sometimes I did my own taxes and sometimes I hired
11       someone.
12  Q.   Look at Schedule 3.  At the top right corner it says
13       Schedule 3.
14  A.   Um-hum.
15  Q.   It's got income and expenses for your rental
16       properties.
17            You've got income and expense in 2006 and
18       2007 but none in 2008.  Do you know why that is?
19  A.   No, I don't.
20  Q.   In the prior year, 2007, you've got income from 4396
21       Rolling Pine.  And you've got nothing for 4396 Rolling
22       Pine in 2008, then you have income from Rolling Pine
23       in 2009.
24            Do you know why Rolling Pine had income and
25       expense in 2007 and 2009 but not 2008?
```

Page 30

```
1   A.   Well, the property was rented out, I believe money was
2        received, but I don't -- I don't know why it was not
3        listed.  I may have put the money somewhere else.
4   Q.   What do you mean by put the money somewhere else?
5   A.   Like I might have written the rent received somewhere
6        else in my taxes, but I don't really remember.
7   Q.   According to this, the only rent you put down on your
8        taxes in 2008 was zero.  Do you recall you had no rent
9        in 2008?
10  A.   Off the top of my head, I don't remember how long
11       property was rented in 2008.
12  Q.   Do you know what Schedule E is for federal tax
13       filings?
14  A.   Not off the top of my head, no.
15  Q.   If I told you Schedule E was for income from rental
16       properties, would you know that was correct or not?
17  A.   I wouldn't know for sure, no.
18  Q.   If you weren't putting your rents received and
19       expenses for 4396 Rolling Pine on Schedule E, where
20       did you put it?
21  A.   Mr. Schmidt, I don't really remember 2008, without
22       looking at my own tax records to see how it was
23       rendered or not.
24  Q.   Do you remember having a tenant there in 2008?
25  A.   I believe I did, but I can't say for sure.
```

Page 31

```
1   Q.   Do you know if you had the same tenant from 2007 into
2        '8 and into '9, the same person, or not?
3   A.   I don't believe so.
4   Q.   Do you recall who your tenant was in 2007 at Rolling
5        Pine?
6   A.   I believe it was a couple from Australia.
7   Q.   Do you remember their name?
8   A.   I think their last name was Roberts.
9   Q.   Do you know where they are today?
10  A.   No, I don't know where the wife lives, but come to
11       think of it I don't know if it was -- yeah, I'm trying
12       to remember if it was Australia or England somewhere,
13       where they came from.  But I think that's when they
14       moved out, was in 2007.
15  Q.   Do you remember what the first name was?
16  A.   I think the wife's name was Sandy.
17  Q.   Do you remember the husband's name?
18  A.   Not off the top of my head.
19  Q.   You would have that in some records somewhere?
20  A.   I believe I would.
21  Q.   Okay.  And then who was the next tenant there?
22  A.   I believe I had a pastor live in the home.
23  Q.   What year would that have been?
24  A.   I would think that would have been around 2008.
25  Q.   Do you remember his or -- was it a lady or a man?
```

Page 32

```
1   A.   It was a man.
2   Q.   Do you remember his name?
3   A.   No, I don't off the top of my head.
4   Q.   How long was he there?
5   A.   I'm not sure when he moved out and when he -- moved in
6        or moved out, but I would think somewhere around a
7        year.
8   Q.   Who came in after him, anybody?
9   A.   Yes, I did have a fellow move in after the pastor.
10  Q.   Do you remember what his name was?
11  A.   His name was Todd Burch.
12  Q.   B-U-R-C-H?
13  A.   I actually don't know how to spell his last name.
14  Q.   Do you know where he is now?
15  A.   No.
16  Q.   How long was he there?
17  A.   I believe he was there for less than a year.
18  Q.   Who followed Mr. Burch as a tenant?
19  A.   No one.
20  Q.   He was the last one?
21  A.   Correct.
22  Q.   Was that the home that was foreclosed on?
23  A.   Correct.
24  Q.   If you look for 2009, there's two other, there's this
25       3983 Courville, C-O-U-R-V-I-L-L-E, and 3006 Kendall,
```

Page 33

1  K-E-N-D-A-L-L. Were those properties rented?
2  A. No.
3  Q. You had bought those to be rentals?
4  A. I bought them to flip them.
5  Q. So you did not intend to rent them?
6  A. It wasn't my plan.
7  Q. And you never rented them.
8  A. No.
9  Q. Correct?
10 A. Correct.
11 Q. What happened to those properties?
12 A. If I remember right, Courville I sold after a number
13    of months, and Kendall I believe burnt down.
14 Q. What town was Courville in?
15 A. Detroit.
16 Q. Do you remember what you sold it for?
17 A. No.
18 Q. Did you make money on it or lose money?
19 A. I believe I lost money on it.
20 Q. How about on the Kendall property, did you have an
21    insurance claim for that?
22 A. No.
23 Q. You had no insurance?
24 A. No.
25 Q. Correct?

Page 34

1  A. Correct.
2  Q. Was that also in Detroit?
3  A. Yes.
4  Q. BK-II Development, LLC; do you know what that is?
5  A. Yes.
6  Q. What is that?
7  A. That's a company that I own.
8  Q. And what business is that for?
9  A. To buy real estate.
10 Q. To buy and sell?
11 A. Correct.
12 Q. Also to rent, or not?
13 A. No, I don't think to rent.
14 Q. How long has that been in business?
15 A. A number of years.
16 Q. Do you have any partners?
17 A. No.
18 Q. Do you know what years -- is it still in business?
19 A. I don't believe it's still in business.
20 Q. What years was it in business?
21 A. I don't know off the top of my head.
22    (Off the record at 2:40 p.m.)
23    (Back on the record at 2:41 p.m.)
24 BY MR. SCHMIDT:
25 Q. If you look at that, it shows there were some large

Page 35

1  checks, $16,018, $21,345 and 18,000 written from the
2  BK-II, LLC National City/PNC Bank account in February,
3  March and April of 2006.
4      Do you know what those large checks were
5  for, who they were written to and for what?
6  A. No.
7  Q. Do you have to review some records to remember what
8  that was?
9  A. I would.
10 Q. If you look over on the left column, it's got deposits
11    in October, November and December of 2008 of $30,000,
12    $30,000 and $10,000.
13      Do you know what those were for, the source
14    of those deposits?
15 A. No, I don't remember what those were for.
16 Q. Would you have records to be able to find that out?
17 A. I could, I'm sure.
18 Q. In late 2008, if you go over to the far right column,
19    about the same time as those deposits, it looks like
20    almost all the money that was in that account, 11,000,
21    33,856 and 10,000 were withdrawn.
22 A. Um-hum.
23 Q. Do you know why that was done?
24 A. No, off the top of my head I don't.
25 Q. Would you have records to figure that out?

Page 36

1  A. I could, I'm sure.
2  Q. If you look at that, that overall Schedule 7, it looks
3  like there's some activity in February, March and
4  April of 2006, and there's like no activity until
5  October of 2008, we're talking a year and-a-half
6  almost. Do you know why that is?
7      Did I say a year and-a-half? I meant to
8  say two and-a-half years.
9  A. I'm not positive, but I believe the withdrawals were
10    to purchase real estate in Detroit.
11 Q. That would have been Kendall and Courville?
12 A. Correct.
13 Q. But my question is why there's no activity for two
14    and-a-half years.
15 A. I didn't buy any properties to flip.
16 Q. If the properties held were Kendall and Courville,
17    then what's the source of the income in October,
18    November and December of 2008 of $70,000?
19 A. If I remember right, I brought in some investors to
20    put in some money. So I put the money into the
21    account and I took money out of the account to buy the
22    real estate.
23 Q. Well, when did you buy the real estate, in 2008 or in
24    2006?
25 A. Well, I believe it would have been right around 2008

9 (Pages 33 to 36)

Page 37

1  that I was purchasing the properties.
2  Q.  Does that refresh your memory of why the money is
3  going out in 2006?
4  A.  Yeah, I'm pretty sure that's exactly where the money
5  went, to buy and fix up properties in the City of
6  Detroit.
7  Q.  I'm asking now 2006.
8  A.  Oh, 2006?
9  Q.  You've got money going out in 2006, 16,000, 21,000,
10  and 18,000.
11  Do you know why that's going on?
12  A.  I'd have to go back in my records.  I believe that's
13  when I was doing a land development project in South
14  Lyon, but I'm not a hundred percent positive.
15  Q.  Your wife had a Vanguard account.  Were you familiar
16  with that at all?
17  A.  No.
18  Q.  She had a Vanguard account with $78,700 in it in
19  December of '10, closed that and switched it over to a
20  checking account at Midwest Credit Union.
21  Were you aware of that transaction?
22  A.  No.
23  Q.  Were you aware that she had a $78,700 in a Vanguard
24  account in December of 2010?
25  A.  I'm not aware of the exact number, but I know my wife

Page 38

1  had money in accounts.
2  Q.  Do you know how much she had?
3  A.  Not exactly, no.
4  Q.  You don't share financial information with your wife?
5  A.  We share financial information with one another, but
6  not with regard to exact numbers, just ballparks.
7  Q.  So what ballpark were you aware she had in a Vanguard
8  account in December of '10?
9  A.  Off the top of my head, I don't know.  But I was aware
10  of all of her, I'm sure all of her financial
11  situations, what accounts she had.
12  Q.  I'll show you this Schedule 2-A.  And that shows she
13  had the $78,700 in the Vanguard account, which she
14  took out of there.
15  A.  Um-hum.
16  Q.  Were you aware that she then transferred it to Midwest
17  Credit Union and wrote a check for $700,700 (sic) out
18  of Midwest Credit Union?
19  MR. BREDELL:  What's the number again you
20  said?
21  MR. SCHMIDT:  $78,700.
22  MR. BREDELL:  I thought you said 700,000.
23  MR. SCHMIDT:  Did I say 700,000?
24  MR. BREDELL:  Yes.  That's okay, you
25  corrected it.

Page 39

1  A.  I'm sorry, your question?
2  BY MR. SCHMIDT:
3  Q.  I'll show you Schedule 3.  I showed you Schedule 2-A.
4  That shows she had $78,700 in Vanguard --
5  A.  Um-hum.
6  Q.  -- which she closed in December of '10.
7  And then Schedule 3 is for Midwest Credit
8  Union.
9  A.  Um-hum.
10  Q.  And it shows that she wrote a check for $78,400 out of
11  that account in February of '11.
12  Do you know where she sent that money?
13  A.  No.
14  Q.  Do you recall discussing that with her, who she'd be
15  writing a check for for 78,000 bucks?
16  A.  No.
17  Q.  Do you remember having a PNC home equity line of
18  credit?
19  A.  I believe I did.
20  Q.  Do you know how much you borrowed against that line of
21  credit in 2007?
22  A.  Not an exact number.
23  Q.  Schedule 11 shows you borrowed $48,000 between April
24  to November of 2007.
25  Do you know what that was for?

Page 40

1  A.  No.  I'd have to open my records.
2  Q.  Do you remember having a Fidelity brokerage account?
3  A.  I believe I did.
4  Q.  Schedule 19 is for your Fidelity account.  It shows a
5  10,000 deposit in December of '06.
6  Do you know what that was from?
7  A.  Yes.
8  Q.  What was that from?
9  A.  I believe Chase offered a credit card, where you could
10  take $10,000 out at no interest for one year.  So I
11  took the money out and I invested it in Fidelity.
12  Q.  Which bank was that from?
13  A.  Chase.
14  Q.  So you could use 10,000 bucks from Chase for a year
15  with no interest?
16  A.  Correct.
17  Q.  That account was then liquidated in 2009.  Why was
18  that?
19  A.  Well, I'm not sure of the date, but the stocks I
20  bought all went down and I lost money, so I liquidated
21  the account, essentially.
22  Q.  Where did you send the money that was left to?
23  A.  I spent it.
24  Q.  Pardon me?
25  A.  I spent it.

10 (Pages 37 to 40)

Page 41

```
 1    Q.  The 6,500 bucks that you had left, you spent?
 2    A.  If that's what was left, yes.
 3    Q.  You had a PNC -- you had, what, a line of credit or an
 4        account with PNC Bank, do you remember, in 2010?  Did
 5        they write that off?
 6    A.  Which account, I apologize?
 7    Q.  PNC, do you recall them writing off one of your
 8        accounts with them?
 9    A.  They may have.
10    Q.  Do you know why?
11        MR. BREDELL:  You'd probably have to ask
12        them.
13  BY MR. SCHMIDT:
14    Q.  Did they discuss it with you, why they were just going
15        to write it off?
16    A.  I don't remember off the top of my head.
17    Q.  Did you ever consider, in a period of time from 2002
18        to 2010, to file bankruptcy?
19    A.  You're asking me if I ever thought of --
20    Q.  Were you considering it?
21    A.  No.
22    Q.  Were you getting into financial problems during that
23        period of time?
24    A.  No.
25    Q.  Pardon me?
```

Page 42

```
 1    A.  Nope.
 2    Q.  Were you in a declining financial condition over that
 3        period of time?
 4    A.  I was making less money.
 5    Q.  What, did you have more debts?
 6    A.  Did I have more debts.  I don't understand the
 7        question.
 8    Q.  Did you or did you not have financial problems over
 9        the period 2002 to 2010?
10        MR. BREDELL:  You can do a better job at
11        defining problems.
12  BY MR. SCHMIDT:
13    Q.  Do you know what I mean by a financial problem?  You
14        can answer the question.
15    A.  Oh, I can?
16    Q.  Yes.  You only don't answer if he tells you not to,
17        but I didn't hear him tell you not to.
18    A.  No, actually, I don't feel like I was having major
19        problems.
20    Q.  You said major problems.  Were you having problems at
21        all, financial problems, or not?
22    A.  I don't understand how you're phrasing problem.  In my
23        mind, no, I don't feel like I was having problems.
24    Q.  Okay.  Starting in 2005, your wife's income was
25        $70,000; in 2006, 50,000; in 2007, 75,000 and 2008,
```

Page 43

```
 1        $2,700.
 2            In 2005, your income was 86,000; in 2006,
 3        53,000; in 2007, 17,000; in 2008 you lost 8,600 bucks.
 4            So from 2005 your joint income was
 5        $156,000, 2008 you had a joint net loss of $5,900.
 6            Do you consider that a financial problem or
 7        not?
 8    A.  Nope.
 9    Q.  So losing money as opposed to making $150,000 is not a
10        problem in your definition.
11    A.  For my wife and myself, not making money for that year
12        was not a problem.
13    Q.  The next year your joint income was 60,000 bucks,
14        which was less than half of 2005.  Is that still not a
15        problem?
16    A.  Not a problem.
17    Q.  In 2010 it's 85,000, which is less than half of 2005.
18        Is that still not a problem?
19    A.  Not a problem.
20    Q.  Your credit card debt increased from $27,000 in 2008
21        to $38,000 in 2010.  Is that a problem or not a
22        problem?
23    A.  It's not a problem.
24    Q.  Your bank account balances declined from an average
25        ending balance of $14,000 in 2006 to $1,000 in 2007 to
```

Page 44

```
 1        2010.  Is that a problem or not a problem?
 2    A.  In my definition of a problem, it was not a problem
 3        for us.
 4    Q.  Your checking account balances declined from 28,000 to
 5        26,000 from 2005 to 2008 to 8,000 in 2009 and 2010.
 6        Is that a problem or not?
 7    A.  No.
 8    Q.  You had significant fees for insufficient fund checks,
 9        overdrafts, returned checks and late fees and finance
10        charges in 2008, '9 and '10.
11            Is that a problem or not a problem?
12    A.  It was not a problem.
13    Q.  Pardon me?
14    A.  It was not a problem.
15    Q.  Do you think it's appropriate to have NSF checks and
16        overdraft checks and returned checks in your account?
17    A.  It was at that time.
18    Q.  Pardon me?
19    A.  It was.
20    Q.  Why were you having all of those NSF checks and
21        overdrafts and returned checks?
22    A.  There wasn't money in the account.
23    Q.  But that's not a problem?
24    A.  No, it wasn't.
25    Q.  So the fact that your income is down, your bank
```

Page 45

1  accounts are down, you're getting all kinds of bounced
2  checks, why are you not saying you have financial
3  problems?
4  A.  Because we weren't.
5  Q.  How do you define a financial problem?
6  A.  I don't know really how to answer that, Mr. Schmidt.
7  Q.  You had that property on Rolling Pine in Bloomfield --
8     West Bloomfield, wasn't it?
9  A.  Correct.
10 Q.  You bought it for 527,500 bucks, a mortgage of
11    422,000.  Does that sound right?
12 A.  About right.
13 Q.  And you had an additional home equity line of credit
14    of $100,000?
15 A.  Yes.
16 Q.  And then the assessed value of that home went down to,
17    by 2010, to $210,000; does that sound right?
18 A.  Yes.
19 Q.  That property was foreclosed on?
20 A.  Yes.
21 Q.  You owed the bank a hundred thousand on a line of
22    credit?
23 A.  Correct.
24 Q.  What happened to that?
25 A.  I've made a settlement with the home equity loan

Page 46

1  company.
2  Q.  What was the settlement?
3  A.  $15,000.
4  Q.  What account did that come out of?
5  A.  My father's.
6  Q.  And what's your dad's name?
7  A.  Irving Keene.
8  Q.  And where does he live?
9  A.  He used to live in Franklin.  He has passed away.
10 Q.  And when did he pass away?
11 A.  Three months ago.
12 Q.  Other than your dad, were you getting support from
13    anybody else during this period of time, 2006 to 2010?
14 A.  I was not.
15 Q.  Was your wife getting support from someone else?
16 A.  Yes.
17 Q.  Who does she get it from?
18 A.  She got support from her mother and her father.
19 Q.  Over the period of 2002 to 2010, how much support did
20    you get from your dad?
21 A.  I couldn't give you an exact number.
22 Q.  Well, ballpark.
23 A.  I think 24, $25,000, approximately.
24 Q.  Do you know how much support your wife got from her
25    parents over the period of 2002 to 2010?

Page 47

1  A.  No.
2  Q.  So for that whole transaction of Rolling Pine, your
3     loss was a hundred thousand for buying the property,
4     then a hundred thousand that you borrowed, so then
5     your net loss was only a hundred thousand for buying
6     it and 15,000 your dad had to pay.  Is that about
7     right?
8  A.  No, my only loss was $15,000.
9  Q.  Well, if you bought it for 527, and you mortgaged 422,
10    you had to come up with a hundred thousand bucks,
11    didn't you?
12 A.  I'm sorry.  One more time.
13 Q.  If you bought it for 527,000 and the mortgage was 422,
14    didn't you have to come up with $100,000?
15 A.  I did put $100,000 down, approximately.
16 Q.  So when it went into foreclosure, you lost a hundred
17    thousand, didn't you?
18 A.  No.
19 Q.  Why not?
20 A.  Because I took out a home equity loan and I pulled out
21    a hundred thousand dollars.  I had no equity in that
22    home at all.
23 Q.  Is that why you took that home equity line of credit,
24    to get your hundred thousand dollars back?
25 A.  At the time I took the home equity loan out, no, that

Page 48

1  wasn't my intention.
2  Q.  So your net position from that transaction was minus
3     $15,000 you borrowed from your dad.  Is that right?
4  A.  No.
5  Q.  What's wrong with that?
6  A.  Because I made lots of money in rental income over the
7     years, so that number for that particular property was
8     plus side for me.
9  Q.  And that rental income is all on that schedule you
10    went over earlier from Rolling Pine?
11 A.  Yep.  A lot of the rental incomes are shown there,
12    correct.
13 Q.  The Brockman home, who is that owned by?
14 A.  That's in my wife's name.
15 Q.  Have you ever had an ownership interest in that?
16 A.  No.
17 Q.  And why is it only in your wife's name?
18 A.  At the time she purchased it, I had the Rolling
19    Pine home in my name.  So for tax purposes, it's
20    better for her to have the house in her name and I had
21    the Rolling Pine house in my name.
22 Q.  Did she own that before you were married or not?
23 A.  After we were married.
24 Q.  You've got a lien on the Brockman home for unpaid
25    taxes in 2009 and 2010.  Do you know why that was?

Page 49

1   A.  I've never heard of that before.
2   Q.  You weren't aware there were taxes owed on that
3      property that weren't paid?
4   A.  Correct.
5   Q.  Do you recall there being a judgment against you by
6      City Bank in, I believe, 2010 or '11?
7   A.  It sounds familiar.
8   Q.  What was that, for $7,800?
9   A.  I don't know the exact number, but that sounds about
10     right.
11   Q.  What was that for?
12   A.  It may have been a credit card, I'm not positive.
13   Q.  As far as the keeping of the records and payments, and
14     whatnot, on the Brockman home, is that all done by
15     your wife then?
16   A.  We split them.
17   Q.  The mortgage payments, who pays those?
18   A.  Mostly my wife.
19   Q.  As far as keeping the books for the Brockman home, who
20     keeps the books?
21   A.  Mostly my wife.
22   Q.  So she never told you that the taxes weren't paid on
23     Brockman for two years?
24   A.  No, she didn't.
25   Q.  When did you first meet or come in contact with

Page 50

1     Mr. Lupiloff?
2   A.  I believe that was 2002.
3   Q.  And how did you come to meet him?
4   A.  A financial advisor with Merrill Lynch introduced us.
5   Q.  And do you recall who that was?
6   A.  His name is Charles Stevens.
7   Q.  S-T-E-V --
8   A.  -- E-N-S. I think.
9   Q.  Is he still at Merrill Lynch, if you know?
10   A.  I don't believe so, no.
11   Q.  What office was he at?
12   A.  I believe he was at an office in Birmingham.
13   Q.  How was the introduction done for whatever reason?
14     What do you recall about that?
15   A.  I think Charles called me to tell me he met someone
16     who needed some money for a business venture.
17   Q.  And do you know why Charles would call you?
18   A.  We were acquaintances.
19   Q.  We being you and Charles, you mean?
20   A.  Correct.
21   Q.  But as far as you being someone -- was he aware that
22     you wanted to get into business ventures or something,
23     or what?
24   A.  No. I don't know why he called me.
25   Q.  Had you ever gone in on any deals that he got you

Page 51

1     involved in before that?
2   A.  No.
3   Q.  Did you still deal with Mr. Stevens after that meeting
4     in 2002?
5   A.  I may have seen Charles a half dozen times after that,
6     but we didn't do any other business dealings.
7   Q.  Did you ever have any accounts with him?
8   A.  I did.
9   Q.  And when did those stop?
10   A.  I don't know the exact year.
11   Q.  Approximately.
12   A.  Maybe 2004.
13   Q.  And how come you stopped dealing with Mr. Stevens?
14   A.  I didn't trust him.
15   Q.  And why not?
16   A.  He put together the deal with me and Mr. Lupiloff.
17   Q.  The deal involving the t.v. for the auto show?
18   A.  Correct.
19   Q.  So when did you first meet Mr. Lupiloff, do you
20     remember when that was?
21   A.  I believe it was 2002.
22   Q.  He made a proposal to you for a deal?
23   A.  Yes.
24   Q.  And what was the proposal?
25   A.  It was primarily I would loan him money to rent some

Page 52

1     video t.v. walls.
2   Q.  Video t.v. walls. I don't know what that is.
3   A.  Think of a billboard and turn it into a television.
4   Q.  Okay. And where were these going to be?
5   A.  At the North American Auto Show.
6   Q.  In Detroit?
7   A.  Correct.
8   Q.  Do you know where they were going to be at the North
9     American Auto Show?
10   A.  In front of Cobo Hall.
11   Q.  In the hall or outside?
12   A.  Outside.
13   Q.  On the street?
14   A.  Correct.
15   Q.  Do you know if Mr. Lupiloff had done that type of deal
16     before?
17   A.  No.
18   Q.  Did you do any checking up on it at all?
19   A.  No.
20   Q.  What was the investment supposed to be by you?
21   A.  What was it supposed to be?
22   Q.  How much.
23   A.  $130,000.
24   Q.  And that was in one or two payments?
25   A.  Two payments.

Page 53

1   Q.   And what were you supposed to get out of it?
2   A.   We were going to split the approximate $500,000 that
3        he estimated was going to be his return.
4   Q.   Is that a return of actually 630 or just 500, so that
5        the total would be 500 minus 130 would your total
6        income?
7   A.   The return would have been half of 500, so
8        approximately $250,000.
9   Q.   Each?
10  A.   Each.
11  Q.   But then you've got to take off the 130 you put into
12       it, right?
13  A.   No.
14  Q.   I'm trying to understand it.  The total return from
15       the deal was 500 plus 130?
16  A.   No.
17  Q.   The total is 500 to come in.
18  A.   (Shakes head.)
19  Q.   Then you and Lupiloff split the 500, 250 each.
20  A.   Correct.
21  Q.   But you put in 130.
22  A.   Yes.
23  Q.   So what you get out of it is 250 minus 130.
24  A.   Correct.
25  Q.   There was an agreement that you signed with him?

Page 54

1   A.   Yes.
2              MARKED FOR IDENTIFICATION:
3              DEPOSITION EXHIBIT 1
4              3:19 p.m.
5   BY MR. SCHMIDT:
6   Q.   Sir, I'll hand you what's marked as Exhibit 1.  Is
7        that the agreement?
8   A.   That is.
9   Q.   And that's signed by -- is that your signature on the
10       second page?
11  A.   Correct.
12  Q.   Do you recognize that Mr. -- is Gary Harmon and Gary
13       Lupiloff the same person?
14  A.   Yes.
15  Q.   Is that his signature?
16  A.   That's his signature as I know it.
17  Q.   And this Exhibit 1, you've seen this before,
18       obviously.
19  A.   I have seen it.
20  Q.   And this is the agreement.  Is there anything that's
21       not the agreement that's written on here?  Is there
22       anything different about the agreement than what's
23       written on here?
24  A.   No, I think this is the agreement he signed.
25  Q.   So it says you're supposed to get a hundred percent of

Page 55

1        the money you advanced back by the end of business on
2        February 28th, 2003, correct?
3   A.   I'm looking from where you're reading.
4   Q.   Actually, right there.
5   A.   Yep.
6   Q.   And it says -- in Paragraph 3, it says, "If by
7        December 13, 2002, MAD Advertising has not produced
8        contracts equal to or exceeding $130,000, MAD
9        Advertising promises to repay 100 percent of all
10       advanced ($65,000) to Mr. William Keene within 10
11       calendars days, (December 23, 2002.)"  Correct?
12  A.   Um-hum.
13  Q.   That's yes?
14  A.   Yes.
15  Q.   If you look on the last page, it says, "MAD
16       Advertising also promises to keep the books open
17       during this investment.  MAD Advertising will allow
18       Mr. Keene and his representative, Charles Stevens,
19       full access, including, but not limited to financial
20       commitments relating to the International Auto Show in
21       Detroit for 2003.  Contracts committing MAD
22       Advertising to their clients, to provide them
23       advertising space on their LED Wall Screens, accounts
24       payable and receivable considering only with the
25       International Auto Show in Detroit for 2003."

Page 56

1              Is that part of the agreement?
2   A.   Yes.
3   Q.   Did you look at the books as of, going back to the
4        first page, as of December 13 to see if there had been
5        contracts produced?
6   A.   I did not look at Mr. Lupiloff's books.
7   Q.   You looked at no books, correct?
8   A.   No.
9   Q.   Correct?
10  A.   Correct.
11  Q.   Why not?
12  A.   Mr. Lupiloff showed me documentation making me think
13       that he had contracts in order with some companies
14       that I recognized the names of.  And that's what he
15       showed me.
16  Q.   Okay.  If you look on that first page, under C it
17       says, "If $130,000 has been invested by Mr. Keene to
18       MAD Advertising, MAD Advertising promises to pay
19       Mr. Keene in the following manner:  An additional
20       $115,000, if paid within 30 days of February 28th,
21       2003.  The additional $115,000, plus ten percent on
22       any remaining balance accumulating every 30 days.  If
23       final payment is not received before July 28th, 2003,
24       MAD Advertising will be in breach of this agreement
25       and Mr. Keene will have the right to seek any and all

Page 57

```
 1    recourse."
 2         Do you remember that as part of the
 3    agreement?
 4  A.  Yes.
 5         MARKED FOR IDENTIFICATION:
 6         DEPOSITION EXHIBIT 2
 7         3:23 p.m.
 8  BY MR. SCHMIDT:
 9  Q.  Exhibit 2 is -- it says -- it's December 30, MAD
10    Advertising.  "We have received $65,000 from William
11    Keene on this date for further funding."
12         Is that your signature on there?
13  A.  Yes.
14  Q.  That's the second payment, isn't it?
15  A.  Correct.
16  Q.  Do you have any proof of the first payment?
17  A.  I don't know if I have a document to show, except that
18    this one stating this money represents the balance
19    due.
20  Q.  Do you have a canceled check or any proof at all of
21    the first payment other than Exhibit, what you just
22    said about Exhibit 2?
23  A.  I do not.
24  Q.  Do you have a canceled check or any proof of the
25    second payment other than Exhibit 2?
```

Page 58

```
 1  A.  I don't know.  I'll have to look.  As a matter of
 2    fact, I'll look for both.
 3  Q.  We already asked for that, It wasn't produced.  So you
 4    recall you've already looked for it.  Did you not find
 5    it?
 6  A.  I don't think I have it.
 7  Q.  You have indicated in your discovery responses that
 8    you made a second loan to Lupiloff -- I'm sorry, maybe
 9    I should say -- we'll call this deal the first loan,
10    but then you made a second loan of $2,500 on 10-6-03;
11    do you recall doing that?
12  A.  I believe so.
13  Q.  And what was that for?
14  A.  To help Gary.
15  Q.  For what?
16  A.  He needed it to help his business.
17  Q.  Anything to do with his first deal or something
18    totally different?
19  A.  It was to help his business.  He told me it was -- he
20    needed some money to help pay his staff, if I remember
21    right.
22  Q.  Okay.  That's ten months after he's already way past
23    paying you all this hundreds of thousands of dollars
24    under Exhibit 1, isn't it?
25  A.  Yes, it is.
```

Page 59

```
 1  Q.  Why would you loan him more money?
 2  A.  Gary told me that he was selling his company, and that
 3    if he couldn't pay his salespeople, he couldn't sell
 4    his company, and assured me that when he sold his
 5    company he would pay me back the principal that I had
 6    loaned him.
 7  Q.  Do you have any proof that you loaned Lupiloff $2,500
 8    on 10-6-03?
 9  A.  I don't think so.
10  Q.  You indicated in your interrogatory answers that --
11    you say Lupiloff paid back that $2,500.  Do you
12    remember answering those?
13  A.  I believe so.
14  Q.  Do you have any proof that he paid the money back?
15  A.  No, I don't think so.
16  Q.  How did he pay it back?
17  A.  I believe he gave me a check.
18  Q.  You don't have a copy of the check.
19  A.  I don't believe I have a check from 2003, no.
20  Q.  How did you pay him the 2,500 bucks?
21  A.  I don't remember.
22  Q.  You don't recall if it was cash or a check?
23  A.  Not off the top of my head.
24  Q.  Looking through all the documents you produced, there
25    was no entry in any of your accounts or any bank entry
```

Page 60

```
 1    or anything showing a $2,500 check to Lupiloff.
 2         Are you aware of any check to Lupiloff?
 3  A.  Just personally, I know I loaned him the money.
 4  Q.  Then you say in your interrogatory answers that you
 5    made a third loan to Lupiloff on July 17, '07 for
 6    6,000 bucks?
 7  A.  That sounds about right.
 8  Q.  And that's after he's now been five years owing you
 9    for Exhibit 1.  Why would you loan him more money in
10    July of '07?
11  A.  I was helping him.
12  Q.  What was helping him this time?
13  A.  I don't remember him telling me why he needed it.  I'm
14    sure it had something to do with his business.  And,
15    again, he was working hard to sell his company and
16    assured me that he would pay me the principal once the
17    company was sold.
18  Q.  Well, he told you he was selling the company back in
19    '03.
20  A.  Um-hum.
21  Q.  So this is four years later.  He's still trying to
22    sell it?
23  A.  Still trying to sell it.
24  Q.  So the 2,500 bucks, that was supposed to keep him
25    going for four years?
```

## Page 61

1   A.  No.  I think he was just short for that month.

2   Q.  You say in the interrogatory answers that he paid the

3       $6,000 back?

4   A.  Yes.

5   Q.  Do you have any proof -- first of all, do you have any

6       proof that you paid him $6,000?

7   A.  I don't know.

8   Q.  Well, nothing you produced, there's no record or bank

9       record or check or any credit card or any reference in

10      what you produced.  Are you aware of anything that's

11      in writing to show that you paid him 6,000 bucks?

12  A.  If you don't have it in your documentation, then I

13      don't have it.

14  Q.  Well, are you aware of anything?

15  A.  Not off the top of my head, no.

16  Q.  Are you aware of any proof of Lupiloff paying you the

17      $6,000 back?

18  A.  No, I don't believe I have any proof that he paid me

19      back.

20  Q.  Do you know how you paid him the 6,000 bucks?  Was it

21      cash, check, or don't you know?

22  A.  I don't know.

23  Q.  Did Lupiloff give you any checks to pay off the deal,

24      Exhibit 1?

25  A.  He did give me a check to pay off part of loan one.

## Page 62

1   Q.  And what happened to that?

2   A.  It was a $20,000 bounced check.

3   Q.  And what did you tell Lupiloff when you got the

4       $20,000 bad check?

5   A.  I told him it bounced.

6   Q.  Then what?

7   A.  I don't remember.

8   Q.  Did you threaten him with any criminal proceedings out

9       of that?

10  A.  No.

11  Q.  When you told him it bounced, what did he say?

12  A.  He assured me that he would pay me my investment back

13      with proceeds from the Woodward Dream Cruise that was

14      six months later.

15  Q.  When did the idea or the issue of buying a life

16      insurance policy come up?

17  A.  I don't know.

18  Q.  Who brought that idea up?

19  A.  Gary brought it up.

20  Q.  And how did he bring it up to you?

21  A.  I don't remember exactly what was said, he just said

22      he would give me a life insurance policy.

23  Q.  Well, what was the rationale for that?

24  A.  You'd have to ask Gary.

25  Q.  Well, what did you understand the rationale to be?

## Page 63

1   A.  I understood it was to cover his debt to me.

2   Q.  But it can only cover his debt if he's dead, right?

3   A.  If something happened to him, correct.

4   Q.  So what good does that do you if he's 46 years old and

5       in excellent health, how is that a benefit to you?

6   A.  It's just an insurance policy, it covers in case of an

7       accident.

8   Q.  Well, it only covers if he's dead, right?

9   A.  I think you said that already.

10  Q.  But you said an accident.  He can't get in an accident

11      and get the money, he's got to be dead, right?

12  A.  Correct.

13  Q.  You're saying that it was Lupiloff's idea for him to

14      get this life insurance policy on his life?

15  A.  I believe so.

16          MARKED FOR IDENTIFICATION:

17          DEPOSITION EXHIBIT 3

18          3:34 p.m.

19  BY MR. SCHMIDT:

20  Q.  I'll hand you, sir, what I marked as Exhibit 3.  This

21      is Defendant, William Keene's, Supplemental Answers to

22      Interrogatories and Requests to Produce from

23      Nationwide.

24          And if you look at the question, it says,

25      "In regard to the purpose of the Nationwide policy, as

## Page 64

1       indicated on the New Account/Suitability Form, to

2       provide coverage over an investor loan" --

3   A.  I'm sorry, where are you reading again?

4   Q.  (Indicating.)

5   A.  Number 2?

6   Q.  Yes.

7   A.  Okay.

8   Q.  "In regard to the purpose of the Nationwide policy, as

9       indicated on the New Account/Suitability Form, 'to

10      provide coverage over an investor loan for capital

11      purchase.'  Please state with factual precision.

12          Please state how the policy was to provide

13      coverage over an investor loan for capital purchase."

14          "ANSWER:  The capital loan was for $130,000

15      and was to cover the $245,000 that was to be paid by

16      MAD Advertising.  William Keene loaned $130,000 to

17      Gary Lupiloff, which Lupiloff received as MAD

18      Advertising.  Lupiloff originally agreed to repay the

19      loan, but when he failed to do so, Keene offered to

20      purchase a life insurance policy that is at issue."

21          Is that answer incorrect or correct?

22          MR. BREDELL:  Well, you asked whose idea it

23      was, you didn't ask about who purchased it.  That's a

24      different question.

25  BY MR. SCHMIDT:

16 (Pages 61 to 64)

Page 65

1 Q. It says in the answer, "Keene offered to purchase the
2 life insurance policy that is at issue."
3 Is that correct or not?
4 A. Mr. Schmidt, you have to be a little more specific
5 with regard to your question.
6 Q. Okay. I read you the question in the interrogatory
7 and I read you the answer. The question -- if you
8 want me to read it again, I'll read it to you, but
9 it's right in front of you. There's the question,
10 2-A, and there's the answer.
11 A. Um-hum.
12 Q. It says, "Lupiloff originally agreed to repay the
13 loan, but when he failed to do so Keene offered to
14 purchase the life insurance policy that is at issue."
15 Is that true or false?
16 A. Well, I did offer to pay -- no, that's not correct.
17 Q. And what's not correct about it?
18 A. Mr. Lupiloff took out the policy. He paid for the
19 policy for a number of years, and when he could not
20 pay the policy any more, he asked me to pay the
21 premiums, which is offered to purchase the life
22 insurance policy that's at issue.
23 Q. Okay. What you just said is not what's written down
24 on Exhibit 3, is it? Exhibit 3 says nothing about --
25 A. No.

Page 66

1 Q. -- Lupiloff coming up with the idea and Lupiloff
2 paying for it and then sometime later you started to
3 pay for it, the answer to 2, sub A, on Exhibit 3 says,
4 "The capital loan was for $130,000 and was to cover
5 the $245,000 that was to be paid by MAD Advertising.
6 William Keene loaned $130,000 to Gary Lupiloff."
7 Okay. That's correct so far, isn't it?
8 A. That's correct.
9 Q. And then it says, "Which Lupiloff received as MAD
10 Advertising."
11 That's correct, isn't it?
12 A. Yes.
13 Q. It says, "Lupiloff originally agreed to repay the
14 loan."
15 Is that correct?
16 A. That is correct.
17 Q. Then it says, "But when he failed to do so, Keene
18 offered to purchase the life insurance policy that is
19 at issue."
20 Is that correct or not?
21 A. Mr. Schmidt, there's a time between when one thing
22 happened and when another thing happened. The
23 statement is true, but there's a gap in time. So what
24 I'm saying is correct and what you are saying is
25 correct.

Page 67

1 Q. All right. If we look at this Exhibit 3, answer to
2 2-A, starting with that last sentence, it says,
3 "Lupiloff originally agreed to repay the loan," and
4 you said that's correct.
5 A. Um-hum.
6 Q. Correct?
7 And then he failed to do so, and you said
8 that's correct.
9 A. Um-hum.
10 Q. Correct? You have to say yes.
11 A. Yes. I'm sorry.
12 Q. And then it says, "Keene offered to purchase the life
13 insurance policy that is at issue."
14 That's what's written down there, correct?
15 Did I read that right, "Keene offered to purchase the
16 life insurance policy that is at issue"?
17 A. Mr. Schmidt, you have read that paragraph correctly.
18 I am not arguing with it. I think I've made myself
19 very clear that there is a gap in time. I did pay for
20 the life insurance policy when Gary called me and
21 said, "Bill, I can no longer pay the premium." So my
22 statement is correct and your statement is correct.
23 Q. Okay. Just for the record, it's not my statement,
24 it's --
25 A. I understand that, but what you are reading.

Page 68

1 Q. We both can't talk at once.
2 Exhibit 3 is your answer to Nationwide's
3 interrogatory. That's your answer. And I'm not here
4 to argue --
5 A. Yes.
6 Q. And I'm not here to argue with you, I'm just asking a
7 question about it.
8 You mentioned this gap in time. There's no
9 mention of any gap in time in this answer, is there?
10 A. To answer your question, no, there's no phrase that
11 says "gap in time."
12 Q. Okay. Now, I'll hand you this. This was marked as
13 Reich Exhibit Number 1. And if you look at that first
14 page, it's entitled, "New Account/Suitability Form."
15 Do you see that?
16 A. Yes.
17 Q. Have you seen this document before?
18 A. I have never seen this document before.
19 Q. On the first page and the bottom -- or I should say on
20 the first page at the top, it says,
21 "Owner/custodian/trustee; first, MI, last, Gary Harmon
22 Lupiloff."
23 Do you see that?
24 A. I do.
25 Q. And then it's got, down further, it says, "Employer

Page 69

1  name, MAD Advertising and Marketing."
2      Do you see that?
3  A. Yes.
4  Q. Okay. And then underneath it, it says, "Financial
5     Information."
6      Do you see that?
7  A. Yes.
8  Q. And it says -- annual income it's checked off, 50 to
9     $100,000.
10     Do you see that?
11 A. I do.
12 Q. Do you know if that's correct or not?
13 A. I have no idea.
14 Q. Okay. And then below that, it says, "Net worth,
15    excluding residence, $500,000."
16     Do you see that?
17 A. I do.
18 Q. Do you know if that's correct or not?
19 A. I have no idea.
20 Q. And I guess, to be fair, I should have said the date
21    of this. So if you look on the fourth page, it's
22    signed by Mr. Lupiloff on 11-11-03.
23     Do you see that? Let me show you the right
24    page. Do you see that?
25 A. 11-11-03.

Page 70

1  Q. Okay. So going back to the first page, do you know if
2     Lupiloff had income of 50 to $100,000 as of 11-11-03?
3  A. Mr. Schmidt, I have no idea.
4  Q. And do you know if he had net worth, excluding
5     residence, of $500,000 as of 11-11-03?
6  A. No idea.
7  Q. And do you know if he had a liquid net worth of
8     $75,000 as of 11-11-03?
9  A. I have no idea.
10 Q. And then if you look on the next page, it says the
11    section Life Insurance Analysis.
12     Do you see that?
13 A. Yes.
14 Q. It says total debt, $500,000.
15     Do you see that?
16 A. Correct.
17 Q. All right. The total debt that you're aware of was
18    $130,000, correct?
19 A. I don't know what Gary's total debt was.
20 Q. But the total debt, I asked you the total debt that
21    you were aware of, per Exhibit 1, you loaned him
22    $130,000.
23 A. Mr. Schmidt, this debt is for 245,000, plus ten
24    percent on any remaining balance accumulating every
25    30 days.

Page 71

1  Q. The amount that you loaned him totally was 65,000 plus
2     65,000; is that correct?
3  A. That's correct.
4  Q. Okay. Are you aware of any other debt that
5     Mr. Lupiloff had other than to you on Exhibit 1?
6  A. I never saw any paperwork that Gary showed me that he
7     had any other debt, but in the times that we spoke, he
8     said that there were, he had other debts.
9  Q. If we look back at Reich Exhibit Number 1, it says --
10    do you see where it says, "Total need, $500,000"?
11 A. Yes. Under Life Insurance Needs Analysis?
12 Q. Yes. And then it says, "Remaining need, $500,000."
13     Do you see that?
14 A. Yes.
15 Q. There's an asterisk in front of each of those 500,000.
16     Do you see that?
17 A. Yes.
18 Q. And then below, in the box with the asterisk, it says,
19    "To provide coverage over an investor loan for capital
20    purchases."
21     Do you see that?
22 A. Yes.
23 Q. Do you know what that's referring to?
24 A. No.
25 Q. When you discussed with Mr. Lupiloff that, there was

Page 72

1  no discussion that he was going to -- that there was
2  going to -- obtaining this Nationwide policy had
3  something to do with the loan that you gave to him?
4  A. Well, that's what he told me he was taking the policy
5     out for.
6  Q. Okay. If you flip to the last page of Reich Exhibit
7     Number 1.
8  A. This page?
9  Q. Yes, sir.
10     MR. BREDELL: Can you read that? Is that
11    clear?
12 A. I think I can read it.
13 BY MR. SCHMIDT:
14 Q. It says -- it's dated November 12th, 2003. It says
15    Summary Sheet.
16     Do you see that?
17 A. Yes.
18 Q. It says, "Purpose of policy is business related.
19    Gary's company, MAD Advertising and Marketing, has
20    borrowed a sum of money for capital and the investor
21    is requesting Gary to carry this policy to protect the
22    loan repayment in the event of Gary's demise."
23     Is that phrase that says, "Gary's company,
24    MAD Advertising, has borrowed a sum of money for
25    capital and the investor is requesting Gary to carry

Page 73

1    this policy to protect the loan repayment in the event
2    of Garry's demise," is that correct or not?
3    A.  Are you asking me that that's what this document says?
4    Q.  No, I'm asking you if that is true, that Gary's
5        company had borrowed -- did Gary's company borrow a
6        sum of money from you?
7    A.  Yes, he did.
8    Q.  Okay.  And as the investor, did you request Gary to
9        carry the policy to protect the loan repayment in the
10       event of his demise?
11   A.  Mr. Schmidt, I've never seen this document before, so
12       I have no idea what you're asking me.  I don't know
13       what this is about.  I don't know this document.
14   Q.  This is a document submitted by the Nationwide agent,
15       Mary E. (Betsy) Reich, to issue the Nationwide policy
16       that this lawsuit is all about.  And on it it says
17       what I'm reading you, it says -- and I'm not asking
18       you if you saw it.  You've already told me you didn't
19       see it before, so I understand that.
20           I'm just asking you, from this language, it
21       says, "Gary's company, MAD Advertising and Marketing,
22       has borrowed a sum of money for capital."
23           Now, you agree Gary's company, MAD
24       Advising, borrowed a sum of money from you.
25   A.  Yes, they did.

Page 74

1    Q.  Then the next part says, "And the investor is
2        requesting Gary to carry this policy to protect the
3        loan repayment in the event of Gary's demise."
4            My question is, did you, as the investor,
5        request Gary to carry the policy to protect the loan
6        repayment in the event of Gary's demise?
7    A.  No.
8    Q.  If the policy was not being purchased to protect the
9        loan repayment in the event of Gary's demise, what is
10       it being purchased for?
11           MR. BREDELL:  That's a different question
12       you're asking him.  You're asking him why as opposed
13       to whose idea it was.
14   BY MR. SCHMIDT:
15   Q.  Is it your understanding that the purpose of the
16       policy was to protect the loan repayment in the event
17       of Gary's demise?
18   A.  I don't know why Mr. Lupiloff took out the policy.  He
19       took the policy out, so --
20   Q.  I think we discussed earlier, you said there was
21       discussions about him taking out the policy to protect
22       the investment in the event that Gary died.
23           Wasn't that your understanding?
24   A.  I think you're going to have to rephrase that because
25       I'm not following you a hundred percent.

Page 75

1    Q.  The question is:  Was it your understanding that the
2        policy was being taken out to protect the loan
3        repayment in the event of Gary's demise?
4    A.  Yes, I believe Gary took the policy out to protect the
5        debt that he owed to me.
6    Q.  That purpose does not benefit -- what benefit does
7        that purpose give to Gary?
8    A.  You'd have to ask Gary.
9    Q.  The person who gets the benefit from that is you.  If
10       he dies, you get $500,000, correct?
11   A.  That's correct.
12   Q.  So the only person who gets a benefit from this
13       transaction of buying this life insurance policy, it
14       would be you only if Gary dies; is that correct?
15   A.  I believe so.
16   Q.  Then it says, "The initial loan amount was for more
17       than $500,000, yet the amount has now decreased to
18       approximately this amount at this time."
19           Is that correct or not?
20   A.  .Mr. Schmidt, I didn't write this, but I don't know
21       exactly what the initial loan amount is that we're
22       talking about.  The initial loan amount -- the
23       investor is listed as me, but I didn't write this.
24   Q.  I understand you didn't write this.
25   A.  So there might be more than one investor that Gary

Page 76

1    owed money to.  I don't really know.
2    Q.  Are you aware of anybody that this policy concerned
3        other than you?  There's no other beneficiary named
4        other than you, correct?
5    A.  Well, at the time he took it out I believe his
6        daughters were listed as --
7    Q.  Contingent.
8    A.  -- contingent.
9    Q.  You were the first beneficiary, correct?
10   A.  Correct.
11   Q.  So if Mr. Lupiloff died, you're the first one in line.
12   A.  That's correct.
13   Q.  All right.  So my question is, once again I'm not --
14   A.  I understand.
15   Q.  -- saying you seen this before, I'm just asking you,
16       this sentence, "The initial loan amount was for more
17       than $500,000."  Is that true or not?
18   A.  I don't believe that was true.
19   Q.  Okay.  And then the second part of it, it says, "Yet
20       the amount has now decreased to approximately this
21       amount at this time."
22           That's not true either, is it?
23   A.  In my understanding, that doesn't seem to be true.
24   Q.  It's wrong.
25   A.  I didn't write this, so --

## Page 77

1  Q.  I understand that.
2  A.  -- and I don't the legalese of whoever wrote this.  So
3  I don't know if there's more to this document.
4  Q.  I'm just asking you what's written there.
5  It says, "The investor, William Keene, will
6  show as the primary beneficiary, with the verbiage
7  ATIMA, with the balance of death benefit at any time
8  to go to the secondary beneficiaries, which are Gary's
9  daughters."
10  Is that your understanding of what the
11  policy was supposed to do?
12  A.  I don't know what ATIMA stands for.
13  Q.  As their interest may appear.
14  A.  I'm sorry, I don't understand what that phrase means.
15  Q.  All right.  As far as the part, "The investor, William
16  Keene, will show as the primary beneficiary," you
17  understand that was correct?
18  A.  Correct.
19  Q.  And it says, "The balance of the death benefit to go
20  to the secondary beneficiaries, which are Gary's
21  daughters," was that your understanding?
22  A.  It wasn't to my understanding, because I've never seen
23  this document before.
24  Q.  You were aware, when the policy was issued, that you
25  were the primary beneficiary, correct?

## Page 78

1  A.  That's what I was told.
2  Q.  And you were aware of the policy issued that
3  Lupiloff's daughters were the contingent
4  beneficiaries.
5  A.  Yes.
6  Q.  "William Keene is paying the first estimated quarterly
7  payment to buy the policy."  Is that correct?
8  A.  I don't really remember if that's the case.
9  Q.  Pardon me?
10  A.  I don't remember if I paid it.
11  Q.  Did you meet this Mary Betsy Reich at the time this
12  policy was issued?
13  A.  I don't remember.
14  Q.  I'll show you what we've marked as Reich Exhibit 2,
15  it's a two-page document.  Have you ever seen that
16  before?
17  A.  I don't remember ever seeing this document.
18  MR. DANZIG:  What's it entitled?
19  MR. BREDELL:  New Accounts/Suitability Form
20  Addendum.
21  BY MR. SCHMIDT:
22  Q.  And attached to it is a copy of Mr. Lupiloff's
23  driver's license; is that correct?
24  A.  That's what it looks like.
25  Q.  But you've never seen that before?

## Page 79

1  A.  Never.
2  Q.  I'm going to hand you what was previously marked as
3  Reich Exhibit Number 3.
4  This is an application for a life insurance
5  policy submitted by Mr. Lupiloff.  Do you see his name
6  on the first page there?
7  A.  I do.
8  Q.  Okay.  And if you look on the last page, it's signed
9  by Mr. Lupiloff on 11-11-03?
10  A.  It looks like his signature, yes.
11  Q.  If you look on Page 3, which at the bottom has 0239 at
12  the bottom of it.
13  A.  Um-hum.
14  Q.  It's got down, "Beneficiary, William Keene/ATIMA."
15  Do you see that?
16  A.  Yes.
17  Q.  And then it says, "Relationship to insured, partner
18  (business)."  Do you see that?
19  A.  I do.
20  Q.  Is that correct?
21  A.  I don't know what my title would be.
22  Q.  Would you consider yourself as a business partner of
23  Lupiloff?
24  A.  I don't know what I would designate as my title.
25  Q.  Well, is partner (business) wrong or right?

## Page 80

1  A.  I didn't write this, so I don't know if it's right or
2  wrong.
3  Q.  It says, "William Keene/ATIMA."  You asked me about
4  that before.
5  Do you recall discussions made that the
6  policy would pay you whatever -- if Lupiloff died, the
7  policy would pay you whatever Lupiloff owed you at the
8  time and the rest of the money would go to the
9  contingent beneficiaries; do you recall any discussion
10  about that?
11  A.  I don't remember ever having any sort of discussion
12  about that.
13  Q.  Okay.  On that Page 3, Page 0239, it has down as -- it
14  has the name of Monica Lynne Lupiloff, do you see
15  that, daughter?
16  A.  Yes.
17  Q.  And Nicole Renee Lupiloff, daughter?
18  A.  Yes.
19  Q.  And you were aware at the time of the policy that they
20  were going to be contingent beneficiaries?
21  A.  Yes.
22  Q.  If you look on the next page, Page 4, it says --
23  there's some questions there, personal information.
24  Question number F, "Have you ever been charged with a
25  violation of any criminal law," and he checked that

Page 81

1    yes; do you see that?
2    A.   Yes.
3    Q.   And it says F, and underneath it it says, "Gary Harmon
4         Lupiloff, 1998 federal bank fraud, one count."
5             Do you see that?
6    A.   I do.
7    Q.   Were you aware of that at that time?
8    A.   No, I wasn't.
9    Q.   When did you first become aware of that?
10   A.   After Gary was shot.
11   Q.   And how did you find out?
12   A.   It was on the television.
13   Q.   So you first saw it by seeing it on t.v. after he was
14        killed?
15   A.   Yes, I believe so.
16   Q.   And then if you look at above there, small G, it has,
17        "Have you had any bankruptcies in the past seven years
18        or have any suits or judgements pending," that's
19        checked yes; do you see that?
20   A.   What letter again?
21   Q.   F.  I'm sorry, G.
22   A.   Okay.
23   Q.   All right.  And then at the bottom it says, "Gary
24        Harmon Lupiloff, 2001, Civil Action 01-036655-CZ,
25        settled."

Page 82

1             Were you aware of any suits against him?
2    A.   No, I wasn't.
3    Q.   And then on the next page, Page 5, it's got answers to
4         a bunch of medical questions, and Lupiloff answered
5         all of those in the negative.  Do you see all those?
6         Whether he had AIDS, whether he had heart disease,
7         headaches, seizures, epilepsy, asthma, emphysema,
8         colitis, ulcer, sugar problems, diabetes, cancer,
9         arthritis, alcoholism, any disease or disorder of the
10        eyes, ears, nose or throat; do you see those are all
11        answered no?
12   A.   I see they're all no except this one, 16-A.
13   Q.   Yes, we'll get down to that.
14            Then the next section, we've got 16-A,
15        there's four questions, and the first one, "Have you
16        consulted or have you been examined by a physician,
17        chiropractor or medical practitioner or been in any
18        hospital," and the answer to that one is "yes."
19            Do you see that?
20   A.   Yes.
21   Q.   And the other three under that, had any diseases or
22        operation not disclosed, any x-rays,
23        electrocardiograms not disclosed, been medically
24        advised to have any surgery, ablation, those are all
25        answered no, correct?

Page 83

1    A.   Correct.
2    Q.   But the one that's answered yes, he's got a note at
3         the bottom for 16-A, and it says, "Dr. L. Scott --
4    A.   Grant.
5    Q.   -- "Grant, check-up and prescription for cough."
6             Do you see that?
7    A.   Yes.
8    Q.   So you've never seen this document before, correct?
9         Or have you?
10   A.   I believe it was in a set of documents that came to my
11        attorney's office.
12   Q.   So after this lawsuit was filed.
13   A.   After the lawsuit, yeah.
14   Q.   But this information that we just went through, where
15        Lupiloff is saying he's got no health problems at all
16        and that he's 46 years old at the time this policy is
17        being issued, do you have any information that's to
18        the contrary to that?
19   A.   No.
20   Q.   Do you have any information that he wasn't 46 years
21        old?
22   A.   No.
23   Q.   Do you have any information that he had any health
24        problems?
25   A.   No.

Page 84

1    Q.   As far as you know, he was in perfect health.
2    A.   We never talked about his health.
3    Q.   Well, were you aware of anything that he was not in
4         perfect health?
5    A.   No.
6    Q.   I'm going to show you, this is Reich Exhibit Number 4.
7         That's the policy.
8    A.   Um-hum.
9    Q.   Have you ever seen the policy before, sir?  This is --
10        that's a bad question.
11            For the record, this is the Nationwide
12        Guaranteed Term Life Insurance Policy issued to Gary
13        Lupiloff on November 11th, 2003.
14            Have you seen this before?
15   A.   Mr. Schmidt, I have seen this, I received it after
16        Gary was shot.
17   Q.   So the first time you ever saw it was after -- after
18        Lupiloff's death.
19   A.   That's right.
20           MR. DANZIG:  Is that Exhibit 4 from Reich?
21           MR. SCHMIDT:  It's Exhibit 4 from Reich.
22           MR. DANZIG:  Thank you.
23   BY MR. SCHMIDT:
24   Q.   If you look, sir, on Page -- at the bottom, there's
25        Bates numbers, Page 303 in the bottom right corner.

Page 85

```
1    A.  Yes.
2    Q.  That says that the owner, Gary Lupiloff; do you see
3        that?
4    A.  Yes.
5    Q.  Age of insured 46; do you see that?
6    A.  Yep.
7    Q.  Premium annual $1,030?
8    A.  Yes.
9    Q.  And then it says, at the bottom it says, "Ten year
10       level guaranteed term life insurance to age 95, $1,030
11       payable to the year 2013."
12           Do you see that?
13   A.  Yes.
14   Q.  Was it your understanding that the policy would cost
15       $1,030 per year from the date it was issued in 2003,
16       for ten years until 2013?
17   A.  No.
18   Q.  You weren't aware of that?
19   A.  I wasn't aware of it.
20   Q.  If you look on Page 304, that's a listing of -- do you
21       see where it says policy year age, guaranteed premium;
22       do you see that?
23   A.  Yes.
24   Q.  And do you see the first ten years is $1,030 per year?
25   A.  Yes.
```

Page 86

```
1    Q.  And then it goes up to, in year 11, it goes up 11
2        times to 11,800?
3    A.  Yes.
4    Q.  And then it keeps going up after that; do you see
5        that?
6    A.  Yes.
7    Q.  Do you know what Mr. Lupiloff's life expectancy was
8        when he was age 46?
9    A.  Mr. Schmidt, I'm not in the insurance business so I
10       have no idea.
11   Q.  Just assume, for the sake of my question, that his
12       life expectancy, when he was 46, was 77 years.
13   A.  Yes.
14   Q.  And assuming, if you add up all those numbers from
15       year one to year 32, do you have any idea what it
16       would cost to pay the premiums for that policy for his
17       expected life when it was issued?
18   A.  No.
19   Q.  If I told you that number would be $915,515, would
20       that shock you?
21   A.  No.
22   Q.  Why not?
23   A.  Because I had seen this document after Gary was shot
24       and I see how much it would cost in premiums.
25   Q.  As a business person, as a college grad, as a real
```

Page 87

```
1        estate salesperson, as of November of 2003 would you
2        have any understanding that it would make any business
3        or economic sense whatsoever to have a policy like
4        this in effect for somebody who's 46 years old and in
5        perfect health?
6    A.  Mr. Schmidt, I've never seen this document, so I had
7        no idea at all that the premiums were ever going to
8        increase more than the thousand or so dollars that it
9        cost.
10   Q.  Okay. As of going back to November of 2003, not as of
11       today, but what you knew then, did you know what a
12       term life policy was versus a whole life policy?
13   A.  I had a general idea.
14   Q.  All right. Do you know that a term life policy is one
15       that's going to have initially real cheap premiums,
16       but then after a certain number of years the premiums
17       go way, way up higher?
18   A.  I never thought about it.
19   Q.  Were you aware that that's what existed at that time?
20   A.  Are you asking me if I was aware of Mr. Lupiloff's
21       policy?
22   Q.  No. I'm asking you if back in November of 2003, if
23       you were aware that there was such a thing out there
24       as a term insurance policy that you could buy for a
25       relatively cheap amount of money, for someone who's,
```

Page 88

```
1        you know, even up to their mid 40's or mid 50's, but
2        it's only going to be cheap for a limited period of
3        time, maybe five or 10 or 15 years, and from then the
4        premiums go way, way up; were you aware of that?
5    A.  No idea.
6    Q.  Did you have any life insurance back in 2003?
7    A.  No.
8    Q.  Have you ever had life insurance?
9    A.  I do now.
10   Q.  When did you first get life insurance?
11   A.  Three years ago.
12   Q.  Is it a guaranteed -- I'm sorry, is it a term policy
13       or a whole life policy?
14   A.  It is a term policy.
15   Q.  Okay. Now, I'm not asking you -- you've said you
16       don't know anything about this policy and hadn't seen
17       it until after Mr. Lupiloff was dead. But I'm asking
18       you as a business college graduate, business person,
19       real estate person, as of 2003 would it make any
20       economic sense whatsoever for someone to have a term
21       policy like this, for someone who's age 46 and in
22       perfect health, and continue paying premiums on that
23       until the person is to their expected life expectancy
24       or they die at 77 years old?
25   A.  I've really never given it any thought.
```

Page 89

1     Q. So you don't think that paying 915,000 for a $500,000
2     policy is okay or not?
3         MR. BREDELL: Well, objection. You're
4     asking him what he knew then and he's told you he
5     didn't know that, so your question is unfair. It's
6     like are you still beating your wife. I mean, he said
7     he didn't know that. And now you've imputed the
8     knowledge to him and now you're asking him if it makes
9     any sense.
10       Do you know want to know whether it made
11     sense then or --
12         MR. SCHMIDT: No, I'm asking him a
13     different question. He said he didn't know about the
14     term policy, and now I'm asking him based on the fact
15     that a term policy would cost $915,000 to go to a
16     46-year-old's expected life expectancy, do you feel
17     that would make any economic sense whatsoever.
18         MR. BREDELL: With what he knows now.
19         MR. SCHMIDT: No, no, with what he knew
20     then.
21         MR. BREDELL: Well, he didn't know that
22     then. You said would it make sense to pay $900,000
23     for a $500,000 policy, but he didn't know that then.
24         MR. SCHMIDT: First of all, I object to
25     your speaking objection. I'm not arguing with you.

Page 90

1 BY MR. SCHMIDT:
2     Q. What my question is -- this is a separate and new and
3     distinct question from the prior question.
4       Based on your experience in 2003, would it
5     make any economic sense to buy a term policy for
6     someone who's 46 years old and in perfect health, with
7     no health conditions, to buy a term policy that's
8     going to cost $915,000 for that person's expected life
9     expectancy?
10     A. My thought, Mr. Schmidt, is it's a very intelligent
11     thing for Mr. Lupiloff or anyone to buy life insurance
12     depending on what their needs are.
13     Q. That's not my question. My question is a specific
14     question, it was does it make any economic or business
15     sense, for someone with your understanding in November
16     of 2003, for a 46-year-old person to buy a term
17     policy, for the $500,000 face value, the person is in
18     perfect health, and it's supposed to be to guarantee a
19     loan, when the premiums are going to cost $915,000 for
20     that person's expected life expectancy?
21     A. Absolutely.
22     Q. And why is that?
23     A. I think every situation is going to be different, so I
24     don't know how to answer your question. You asked me
25     a question, if I thought it was a good idea for

Page 91

1     someone to buy a life insurance policy and my answer
2     was absolutely.
3     Q. That's not what I asked you, sir. My question was
4     based on your experience in November of 2003, does it
5     make economic sense to buy a term life policy, with a
6     $500,000 face value, for someone who's 46 years old
7     and in perfect health, with a policy that's intended
8     to protect a loan of $500,000, when the person is in
9     perfect health, and in order to keep that policy in
10     effect for an expected life expectancy will cost
11     $915,000; based on each one of those facts, don't
12     discard any one of those, but for each one of those
13     facts do you feel that it makes any economic sense or
14     not?
15     A. I really don't know how to answer that question.
16     Q. And why don't you know how to answer that?
17     A. Because it seems to me like there are too many
18     variables that you are asking.
19     Q. Tell me the variable that you want to eliminate.
20     A. If you were to -- sorry, Mr. Schmidt, I don't -- I
21     can't help with your question. I'm not following your
22     question.
23     Q. Okay.
24     A. You're asking me a question about economics and is
25     life insurance a good idea or a bad idea. I'm sorry,

Page 92

1     I don't know the answer to that.
2         MR. DANZIG: Michael, whenever you're ready
3     to move on to a different subject, can we stop for a
4     second?
5         MR. SCHMIDT: Sure. We can stop right now.
6         (Off the record at 4:16 p.m.)
7         (Back on the record at 4:33 p.m.)
8         MARKED FOR IDENTIFICATION:
9         DEPOSITION EXHIBIT 4
10         4:33 p.m.
11 BY MR. SCHMIDT:
12     Q. Sir, I'll hand you Exhibit 4.
13     A. Okay.
14     Q. Have you seen that before?
15     A. Okay.
16     Q. Does that refresh your memory that you paid the first
17     premium payment on 11-12-03 for $200 to Nationwide?
18     A. That would make sense, yeah.
19     Q. That's your check, right?
20     A. Yeah, that's my check, that's my writing.
21     Q. It's made out to Nationwide, at the bottom left corner
22     it says for -- I can't read that -- Gary Harmon?
23     A. Yeah, for Gary Harmon.
24     Q. Now, just so we get this straight on the record, Gary
25     Harmon is that another name for Gary Lupiloff?

Page 93

1    A.   Correct.
2    Q.   Do you recall that you paid the first premium?
3    A.   Well, I don't know if the $200 covers the whole
4         premium, but I paid $200.
5    Q.   Towards the first premium?
6    A.   Um-hum.
7    Q.   That means yes?
8    A.   Yes.
9              MARKED FOR IDENTIFICATION:
10             DEPOSITION EXHIBIT 5
11             4:34 p.m.
12   BY MR. SCHMIDT:
13   Q.   I'll hand you Exhibit 5, sir.  If you look at the
14        second page of it, it's entitled, "Application for
15        Change of Beneficiary Designation."
16             Do you see that?
17   A.   I do.
18   Q.   And that's a three-page document?
19   A.   I don't know how many pages it is.
20   Q.   Well, Page 170 is the first page of it, 171 is the
21        second and 172 is the third.
22   A.   Okay.
23   Q.   Do you see that?
24   A.   Yes, I see it.
25   Q.   Do you recall there being a change of beneficiary for

Page 94

1         the policy?
2    A.   I do.
3    Q.   And as you understand it, the beneficiary, you
4         remained as the primary beneficiary and your wife
5         became the contingent beneficiary?
6    A.   That's right.
7    Q.   In place of the two Lupiloff daughters?
8    A.   That's right.
9    Q.   And why was that?
10   A.   At this time I became the owner of the policy.  And I
11        figured if I'm going to pay for it, I might as well
12        put my wife down as the contingent beneficiary.
13   Q.   Okay.  And if you look on that document, Page 170,
14        it's got, "Full name, William Keene.  Relationship to
15        insured, business.  Relationship on file."
16             Do you see that?
17   A.   Yeah.
18   Q.   Okay.  Do you recall that discussion with the agent
19        about the fact that your relationship to Lupiloff was
20        that you had a business relationship, was how you were
21        related to the policy?
22   A.   Yes.
23   Q.   If you look on Page 171, if you know, is that
24        Lupiloff's signature?
25   A.   I believe so.

Page 95

1    Q.   To your knowledge, Lupiloff agreed to change the
2         beneficiary?
3    A.   He must have.
4    Q.   If you look on that document to Page 175?
5    A.   Yes.
6    Q.   That's a change of -- Application for Designation of
7         Owner and/or Contingent Owner; do you see that?
8    A.   Yes.
9    Q.   And you mentioned a few minutes ago that you became
10        the owner?
11   A.   Yes.
12   Q.   And is that your signature on that document, 175 at
13        the bottom left?
14   A.   Yes.
15   Q.   Is that Mr. Lupiloff's signature?
16   A.   Yes.
17   Q.   And that's based on what you said before, is you were
18        paying the premiums?
19   A.   Correct.
20   Q.   So you wanted to be the owner?
21   A.   Correct.
22   Q.   Why were you paying the premiums?
23   A.   Gary called me and said he couldn't afford the policy
24        any more and wanted to know if I wanted to take
25        ownership of it.

Page 96

1    Q.   Is the effective date of this April -- this document,
2         changing ownership, is signed April 4, '07.
3              Do you see that?
4    A.   I do see that.
5    Q.   Let me show you this document.  Why don't we mark
6         this.
7              MARKED FOR IDENTIFICATION:
8              DEPOSITION EXHIBIT 6
9              4:38 p.m.
10   BY MR. SCHMIDT:
11   Q.   Exhibit 6 is a letter from Nationwide to you, and that
12        says -- it's dated June 18, '07.  It says, "The
13        ownership designation form signed on April 7, '07 has
14        been recorded with our home office, effective the date
15        it was signed by the previous owner."
16             So do you recall receiving that letter?
17   A.   I don't recall it.
18   Q.   Do you have any information that that's incorrect,
19        that you became the owner of the policy as of 4-7-07?
20   A.   I believe I may have gotten this letter, it looks
21        familiar, but -- and I had, I believe I had this in my
22        file.
23   Q.   Okay.  But, I mean, this letter --
24   A.   Yes.
25   Q.   -- this letter, Exhibit 6, is saying that as of

Page 97

1  4-7-07, you, William Keene, became the owner of that
2  policy.
3      Do you have any information to the
4  contrary?
5  A.  No.
6      MARKED FOR IDENTIFICATION:
7      DEPOSITION EXHIBIT 7
8      4:40 p.m.
9  BY MR. SCHMIDT:
10  Q.  I'm going to show you Exhibit 7. Sir, that's that
11  6-21-07 letter from Nationwide to you?
12      It says, "The ownership designation form
13  signed on 4-7-07 has been recorded with our home
14  office effective the date it was signed by the
15  previous owner.  Attached is the copy of the transfer
16  of ownership form that we have recorded.  Please
17  accept this letter as confirmation that it has been
18  recorded."
19      Do you see that?
20  A.  I do.
21  Q.  Do you recall getting that?
22  A.  I don't recall getting it.
23  Q.  That's the same information that you were given in
24  Exhibit 6, that as of 4-7-07 you're the owner, right?
25  A.  Yes.

Page 98

1      MARKED FOR IDENTIFICATION:
2      DEPOSITION EXHIBIT 8
3      4:41 p.m.
4  BY MR. SCHMIDT:
5  Q.  I'll hand you Exhibit 8, sir.  That's a 10-9-07 letter
6  from Nationwide to you, and it says, "Please accept
7  this letter as confirmation that the payor on the
8  above life policy has updated to the policy owner,
9  William Keene."
10      Do you see that?
11  A.  Yes, I do.
12  Q.  And you agree that is correct, that you knew as of
13  10-9-07 you were paying the premiums?
14  A.  I believe I do.
15  Q.  Do you know what the premiums were?
16  A.  I think they were 400 and some dollars every six
17  months.
18  Q.  Reich Exhibit 4 is the policy.  Page 304, that lists
19  the premiums.  As of 10-4-07 you were paying the
20  premiums, and if we look at that Reich Exhibit 4,
21  Page 304, that lists the premiums per year.
22      Do you see that?
23  A.  I do.
24  Q.  You understood at that time that's what you'd be
25  paying per year?

Page 99

1  A.  No.
2  Q.  What did you understand you were paying?
3  A.  I thought I was going to be paying $1,000,
4  approximately, a year up until Gary passed away.
5  Q.  And who told you that?
6  A.  Nobody.  That's what I assumed.
7  Q.  Did you get a copy of the policy?
8  A.  I only got a policy after Gary was shot.
9  Q.  Did you ever ask anybody what their premiums were?
10  A.  No.
11  Q.  How did you have this number that you assumed what it
12  was?
13  A.  When I received the bills in the mail every six
14  months, it's listed on the bill.
15  Q.  According to your interrogatory answer, you said
16  that -- we asked you how many of these premium
17  payments you made.  In response to Interrogatory
18  Number 6, you said, "It is Mr. Keene's memory that he
19  made two, possibly more payments on a policy while the
20  policy was still in Mr. Lupiloff's name.  Mr. Keene is
21  checking his bank records to try to locate these
22  payments."
23      Does that sound right to you, that you
24  might have made two before you changed over?
25  A.  Yes, I remember helping Gary pay his policy amount,

Page 100

1  but I don't remember how many.  I thought maybe I may
2  have paid a second one, but I have not found any
3  records to show that.
4  Q.  All right.  And then as of this October -- well, you
5  took over in April of '07.  After that time you paid
6  every premium, correct?
7  A.  Yes.
8  Q.  Up until Mr. Lupiloff died.
9  A.  That's correct.
10  Q.  And you were paying $272.95 per quarter; does that
11  sound right?
12  A.  That sounds about right.
13  Q.  And your testimony is, you're saying you weren't aware
14  that that premium was ever going to change?
15  A.  No, I didn't think it was ever going to change.  I
16  figured if I had to pay 30 years of payments, and it
17  was going to cost me 30 grand over 30 years for that
18  sort of a return, I thought that was a good business
19  investment.
20  Q.  Did you ever ask anybody for a copy of the policy at
21  any time before Mr. Lupiloff's death?
22  A.  I don't believe so, no.
23  Q.  And the first time you ever saw the policy would have
24  been after Mr. Lupiloff's death, right?
25  A.  That's correct.

Page 101

1    MR. BREDELL: Off the record.
2    (Off the record at 4:47 p.m.)
3    (Back on the record at 4:51 p.m.)
4    MARKED FOR IDENTIFICATION:
5    DEPOSITION EXHIBIT 9
6    4:51 p.m.
7  BY MR. SCHMIDT:
8  Q.  Sir, I'll hand you what has been marked as Exhibit 9.
9      That's a promissory note for $6,000 of 7-17-07?
10 A.  Yes.
11 Q.  And you are loaning $6,000 to MAD Advertising, Gary
12     Harmon?
13 A.  Yes.
14 Q.  We talked about this briefly before, this is the loan
15     you're making to Harmon. This is after he's told you
16     he's not going to pay for the policy anymore?
17 A.  Yeah, I believe it is.
18 Q.  Okay. So when I asked you about it before, I didn't
19     ask you about it in that timeframe, I just asked you a
20     question about whether you had proof he paid you or
21     you paid him and all of this.
22        But now my question is why are you loaning
23     him the $6,000, now he owes you for this original
24     agreement that he's never paid you anything on, and
25     now he's told you he's not paying for the life

Page 102

1      insurance policy anymore, so why are you going to loan
2      him another 6,000 bucks?
3  A.  The same answer. I was trying to help Gary.
4  Q.  Help him what?
5  A.  With his business. He said he needed some money to
6      continue his business.
7  Q.  And how does that help you?
8  A.  Well, he paid me back.
9  Q.  Pardon me?
10 A.  He paid me back.
11 Q.  You loaning him $6,000 to help his business, how does
12     that benefit you as a businessman?
13 A.  Well, when I spoke with Gary, Gary was hoping to be
14     selling his company, and he needed the money to keep
15     his company going, because if he couldn't pay his
16     salespeople, or whatever he needed the money for, his
17     business would go under and he wouldn't be able to
18     sell the company, which means he couldn't pay me back
19     the principal.
20 Q.  That's the same excuse he gave you four years earlier
21     in 2003 for the 2,500 bucks, that he was going to try
22     to sell his business, though. Isn't it the same
23     excuse?
24 A.  Mr. Schmidt, I don't know if excuse is the word.
25 Q.  Reason, the same reason he gave you?

Page 103

1  A.  Yep.
2  Q.  And you accepted it?
3  A.  I did.
4  Q.  Even though he's not followed through any promise to
5      date with you?
6  A.  He's paid me back some of the small loan I gave him
7      and then he paid me back this one that I gave him.
8  Q.  But you've got no proof of that.
9  A.  No.
10        MARKED FOR IDENTIFICATION:
11        DEPOSITION EXHIBIT 10
12        4:55 p.m.
13 BY MR. SCHMIDT:
14 Q.  Do you recall any discussion you had with
15     Mr. Lupiloff, that the reason -- that you were going
16     to submit a Bad Check Crime Report when he sent you
17     that $20,000 NSF check way back in April of '03, and
18     that after that is when -- your discussion about the
19     life insurance policy, in which case you wouldn't file
20     a crime report for that NSF check; do you remember any
21     discussion about that?
22 A.  I think you have to ask me that question again.
23 Q.  Back in '03 --
24 A.  Yes.
25 Q.  -- for your initial deal, Exhibit 1, I asked you a

Page 104

1      couple of hours ago, you said that Lupiloff gave you a
2      check for 20,000 bucks as a payment on that, right?
3  A.  Yes.
4  Q.  And then you told me that that check came up NSF, no
5      sufficient funds, correct, bad check?
6  A.  Yes.
7  Q.  Do you recall a discussion, at any time thereafter,
8      that if Lupiloff got the insurance policy you wouldn't
9      proceed to have criminal charges brought against him
10     for the NSF check?
11 A.  No, that was never said.
12 Q.  You had no discussion about that?
13 A.  No. No.
14 Q.  I'll show you Exhibit 10. This is a report from bad
15     check, it's dated 2-6-08. It's for this April 9, '03
16     $20,000 check signed by you.
17        Do you recall that?
18 A.  I have a recollection of it, yes.
19 Q.  Do you want to take a look at that for a second and
20     refresh your memory?
21 A.  I remember filling out these documents, yes.
22 Q.  And why did you -- and the date of that, excuse me, is
23     2-6-08.
24        So why on 2-6-08 are you filing this
25     criminal report for a bad check that's way back from

Page 105

1     five years earlier, 4-9-03?
2     A.  If I remember right, I was mailed documents from the
3         court, I don't know what court, that Gary was
4         declaring bankruptcy.  And I believe an attorney that
5         I knew suggested that for me to be on the list of
6         creditors, that I should have as much documentation as
7         possible in case there was ever a time that I could
8         collect from Gary.  So the attorney suggested that I
9         put in a report with regard to the check.
10    Q.  Some attorney told you that?
11    A.  I think so.  I think so.
12    Q.  So that's not to get a record in bankruptcy, it's more
13        or less to show a record about this bad check
14        transaction; is that what it's for?
15            You already had a record of this agreement
16        with him, Exhibit 1, right?
17    A.  Correct.
18    Q.  So why are you doing it?  You already got Exhibit 1,
19        which is the full amount, why are you doing this
20        criminal report for Exhibit 10?
21    A.  I think I did this, like I mentioned, I don't remember
22        who mentioned that I should do this, but I'm going to
23        repeat my answer, I got a letter from the court saying
24        Gary was declaring bankruptcy, that I was a list of --
25        I was one of a number of people that Gary owed money

Page 106

1         to and that I should do a Bad Check Crime Report just
2         to add to it.
3     Q.  That letter you never produced, do you still have that
4         letter from the bank report?
5     A.  No, I don't think I do.
6             MARKED FOR IDENTIFICATION:
7             DEPOSITION EXHIBIT 11
8             4:59 p.m.
9     BY MR. SCHMIDT:
10    Q.  Sir, I'm going to hand you Exhibit 11.  That's a
11        letter of 8-31-08 from Nationwide to you, referring to
12        the life insurance policy, and it says, "We are
13        concerned because you are rapidly approaching a very
14        important policy anniversary.  This is your final
15        opportunity to convert this policy to a policy that
16        builds cash value.  The term life policy contract
17        gives you the option to convert this temporary term
18        policy to a permanent whole life policy with no
19        medical requirements.
20            One of the benefits of converting this
21        policy is the ability to build cash value.  Your
22        current policy does not build cash value.  Please act
23        quickly, because the conversion privilege will end 30
24        days after the policy anniversary listed at the top of
25        this letter," which is listed as 11-28-08.

Page 107

1             Do you recall getting this letter?
2     A.  I don't.
3     Q.  Do you recall this issue at all?
4     A.  I beg your pardon?
5     Q.  Do you recall this discussion at all --
6     A.  No.
7     Q.  -- that the anniversary is coming up and you've got to
8         convert it to a cash value now if you want to?
9     A.  No.
10    Q.  If you had this letter, if you read this letter back
11        in November of '08, would you have made any different
12        decision with the policy?  I'm sorry, with the letter
13        in August of '08, would you have made any different
14        decision about the policy?
15    A.  No, I wouldn't have.  No, I don't think I would have
16        understood exactly what this meant and I would have
17        thrown it in the circular file.
18    Q.  Do you recall making any contacts with the Nationwide
19        agent, Betsy Reich, to discuss whether Lupiloff was
20        paying the premiums during the time that -- before the
21        time that you became the owner and payor of the
22        premiums?
23    A.  I remember giving Betsy a call when Gary was the
24        owner.
25    Q.  Do you recall how often you were calling her?

Page 108

1     A.  I probably gave her a call once every six months to a year,
2         I think.
3     Q.  Okay.  Why were you doing that?
4     A.  Well, Gary had already asked me once or twice to pay
5         his insurance premium, so I thought I would call Betsy
6         every six or seven months to see if I needed to come
7         in and pay Gary's premium or not.  But Betsy didn't
8         tell me anything.
9     Q.  When you asked her if he had paid, would she tell you
10        yes or no?
11    A.  No.  No.  She wouldn't.
12    Q.  She would tell you that she wasn't allow to tell you?
13    A.  Correct.
14    Q.  So if you called her once, and she says I can't tell
15        you, why would you keep calling her?
16    A.  I actually don't really have a good answer.  I just
17        called her, and maybe I was thinking that if Gary
18        wasn't paying the premiums that she might contact him
19        and say, well, Gary, you're late, or something like
20        that.
21    Q.  Do you recall calling Betsy Reich, before Lupiloff's
22        death, and asking her if she knew if he had any other
23        life insurance policies?
24    A.  No, I don't think I ever asked Betsy that before.
25    Q.  She testified at her dep that you called her before

Page 109

1    Lupiloff was killed and asked her if she was aware if
2    Lupiloff had any other life insurance policies. You
3    don't recall that happening?
4    A.  No, I don't recall that at all.
5    Q.  You, after Lupiloff's death, you recall you made a
6    beneficiary claim for the benefits of the policy?
7    A.  I do remember.
8         MARKED FOR IDENTIFICATION:
9         DEPOSITION EXHIBIT 12
10        5:05 p.m.
11   BY MR. SCHMIDT:
12   Q.  Do you recall when you first contacted anybody from
13   Nationwide after Lupiloff's death about recovering
14   under the policy?
15   A.  Yes.
16   Q.  When did you first call?
17   A.  I believe I called Betsy Thursday morning.
18   Q.  So he died Tuesday, and how did you find out?
19   A.  I saw it on the news.
20   Q.  And which date did you see it on the news?
21   A.  I think it was Wednesday night.
22   Q.  So your understanding was that it happened on Tuesday,
23   his death happened on Tuesday?
24   A.  Yes.
25   Q.  But it wasn't on the news until Wednesday night?  Are

Page 110

1    you sure about that or are you not sure?
2    A.  I am sure.
3    Q.  That you first saw it on Wednesday night.
4    A.  Yeah.  That's when they released his name.
5    Q.  So you called Betsy on Thursday?
6    A.  Yes.
7    Q.  And what did you ask her or tell her, or whatever?
8    A.  I asked her had she heard that Gary got shot.
9    Q.  And then what?
10   A.  I believe she said she did.
11   Q.  And then what?
12   A.  And I think we consoled one another.  And then she
13   said that I should call up the Nationwide agent who's
14   handling her accounts, that she's no longer with
15   Nationwide.
16   Q.  She told you to call the new agent?
17   A.  Correct.
18   Q.  And you did so?
19   A.  I did.
20   Q.  And then you followed up to Exhibit 12, is a
21   beneficiary claim form.  Is that what you filled out?
22   A.  Yes.
23   Q.  And you asked for a lump-sum payment by a check?
24   A.  I did.
25   Q.  And that's your signature on Page 0285?

Page 111

1    A.  That is.
2    Q.  That's dated 7-15-2010?
3    A.  That's the date that's on there, yes.
4    Q.  So that would have been two days after his death?
5    A.  Was he killed in July or June?
6    Q.  July.
7    A.  July.  Yes, so I got that on Thursday.
8    Q.  So you got it and sent it in on the same day.
9    A.  I don't remember what day I sent it in.
10   Q.  Well, it's signed by you.
11   A.  It's signed, that's when I got it, but I don't know if
12   I mailed it in.  I believe I may have mailed it in
13   seven months later.
14   Q.  You think you mailed it seven months later?
15   A.  I think so.  I don't remember.
16   Q.  Why do you think you did?
17   A.  I think my attorney at the time told me when I should
18   apply for the proceeds to the life insurance policy.
19   Q.  Do you have any proof of when you sent it in?
20   A.  No.  I was looking on this document to see if it had
21   some fax or timestamp on it, but I don't see one.  So
22   I'm not exactly sure when I mailed it in.  That's when
23   I filled it out, because that's when I got it.
24        MARKED FOR IDENTIFICATION:
25        DEPOSITION EXHIBIT 13

Page 112

1         5:09 p.m.
2    BY MR. SCHMIDT:
3    Q.  I'll hand you, sir, Exhibit 13.  That's an E-mail from
4    you to Abby T-E-D-E-S-C-H-I of Nationwide of 2-14-11.
5    Do you recall that?
6    A.  I'll have to read it.
7    Q.  All right.
8         (Off the record at 5:10 p.m.)
9         (The deposition was adjourned at 5:10 p.m.
10   Signature of the witness was not requested by
11   counsel for the respective parties hereto.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 113

```
 1              CERTIFICATE
 2    STATE OF MICHIGAN
 3    COUNTY OF MACOMB
 4
 5         I, SUSAN LOWRY, a Notary Public in and for
 6    the above county and state, do hereby certify that
 7    this deposition was taken before me at the time and
 8    place hereinbefore set forth; that the witness was by
 9    me first duly sworn to testify to the truth; that this
10    is a true, full and correct transcript of my
11    stenographic notes so taken; and that I am not
12    related, nor of counsel to either party, nor
13    interested in the event of this cause.
14
15
16
17
18
19
20
21    SUSAN LOWRY, CSR-2636
22    Notary Public
23    Macomb County, Michigan
24    My commission expires December 3, 2016
25
```