# EXHIBIT 2

**EXHIBIT 2**

MARY ELIZABETH REICH
January 4, 2012

**Page 1**

```
 1       UNITED STATES DISTRICT COURT
 2        EASTERN DISTRICT OF MICHIGAN
 3             SOUTHERN DIVISION
 4  NATIONWIDE LIFE INSURANCE
    COMPANY, a foreign corporation,
 5            Plaintiff/
              Counter-Defendant,
 6     vs.           Case No.
                     11-cv-12422-AC-MKM
 7                   Hon. Avern Cohn
    WILLIAM KEENE, JENNIFER KEENE,
 8  MONICA LYNNE LUPILOFF, NICOLE
    RENEE LUPILOFF and NICOLE RENEE
 9  LUPILOFF, PERSONAL REPRESENTATIVE
    OF THE ESTATE OF GARY LUPILOFF,
10  DECEASED,
              Defendants,
11       and
12  MONICA LYNNE LUPILOFF, NICOLE
    RENEE LUPILOFF and NICOLE RENEE
13  LUPILOFF, PERSONAL REPRESENTATIVE
    OF THE ESTATE OF GARY LUPILOFF,
14  DECEASED,
              Defendants/
15            Counter-Plaintiffs and
              Cross-Plaintiffs,
16     vs.
17  WILLIAM KEENE, JENNIFER KEENE,
    Individually, jointly and severally,
18            Defendants/
              Cross-Defendants.
19  _____
20       The Deposition of MARY ELIZABETH (BETSY) REICH,
21       Taken at 1050 Wilshire Drive, Suite 320,
22       Troy, Michigan,
23       Commencing at 3:18 p.m.,
24       Wednesday, January 4, 2012,
25       Before Lezlie A. Setchell, CSR-2404, RPR, CRR.
```

**Page 2**

```
 1  APPEARANCES:
 2
 3  MICHAEL F. SCHMIDT
 4  Harvey Kruse, PC
 5  1050 Wilshire Drive
 6  Suite 320
 7  Troy, Michigan 48084
 8  248.649.7800
 9  mschmidt@harveykruse.com
10      Appearing on behalf of the
11      Plaintiff/Counter-Defendant.
12
13  ALBERT L. HOLTZ
14  Albert L. Holtz, PC
15  3910 Telegraph Road
16  Suite 200
17  Bloomfield Hills, Michigan 48302
18  248.593.5000
19  aholtz@lipsonneilson.com
20      Appearing on behalf of Monica Lynne Lupiloff, Nicole
21      Renee Lupiloff and Nicole Renee Lupiloff, personal
22      representative of the Estate of Gary Lupiloff,
23      deceased.
24
25
```

**Page 3**

```
 1  JEFFREY A. DANZIG
 2  Fieger, Fieger, Kenney, Giroux & Danzig, PC
 3  19390 West Ten Mile Road
 4  Southfield, Michigan 48075
 5  248.355.5555
 6  jdanzig@fiegerlaw.com
 7      Appearing on behalf of Monica Lynne Lupiloff, Nicole
 8      Renee Lupiloff and Nicole Renee Lupiloff, personal
 9      representative of the Estate of Gary Lupiloff,
10      deceased.
11
12  JOHN H. BREDELL
13  Bredell & Bredell
14  119 North Huron Street
15  Ypsilanti, Michigan 48197
16  734.482.5000
17  jbredell@bredell.com
18      Appearing on behalf of William and Jennifer Keene.
```

**Page 4**

```
 1  MICHAEL D. FISHMAN
 2  Law Office of Michael D. Fishman, PLLC
 3  255 East Brown Street
 4  Suite 310
 5  Birmingham, Michigan 48009
 6  248.258.6688
 7  fishman@sports-gallery.com
 8      Appearing on behalf of the witness.
```

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

1 (Pages 1 to 4)

MARY ELIZABETH REICH
January 4, 2012

Page 17

1  Q.  And it's also signed by you?
2  A.  Correct.
3  Q.  And the change of beneficiary, that's dated 4-4-07,
4      the signatures?
5  A.  4-4-07.
6  Q.  And that's the same day that the change of ownership
7      is dated?
8  A.  Correct.
9  Q.  So do you recall that all happening at the same time?
10 A.  I do not.
11 Q.  And then you would have eventually sent those to
12     Nationwide, correct?
13 A.  Correct.
14 Q.  The first page of Exhibit 5, Page 169, is that the fax
15     from you to Nationwide Underwriting?
16 A.  That's correct.
17     MR. DANZIG:  Mike, 169 did you say?
18     MR. SCHMIDT:  Yes.
19     MR. DANZIG:  Thank you.
20 BY MR. SCHMIDT:
21 Q.  And that's sending them the two different forms?
22 A.  Correct.
23 Q.  The change of beneficiary and the change of ownership
24     forms?
25 A.  It says six pages, so I'm guessing correct.

Page 18

1  Q.  Do you know if sometime -- let me ask you this.  Do
2      you know who was paying the premiums on that policy up
3      until that time, if you know?
4  A.  Two different people.
5  Q.  Who was paying them?
6  A.  Mr. Lupiloff was paying and Mr. Keene had paid some.
7      So I'm not sure who paid how much.
8  Q.  Who would have kept the record as to who was paying
9      that, though?
10 A.  Nationwide.
11 Q.  The agent office or Nationwide's office?
12 A.  Nationwide.  The bill is sent directly, you know, to
13     the client, and they send it in or call it in or
14     whatever they do.
15 Q.  Okay.  Did there come a time that you're aware of
16     where the payor of the policy was changed to Mr. Keene
17     on Nationwide's records?
18 A.  I don't recall when, but I do know that it had
19     changed.
20 Q.  And it was changed so that Keene was then the person
21     who was paying the premiums?
22 A.  Correct, but I'm not sure at that point how much was
23     paid.
24 Q.  According to Nationwide's records, that happened on --
25     the change was on October 9, '07.  Does that sound

Page 19

1      right to you or not?
2  A.  I don't know.
3  Q.  You have no idea?
4  A.  He did that directly, I believe, through Nationwide.
5  Q.  So you weren't part of that transaction?
6  A.  Correct.
7      MR. DANZIG:  Which change are you referring
8      to, Mike?
9      MR. SCHMIDT:  Change of payor.
10     MR. DANZIG:  Thank you.
11 A.  I don't recall being part of that transaction.
12 BY MR. SCHMIDT:
13 Q.  During the course of this policy when it was in force,
14     did you ever get any calls from Mr. Keene asking if
15     the premiums were being paid?
16 A.  Yes.
17 Q.  How often would you get those?
18 A.  About once a month.
19 Q.  And that's something you would have to check for him?
20 A.  No.  We told him we couldn't advise him of that.
21 Q.  You would direct him who to call for that?
22 A.  You know, it would be myself or my staff.  I know when
23     I spoke with him, I would say, you know, we could not
24     tell him that.
25 Q.  Would you tell him who to call?

Page 20

1  A.  Because he was not the owner of the policy at that
2      time, and if it was -- you know, I think protocol
3      with Nationwide is if it cancelled, I imagine the
4      beneficiary gets notified.  I don't even know.
5  Q.  Okay.  Do you know if he called you after he became
6      the owner to see if the premiums were being paid?
7  A.  I don't recall.
8  Q.  Did you ever -- let me ask you, did you hear about
9      Mr. Lupiloff being murdered?
10 A.  Yes.
11 Q.  And how did you hear that?
12 A.  I received a call from one of my prior staff who saw
13     it on the news.
14 Q.  At that time were you still working for Nationwide?
15 A.  I was not.
16 Q.  Did you receive a call from Mr. Keene in regard to
17     Mr. Lupiloff being murdered?
18 A.  Yes.
19 Q.  When did you get that call?
20 A.  That same next morning I guess it was.
21 Q.  And did you speak to Mr. Keene or was it a voicemail?
22 A.  I received a voicemail, and then I called him back.
23 Q.  And do you recall what Mr. Keene had to say about
24     whatever?
25     MR. HOLTZ:  I was just unclear when the

MARY ELIZABETH REICH
January 4, 2012

Page 21

1 next morning was. Was it the morning after the murder
2 or the morning after the call?
3 BY MR. SCHMIDT:
4 Q. When you say next morning, what --
5 A. I'm not certain if it was the morning after the murder
6 occurred. I got a call simultaneously that I took
7 first from a staff person telling me that he had just
8 been murdered the night before, so I'm guessing. But
9 again, I don't know what the exact date was.
10 Q. Your best memory is it would have been the day after
11 the murder?
12 A. It was very close if it wasn't the day after.
13 Q. Okay. And do you recall what the message was from
14 Mr. Keene?
15 A. I don't recall the full message.
16 Q. And do you recall what the phone call was about? Did
17 you call him back?
18 A. I called him back. He had left me a message. I
19 called him back. He was essentially letting me know
20 that Gary had been killed, and he wanted to remind me
21 about the life insurance policy and wanted to meet
22 with me to go through the process.
23 Q. And what did you tell him?
24 A. I told him I was no longer the agent on the policy,
25 and I referred him to the new agent who was servicing

Page 22

1 my book at that time.
2 Q. And do you recall who the new agent was?
3 A. Yes, Robert Pliskow, P-L-I-S-K-O-W.
4 Q. Did you ever speak to Mr. Pliskow about Mr. Keene
5 calling him up or about the policy?
6 A. Did I what?
7 Q. Did you follow up with Mr. Pliskow at all about that
8 issue?
9 A. I did. I called Mr. Pliskow and let him know he would
10 be receiving a call, and I can't recall, but I believe
11 he said he already heard from him.
12 Q. Did you have any further contact with Mr. Keene after
13 that?
14 A. Yes.
15 Q. What other contact did you have?
16 A. He's called me several times.
17 Q. About what?
18 A. I don't recall entirely. He's called me to inquire
19 about the process and just to fill me in on, you know,
20 his, you know, talking about, you know, what his take
21 on the whole situation is and etcetera, etcetera.
22 Q. And would those calls have been around the time of the
23 murder or after that time?
24 A. Well, obviously after.
25 Q. But how many, like -- okay -- that was July 13 of

Page 23

1 2010. So would it have been just a month or two
2 later, six months later, or what are we talking about?
3 A. I don't recall how often. There were numerous calls.
4 Q. How many calls approximately were there?
5 A. Oh, gees, I can't recall.
6 Q. More than 10?
7 A. Yes.
8 Q. More than 20?
9 A. I don't recall.
10 Q. Have you had any calls from anyone on behalf of the
11 Lupiloff Family Estate?
12 A. No.
13 Q. Other than the document we discussed a while ago, this
14 legal document that you recall you obtained from
15 Lupiloff or Keene about their transaction, did you
16 ever see any other documents regarding their business
17 transactions other than that document?
18 A. No.
19 Q. And your best memory of the transaction or situation
20 would be that memo that you did as part of Exhibit 1,
21 Page 411; that's your best, a summary of your best
22 memory of what their transaction was?
23 A. Correct.
24     MR. SCHMIDT: Okay. That's all the
25 questions I have. Thank you.

Page 24

1     EXAMINATION
2 BY MR. DANZIG:
3 Q. Ms. Reich, my name is Jeffrey Danzig, I represent the
4 Lupiloff Estate, and I have some questions for you.
5 What I'd like to do is first go over some of the
6 things that have already been discussed and then maybe
7 ask you some new questions.
8     As an agent for Nationwide Insurance
9 Company, I assume there's some routine protocols that
10 you engage in when you bind over a life insurance
11 policy, especially a term life policy, correct; you go
12 through certain routines.
13 A. For insurance policies.
14 Q. All insurance policies?
15 A. Yes.
16 Q. And when there are change requests for those policies,
17 there is certain other protocols that you follow,
18 correct?
19 A. There would be, yes.
20 Q. Is it your experience that when a change of ownership
21 or a change of beneficiary request takes place, that
22 there would be a home office endorsement from the
23 company?
24 A. What do you mean by home office endorsement?
25 Q. They approve it, they endorse it, they sign off on it?

MARY ELIZABETH REICH
January 4, 2012

Page 29

```
 1    and the change of ownership designation, there's a
 2    signature of endorsement in the beneficiary change but
 3    not one in the ownership change; is that fair?
 4           Do you understand my question?
 5  A.  I do.
 6  Q.  Okay, good. I wanted to make sure it was clear.
 7           MR. SCHMIDT: No foundation. She doesn't
 8    know where it goes or if it's supposed to be there or
 9    not. I don't know how she could answer that question.
10  BY MR. DANZIG:
11  Q.  Would you agree there's a signature of endorsement on
12    the change of beneficiary but not one on the change of
13    ownership?
14  A.  On these particular forms, you're correct.
15  Q.  Okay. Does that make sense to you as an agent for
16    Nationwide that there would be an endorsement on one
17    where there's a change of beneficiary request but not
18    one on the change of ownership request?
19           MR. SCHMIDT: I'm just going to object.
20    There's no foundation that that's an endorsement. She
21    doesn't even know what that is. You're making her
22    assume something she doesn't know what that is or what
23    that's talking about.
24           MR. DANZIG: So your objection is noted.
25           MR. SCHMIDT: I object to the form of the
```

Page 30

```
 1    question.
 2           MR. DANZIG: Good.
 3  BY MR. DANZIG:
 4  Q.  Can you tell me, does it make sense to you?
 5  A.  I don't think this is a matter of what makes sense or
 6    not. I don't know what their process is.
 7  Q.  You said previously, I think you said it this way, it
 8    makes sense that the change of ownership would come
 9    first and then a change of beneficiary would come
10    second?
11  A.  Or simultaneously.
12  Q.  Does it make sense to you that change of ownership
13    might have to take place before you change a
14    beneficiary?
15  A.  It doesn't have to.
16  Q.  If you're changing ownership, does it make sense that
17    it would go one and then the other?
18  A.  It doesn't have to.
19  Q.  Okay. In this instance do you believe that it was
20    simultaneous?
21  A.  I don't recall.
22  Q.  You were present on April 7th of 2007 when these
23    changes were made, right?
24  A.  I was.
25  Q.  Where were you at the time?
```

Page 31

```
 1  A.  I don't recall which office.
 2  Q.  You were in one of your offices?
 3  A.  We were in, yeah, in an office.
 4  Q.  Okay. It could be any office. What I'm wondering is
 5    if you were in one of your offices?
 6  A.  It could have been Gary's office as well.
 7  Q.  Okay. Where was Gary's office?
 8  A.  I don't recall at that point which office he was in,
 9    if it was Pontiac or -- he had several locations over
10    the years.
11  Q.  Let's go back.
12  A.  I'm over 50. I'm sorry.
13  Q.  It's okay. So am I and I do the same thing.
14           The original application was in 2003 for
15    this term life insurance policy, right?
16  A.  Yes.
17  Q.  And I think you were asked whether or not you knew
18    Gary Lupiloff before this term life insurance policy
19    was applied for, and I think you said you did?
20  A.  Yes.
21  Q.  Would it be fair to state that you had binded some
22    insurance for him in the past, maybe some auto
23    insurance?
24  A.  I don't recall if it was prior to this or not.
25  Q.  But you knew him?
```

Page 32

```
 1  A.  Oh, yeah.
 2  Q.  In a business sense?
 3  A.  Yeah, I knew him because of his business as well.
 4  Q.  Okay. And would you recall knowing him in relation to
 5    your work as an agent for Nationwide having done some
 6    business with him in the past?
 7  A.  Again, I don't know what came first as far as policies
 8    with him.
 9  Q.  Okay. So you're not sure whether or not you bound any
10    previous policies for Gary Lupiloff before 2003?
11  A.  I don't remember.
12  Q.  Okay. But you think you knew him before 2003?
13  A.  Oh, I did know him.
14  Q.  And did you like him?
15  A.  Yeah.
16  Q.  Did you get along with him?
17  A.  Sure.
18  Q.  It was a cordial, congenial relationship?
19  A.  Uh-huh.
20  Q.  Yes?
21  A.  Yes.
22  Q.  Got along with him?
23  A.  Yes.
24  Q.  Okay. When you had conversations with him, your
25    conversations were smooth and easy?
```

MARY ELIZABETH REICH
January 4, 2012

**Page 33**

1  A. Yes.
2  Q. Meaning you didn't have arguments or fights about
3     differences of opinion?
4  A. No.
5  Q. Okay. And you gave him advice as an agent as one
6     normally would when he needed it?
7  A. Well, again, I don't know what prior to that we had
8     partaken in for insurance.
9  Q. Okay. Now when this transaction came about in 2003,
10    you felt as an agent this was an unusual transaction,
11    it was different?
12 A. Different. It's not unusual because obviously
13    Nationwide had forms to allow it.
14 Q. Okay. But it was different, and tell me how it was
15    different in your mind.
16 A. Different because it's a business transaction, is the
17    basis for the life insurance, and so not two related
18    persons. To me that was different. It's not husband
19    and wife. It's not, you know, parents and children.
20 Q. So the fact that the term policy of life insurance was
21    being bound as a business transaction amongst
22    unrelated persons made it different?
23 A. Yes.
24 Q. Okay. And the company underwriting required
25    additional verification of the nature of their

**Page 34**

1     relationship?
2  A. Correct.
3  Q. They wanted some verification before approval,
4     correct?
5  A. That would be my understanding, yes.
6  Q. Because the company, as far as you knew, didn't want
7     to bind the policy until they had assurances that this
8     was on the up-and-up, true?
9  A. They have to show insurable interest.
10 Q. And basically, if you would agree or disagree with me,
11    the company is doing its due diligence as far as
12    whether or not it would be appropriate to bind this
13    policy over between these two individuals?
14 A. That's their job, I guess.
15 Q. You would agree that's what they're doing?
16 A. Underwriter's position.
17 Q. Would you agree with me that if the change of
18    ownership is taking place, the company should likely
19    do its due diligence to determine and verify that this
20    is an appropriate transaction, do you agree?
21        MR. SCHMIDT: No foundation she knows what
22    underwriting does.
23        MR. BREDELL: Or appropriate for who? I
24    guess I object to the form of the question.
25 BY MR. DANZIG:

**Page 35**

1  Q. Okay. Do you understand my question? They're making
2     objections, and you can answer if you understand the
3     question.
4  A. Rephrase it.
5  Q. Sure. I started with the underwriting process and
6     wanting verification of the nature of their
7     relationship. Now that years later the policy is
8     intending to change in terms of ownership and
9     beneficiary, would you agree that standard format
10    would be the company would want to also exercise due
11    diligence and make sure this transaction is
12    appropriate?
13        MR. SCHMIDT: Same objection, no foundation
14    she knows how that works.
15 A. I called the underwriter. They provided the forms
16    that needed to be filled out, and I don't know what
17    they do beyond that to make, you know, sure that
18    that's all they need.
19 BY MR. DANZIG:
20 Q. How many years were you an agent for Nationwide?
21 A. For 14 years.
22 Q. And in those 14 years, you never learned about the
23    company's desire for due diligence and due process in
24    --
25 A. I think that's textbook requirement of life insurance

**Page 36**

1     that you should have insurable interest, and they have
2     their own procedures that I'm not -- for underwriting
3     a person's health, for everything. So that's not part
4     of my job. I just provide what they require me to
5     provide.
6  Q. In your 14 years of experience as an agent for
7     Nationwide, did you learn that they like to do things
8     a certain way, and they would require you to do
9     things, certain things in a certain way, or was it
10    just --
11 A. In my 14 years at Nationwide, the forms, the
12    procedures, the protocol changed several times. So
13    where they were in that particular year could have
14    been different the next year.
15 Q. Okay. Had you ever met Bill Keene in person before
16    the change request was made?
17 A. Yes.
18 Q. In person or on the phone or both?
19 A. In person, on the phone, both.
20 Q. What was the context in which you met him in person?
21 A. He had stopped in my office in the very beginning of
22    the whole process.
23 Q. When you first met him, did you have a cordial
24    relationship with him?
25 A. Yes.

MARY ELIZABETH REICH
January 4, 2012

Page 37

1 Q. Did you have any difficulties with him in any way?
2 A. No, just that he was constantly calling, and we
3    weren't allowed to really share with him the
4    information.
5 Q. Because he wasn't the owner?
6 A. Correct.
7 Q. And you'd want to share the information with the owner
8    as opposed to a beneficiary at that time?
9 A. Correct. He would call to ask various questions and
10   things that I could not share with him.
11 Q. When Gary Lupiloff first applied for the policy, did
12   he tell you that one of his interests was in
13   protecting his children as contingent beneficiaries?
14 A. Yes.
15 Q. Was that a significant concern of his in terms of the
16   life insurance policy he was binding over?
17 A. I don't recall how significant but it was a concern as
18   stated in the memo.
19 Q. And it stated what in the memo that you're referring
20   to? I don't know what memo you're referring to. In
21   the document that's right in front of you?
22 A. Yes, it was, you know, attached, the initial intent.
23 Q. That's the exhibit, the back exhibit to Exhibit 1,
24   correct?
25 A. Page 0411.

Page 38

1 Q. Thank you. And it indicates there that it is his
2    desire to have his children as the contingent
3    beneficiaries, correct?
4 A. Uh-huh.
5 Q. Yes?
6 A. Yes.
7 Q. That's also on the application that he made out,
8    correct?
9 A. That's correct.
10 Q. And it's also on the formal application, Exhibit 3,
11   where he signed the application in writing where he
12   indicated his children were going to be the contingent
13   beneficiaries, correct?
14 A. Correct.
15 Q. Do you recall anything in particular that Gary
16   Lupiloff would have said to you about his children and
17   his desire to insure their interests?
18 A. No.
19 Q. Other than the fact that it appears on these documents
20   that we've referenced, there is nothing extraneous
21   that you recall independently of the documents in that
22   regard?
23 A. No.
24 Q. I want to understand the context -- strike that.
25       I want to show you a document. This is

Page 39

1    dated October 19, 2006. It's on Nationwide
2    letterhead, it's Bates 225, and if I can stand over
3    you for a moment. I'll let you read it first.
4       First of all, it's a letter that's cc'd to
5    you as the agent, correct?
6 A. Yes, I see that.
7 Q. And it's dated October 19th, 2006?
8 A. Yep.
9 Q. At face value does it appear to be a request or
10   response to a request for information about
11   beneficiaries on the policy?
12 A. Correct.
13 Q. Someone, perhaps Mr. Lupiloff or somebody else, is
14   making an inquiry about who the beneficiaries are?
15 A. Correct, it appears that way.
16 Q. Do you recall this document?
17 A. No.
18 Q. Do you recall receiving the document?
19 A. No.
20 Q. This is prior to the change request in 2007 of April,
21   correct? The change request I'll tell you was in
22   April of 2007.
23       MR. SCHMIDT: 4-4-07 it's dated.
24 A. Oh, I'm sorry, you're right, yep.
25 BY MR. DANZIG:

Page 40

1 Q. So about six months before the change request,
2    information is coming to Mr. Lupiloff about who the
3    beneficiaries are on this policy, correct?
4 A. Right.
5 Q. Do you have any recollection of the events surrounding
6    this document?
7 A. I do not.
8 Q. From what you knew of Gary Lupiloff, was he someone
9    who might forget who the beneficiaries were of his own
10   life insurance policy?
11 A. He could have called and we could have looked those
12   up.
13 Q. Right.
14 A. Yeah.
15 Q. Does it strike you as unusual that someone is making
16   an inquiry about who the beneficiaries are of this
17   policy six months before a change request is going to
18   be made?
19 A. I would guess so.
20 Q. When you were approached by Gary Lupiloff -- strike
21   that.
22      Do you know who first approached you
23   regarding a change request?
24 A. I do not recall.
25 Q. It could have been either/or; you're not sure as you

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

10 (Pages 37 to 40)