UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATIONWIDE LIFE INSURANCE COMPANY,
a foreign corporation,

       Plaintiff,                      Case No. 2:11-cv-12422-AC-MKM

v.                                         Hon. Avern Cohn

WILLIAM KEENE, JENNIFER KEENE,
MONICA LYNN LUPILOFF, NICOLE RENEE
LUPILOFF and NICOLE RENEE LUPILOFF,
PERSONAL REPRESENTATIVE OF THE
ESTATE OF GARY LUPILOFF, DECEASED,

       Defendants.
_____

| | |
|---|---|
| Michael F. Schmidt (P25213)<br>Harvey Kruse, P.C.<br>Attorney for Plaintiff<br>1050 Wilshire Drive, Suite 320<br>Troy, MI  48084<br>248-649-7800 | John H. Bredell (P36577)<br>Bredell & Bredell<br>Attorney for Defendants, William<br> & Jennifer Keene<br>119 N. Huron Street<br>Ypsilanti, MI  48197<br>734-482-5000 |
| Albert L. Holtz (P15088)<br>ALBERT L. HOLTZ, P.C.<br>Attorney for Monica Lupiloff, Nicole Lupiloff<br>and Nicole Lupiloff Personal Representative<br>of the Estate of Gary Lupiloff, deceased<br>3910 Telegraph Road, Suite 200<br>Bloomfield Hills, MI  48302<br>248-593-5000 | Geoffrey N. Fieger (P30441)<br>E. Jason Blankenship (P63566)<br>Fieger Fieger Kenney Groux<br> & Harrington PC<br>Attorney for Lupiloffs<br>19390 West Ten Mile Road<br>Southfield, MI  48075<br>248-355-5555 |
| T. Joseph Seward (P35095)<br>Cummings, McClorey, Davis &<br> Acho, P.L.C.<br>Attorney for Non-Party, Royal Oak Police Dept.<br>33900 Schoolcraft Road<br>Livonia, MI  48150<br>734-261-2400 | Joyce F. Todd (P31026)<br>Oakland County Corp. Counsel<br>Attorney for Oakland County<br> Prosecutor<br>1200 N. Telegraph Road<br>Pontiac, MI  48341<br>248-858-2003 |

David W. Gillam (P39131)
Mark Liss (P42441)
City Attorney's Office
Co-Counsel for Non-Party,
Royal Oak Police Department
211 Williams Street
Royal Oak, MI  48068-0064
248-246-3240

---

### KEENE DEFENDANTS' BRIEF IN SUPPORT OF NATIONWIDE'S MOTION FOR SUMMARY JUDGMENT AGAINST THE LUPILOFF DEFENDANTS

NOW COMES, Defendants, William Keene and Jennifer Keene, and for their response in support of Nationwide's Motion for Summary Judgments against the Lupiloff defendants, states as follows:

### STATEMENT OF RELEVANT FACTS

Plaintiff Nationwide has filed a Motion for Summary Judgment asserting that the Lupiloff Defendants have no entitlement to any of the proceeds of the subject life insurance policy, regardless of the Keenes' entitlement .

As this Court has been advised ad nauseam, Gary Lupiloff and Bill Keene were in business together and Bill Keene foolishly loaned Gary Lupiloff a large sum of money.  When Lupiloff failed to repay the money and it was apparent that Lupiloff was not going to repay the money, a life insurance policy was taken out by Gary Lupiloff, which designated Bill Keene as the primary beneficiary.  These facts are not in dispute. It is also not in dispute that Lupiloff was initially the owner of the policy and as the owner of the policy, he did what any person would do, he named his daughters as contingent beneficiaries.

2

It is pretty apparent that after taking out the policy that Gary Lupiloff was not at all enthusiastic about making the $91.60 monthly payment. (See EXHIBIT A for Payment Schedule). Insurance agent, Mary Reich, who sold Gary Lupiloff the policy, testified that Bill Keene called practically every month to determine if Gary Lupiloff paid the policy. (Deposition of Mary Reich at p. 19, EXHIBIT B) She also testified that Gary Lupiloff was late paying the policy premium on several occasions (Deposition of Mary Reich at p. 65, EXHIBIT B) and on other occasions, Bill Keene, paid the premium. (Deposition of Mary Reich at p. 18, EXHIBIT B). Reich testified that she and Lupiloff were social friends and based upon her conversations with Lupiloff, Reich testified as to Gary, "He was not excited about making the payments." (Deposition of Mary Reich at p. 66, EXHIBIT B). Mary Reich also testified that when the policy was in force, the bill is sent directly to the client. (Deposition of Mary Reich at p. 18.)

Mary Reich also testified that she informed Keene that when he called her to inquire as to whether or not Lupiloff had made the premium payments, that since he did not own the policy, she could not advise him of this information. (Deposition of Mary Reich at p. 19.) From the testimony of Reich and Keene, it seems apparent that Lupiloff was not at all interested in making the premium payments and Keene was very frustrated that he was not able to monitor whether or not Lupiloff was in fact making the payments. By this time, Keene must have become a little more than suspicious of Lupiloff as Lupiloff had cheated him out of a large sum of money and it must have been frustrating that Lupiloff was not timely paying for the life insurance policy and according to Reich, Keene did make some of the payments in an attempt to keep the policy in force, so he would have some potential protection of his loan to Lupiloff.

3

Bill Keene testified that he had conversations with Gary Lupiloff and Lupiloff told him he could not afford the payments. (Deposition of William Keene at p. 77). Keene testified that he and Lupiloff had a conversation about changing the ownership of the policy. The testimony of Keene was as follows:

> Questioning by Albert Holt:
>
> Q. Did you have a conversation with Mr. Lupiloff about the change of ownership and change of beneficiary?
>
> A. Yes.
>
> Q. When did that occur in proximity to the time that the actual change?
>
> A. It was – I can't give you an exact date but it was a short time before, Mr. Lupiloff and I had, I think, a good business relationship. He brought up the fact that he couldn't afford it any longer and would I like to take ownership of it.

(Deposition of William Keene, at p. 76)

On October 19, 2006, Gary Lupiloff received correspondence from Nationwide that advised him of the following:

> We have received a request for beneficiary information on your life policy listed above.
>
> The primary beneficiary of record is William Keene, Partner. The contingent beneficiary of the record is Monica Lupiloff and Nicole Lupiloff, Children. If you would like to change these designations, please complete the enclosed application and return it in the envelope provided.

Enclosed with this letter were applications for designation for a new owner and/or contingent owner and these were mailed to Gary Harmon a/k/a Gary Lupiloff. (See **EXHIBIT C**). It is logical to assume that after Keene and Lupiloff discussed transferring

4

ownership of the policy to Keene, that Lupiloff contacted Nationwide to explore the transfer of ownership process.

Mary Reich, Gary Lupiloff's agent and friend, testified that she had numerous conversations with Gary Lupiloff and she personally observed him sign the change of ownership and change of beneficiary forms for the policy. The testimony of Mary Reich was as follows:

> Q. Do you recall talking to both Mr. Keene and Mr. Lupiloff about [changing the ownership of the policy]?
>
> A. Yes.
>
> Q. At Exhibit No. 5 there, we have several documents. Do you recall which document was first, the change of beneficiary or the change of ownership?
>
> A. I don't recall, but it would have made sense to be the change of ownership?
>
> Q. Change of ownership form is page 175?
>
> A. Yes.
>
> Q. And that changes the owner of the policy from Mr. Lupiloff to Mr. Keene?
>
> A. Yes.
>
> Q. Do you recall discussing that with Mr. Lupiloff before that occurred?
>
> A. Yes.

Deposition of Mary Reich at p. 15.

> Q. Did you have any private conversations with Gary Lupiloff before the change [of ownership] request were put into effect?
>
> A. Define "private."

5

> Q. Did you have a conversation at any location where Mr. Keene wasn't present, where you were advising Mr. Lupiloff of what the effect of the change would be?
>
> A. Yes.

Deposition of Mary Reich at p. 41.

> Q. Do you recall Mr. Lupiloff telling you he had some concerns with regards to any change [of ownership] requests that was going to be made.
>
> A. He had no concerns regarding the change.
>
> Q. Okay. He never expressed any concerns or the effectuation of the change of ownership or beneficiary?
>
> A. No.
>
> Q. What concerns did you have, if any, because you indicated previously that?
>
> A. Just simply that he would lose control over the policy, as well as who the beneficiaries could be.
>
> Q. Is that all you said to him?
>
> A. Yes.

Deposition of Mary Reich at p. 43.

In addition to completely discussing the effect of change of ownership and change of beneficiaries with Gary Lupiloff, Mary Reich was just as adamant that she personally observed Gary Lupiloff sign the disputed forms. That testimony was as follows:

> Q. Do you know for a fact that [the person signed in front of you]?
>
> A. Yes.
>
> Q. That Gary Lupiloff signed this document?

6

> A. Yes.
>
> Q. The change of ownership and beneficiary?
>
> A. Yes.
>
> Q. Did you witness both the change of ownership and the change of beneficiary signatures?
>
> A. Yes.

Deposition of Mary Reich at p. 45.

> Q. When Gary Lupiloff signed the change of beneficiary designation, he was in your physical presence?
>
> A. He was.

Mary Reich was asked on several occasions who signed the form first, Bill Keene or Gary Lupiloff and Mary Reich testified she didn't recall who signed first, but then added, "You know, I just know that they were signed by Gary." Deposition of Mary Reich at p. 51.

Mary Reich also testified that she spent several conversations with Gary Lupiloff wherein she advised him to not transfer ownership of the policy. Mary Reich testified that she also pointed out that Lupiloff could simply make Bill Keene the Payer on the policy, with the monthly bill going to Bill Keene and that Gary Lupiloff could continue to retain ownership of the policy. That testimony was as follows:

> Q. Did you ever ask Mr. Lupiloff why he was making the change in 2007? Why are you doing this?
>
> A. Sure.
>
> Q. What did he say?
>
> A. He no longer wanted to pay the premiums.
>
> Q. Any other reasons given?

7

> A. And, I explained to him that just having Mr. Keene pay the premiums as a Payer was enough, and he said he didn't care.
>
> Q. Anything else do you recall?
>
> A. No.
>
> Q. Are you of the understanding that he knew that Mr. Keene was going to replace his kids as contingent beneficiary?
>
> A. He knew the beneficiaries were going to be changed. Yes.
>
> Q. Because of the change of ownership?
>
> A. Yes, and that's why I was advising him, you know, why are you doing this? You know, I didn't feel it was necessary.

Deposition of Mary Reich at pp. 59-60.

Later in the deposition under cross-examination, Mary Reich summarized her testimony as follows:

> Questioning by John Bredell:
>
> Q. And, I am pretty confident the reason why you are here is because there is an allegation that those changes of beneficiaries were forgeries; in fact, that was stated in court. And, all these other questions – I mean, they're really why you're here.
>
> A. Okay.
>
> Q. And what you knew about the form or who signed it and where you were. I can tell you the reason why you're here is because of that allegation. It sounds that you're adamant that you knew who Mr. Lupiloff was, you recognized him, it couldn't be an imposter, you knew him before and you're adamant as his social acquaintance and his agent, that you not only advised him of the consequences, you recommended him professionally not to sign it and he ignored your

8

>    advice, said he didn't care, signed it in front you; is
>    that a fair statement?
>
> A.   Correct.

Deposition of Mary Reich, pp. 62-63.

Mary Reich after 75 pages of being asked the same questions summarized her testimony as follows:

> I witnessed his signature. I saw him - - I shouldn't use that
> word - - I saw him sign his name, yes.

The change of beneficiary forms which were mailed to Gary Lupiloff on October 19, 2006, were signed by Gary Lupiloff on April 4, 2007. Gary signed an Application for Change of Beneficiary Designation and he also signed an Application for Designation of Owner which Bill Keene as the "New Owner." The New Ownership form was also signed by Bill Keene on April 4, 2007. See **EXHIBIT D**.

The next month after Gary Lupiloff signed the ownership of the Nationwide Life Insurance Policy over to Bill Keene, Bill Keene received a quarterly statement from Nationwide in the amount $272.95. Keene received and made the following payments on the Nationwide policy:

| | |
|---|---|
| May 28, 2007 | $272.95 |
| August 28, 2007 | $272.95 |
| November 28, 2007 | $272.95 |
| February 28, 2008 | $272.95 |
| May 28, 2008 | $272.95 |
| August 28, 2008 | $272.95 |
| November 28, 2008 | $272.95 |
| February 28, 2009 | $272.95 |
| May 28, 2009 | $272.95 |
| August 28, 2009 | $272.95 |
| November 28, 2009 | $272.95 |
| February 28, 2010 | $272.95 |
| May 28, 2010 | $272.95 |
| **Total** | **$3,539.25** |

See **EXHIBIT E**.

Gary Lupiloff was murdered on July 3, 2010, so Bill Keene made no more payments on the policy.

Mary Reich testified that Gary Lupiloff had been making monthly payments and even though Keene was making quarterly payments, Bill Keene had made the equivalent of 39 monthly payments.  In other words, after the several meetings, after Gary Lupiloff wrote to the company and requested the change of beneficiary forms, after he met with Mary Reich and signed the change of beneficiary forms, after he told Bill Keene he could not afford to make the payments, after he told Mary Reich he did not want to make the payments, he did not make another single payment for the 39 months or almost 3 ½ years.  Evidently, it is now the theory of the Lupiloff daughters that someone forged Gary Lupiloff's name to the change of ownership form and just coincidently, 39 months went by and Gary Lupiloff never made a payment.  During this period 3 year and 3 months, the total amount of payments made by Bill Keene were $3,539.25.  Likewise, Gary Lupiloff avoided payments of $3,539.25.

The Lupiloffs have hired a handwriting analyst who has reviewed the relevant documents.  This handwriting analyst, Robert Kullman, has opined that the change of beneficiary form "was probably written and signed by Gary Harmon Lupiloff."  (Report of Kullman at **EXHIBIT F**).[1]  Kullman also opined that the change of ownership form "was probably not written or signed by Gary Harmon Lupiloff.  (See **EXHIBIT F**).

These change of ownership and beneficiary forms are both dated April 4, 2007.  The next month, May 207, the quarterly bill for the Nationwide insurance

---

[1] The Kullman report refers to the exhibits attached to the original complaint filed by Nationwide.  Those exhibits to the complaint are attached to this brief at **EXHIBIT G**.

policy was mailed to Bill Keene's address in Ann Arbor. (See, **EXHIBIT E**). And, as stated above, the payments for the next 39 months were mailed to Bill Keene.

## LEGAL ARGUMENT

### Gary Lupiloff Transferred Ownership of The Nationwide Policy to Bill Keene and Removed His Own Daughters as Contingent Beneficiaries

It seems to be the position of the Lupiloff Defendants that all they need to prove is that one or more of the signatures on the forms changing the ownership and beneficiaries on the policy is "probably" not the signature of Gary Lupiloff. This is not what the Lupiloff Defendants need to prove. The Lupiloff defendants need to prove by clear and convincing evidence that the signature is in fact a "forgery". The assertion that the subject signatures are probably not Gary Lupiloff's has little to do with whether the signatures are forgeries.

But before we discuss the burden of proof and the other legal arguments, let's take a moment to discuss, in plain English, just how preposterous the theories of the Lupiloffs are. It is not disputed that Gary Lupiloff did not want to pay for the life insurance policy and that he was frequently late paying the policy. After being nagged by Keene to pay the policy, he contacted his friend and insurance agent, Betsy Reich and told her he wanted to transfer the policy to Keene. He specifically declined the option of keeping the policy in his name and making Keene the payer on the policy. Shortly after these conversations with Betsy Reich, Lupiloff obviously contacted Nationwide because he received in the mail instructions and forms that would allow him to change the ownership and beneficiary of the policy. We know that Betsy Reich would not give Keene any information on the policy, because he was not the owner, so

11

only Lupiloff could have contacted Nationwide to request the change of ownership forms.

We also know that Lupiloff received the change of ownership and change of beneficiary forms because Lupiloff's expert has opined that the signature on the change of beneficiary form is the signature of Gary Lupiloff. And this is the point in the story where the narrator should slip into the voice of Rod Serling, as the Lupiloffs are entering the Twilight Zone. The Lupiloffs claim that even though Gary Lupiloff received both forms from Nationwide and both forms were returned to Nationwide on the same day, that somehow one form, the change of beneficiary form, was signed by Gary and the change of ownership form was not. And, only in the twilight zone would a father make another man's wife a beneficiary of his life insurance policy and remove his own daughters. And, only in the twilight zone would this same man keep the policy in his name, along with the obligation to pay. And, only in the twilight zone would this same man not notice that he was not paying premiums on the policy for over three years.

Even though we all know that Gary Lupiloff signed both documents because he did not want to pay for a life insurance policy for a guy he cheated, even if one of the signatures is not his, it does not mean the forms were "forged". The Michigan Supreme Court and Court of Appeals have unequivocally held that a civil forgery must be proven by clear and convincing evidence. In an unpublished decision, citing several published decisions, the Michigan Court of Appeals has recently stated the following:

> A. Standard of Review
>
> The determination of the proper standard of proof is an issue of law. This Court reviews questions of law de novo. *Burba v Burba*, 461 Mich. 637, 647; 610 N.W.2d 873 (2000).

12

B. Analysis

The trial court was required to determine whether Asher's signatures had been forged. Forgery may be defined as the making of a false document, with the intent to deceive in a manner which exposes another to loss. *People v Susalla*, 392 Mich. 387, 392-393; 220 N.W.2d 405 (1974); Matter of Loyd, 424 Mich. 514, 526; 384 N.W.2d 9 (1986). Intent to defraud is the gist of the offense of forgery. *People v Gill*, 8 Mich. App. 89, 92-93; 153 N.W.2d 678 (1967).

Generally, fraud must be proved by "clear and convincing" evidence rather than by the preponderance of the evidence. *Foodland Distributors v Al-Naimi*, 220 Mich. App. 453, 459; 559 N.W.2d 379 (1996). This Court has rejected claims that our Courts have established "no definitive standard for the burden of proof" in fraud cases. Both *Campbell v Great Lakes Insurance Co*, 228 Mich. 636; 200 NW 457 (1924) and *Mina v General Star Indemnity Co*, 218 Mich. App. 678; 555 N.W.2d 1 (1996), rev'd in part on other grounds 455 Mich. 866 (1997), involved insurers that used fraud and false swearing as an affirmative defense to preclude recovery under insurance policies. Our Supreme Court and this Court have clearly stated that a plaintiff must prove a tort claim of fraud by clear and convincing evidence. *Flynn v Korneffel*, 451 Mich. 186, 199, 201-202; 547 N.W.2d 249 (1996).

Therefore, the proper standard in analyzing the signatures in this case is clear and convincing evidence. In *Wayne Co Prosecutor v Parole Bd*, 210 Mich. App. 148; 532 N.W.2d 899 (1995), the trial court, in vacating the parole board's decision, applied a higher standard of review than was warranted. Despite the development of a complete record, this Court remanded, requiring the trial court to apply the appropriate standard of review in light of the record and statutory requirements. Id. at 152-153. Similarly, where a trial court applied the preponderance-of-the-evidence standard to a juvenile proceeding, this Court remanded the matter for application of the proper and stricter beyond-a-reasonable-doubt standard of proof. *In re Weiss*, 224 Mich. App. 37, 42; 568 N.W.2d 336 (1997). In both cases, remand was appropriate because the reviewing court could not guess whether the outcome would have been different had the trial court applied the proper standard in the first instance. [*Marlo Beauty Supply, Inc. v. Farmers Ins. Group of Cos.*, 2005 Mich. App. LEXIS 1354 (2005), attached as **EXHIBIT H**]

13

Federal District Courts in Michigan have applied the clear and convincing burden of proof to claims of civil forgery. The District for the Western District of Michigan has stated:

> Under Michigan law, the burden of proof is on plaintiff to establish fraud. Fraud is never presumed, but must be established by clear and convincing evidence. See *Bitkowski v. Merril Lynch, Fenner & Smith, Inc.*, 866 F.2d 821, 823 (6th Cir. 1987); *Hi-Way Motor Co. v. International Harvester Co.*, 398 Mich. 330, 247 N.W.2d 813, 816 (Mich. 1976). The Michigan courts have traditionally applied this standard to equitable actions seeking to set aside a deed on the basis of fraud. See, e.g., *Reo v. Vecchio*, 340 Mich. 216, 65 N.W.2d 773, 776 (Mich. 1954). [*LaVean v. Cowels*, 835 F. Supp. 375, 1993 U.S. Dist. LEXIS 18996 (W.D. Mich. 1993)]

The Michigan Supreme Court has articulated what is required to sustain the burden of proof of clear and convincing evidence:

> Evidence is clear and convincing when it
>
>> "produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the fact finder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." . . . Evidence may be uncontroverted, and yet not be "clear and convincing." . . . Conversely, evidence may be "clear and convincing" despite the fact that it has been contradicted. [In re Jobes, supra at 407-408.] [*Martin v. Martin (In re Martin)*, 450 Mich. 204, 538 N.W.2d 399, 1995 Mich. LEXIS 1817 (Mich. 1995)]

The best evidence that the Lupiloffs can come forward with to prove that one of the subject forms is a forgery is the opinion of their expert that one of the subject signatures is "probably" not that of Gary Lupiloff. And, as stated above, all of the evidence supports the fact that Lupiloff requested the change of ownership and change

14

of beneficiary forms. The opinion that the change of ownership form was "probably" not signed by Gary Lupiloff does establish by clear and convincing evidence that Gary Lupiloff terminated any interest he or his daughter had in the subject policy.

### Even If Someone Other Than Gary Lupiloff Magically Signed the Change Of Ownership Form, The Lupiloffs Are Estopped From Claiming Under the Policy

For the sake of argument, we will play along with the Lupiloffs and pretend for a moment that someone else besides Gary Lupiloff signed the change of ownership and dated this form the same date as Gary signed the change of beneficiary form and returned these two forms to Nationwide on the same day. The only logical explanation if this is true is that Gary, always the con man, was trying to pull one last con from the grave. The only thing that the Lupiloffs have alleged is that someone besides Gary signed the change of ownership forms, but they cannot overcome the overwhelming evidence that this form was signed at the direction and with the full knowledge of Gary Lupiloff.

Only Gary had access to the policy information and only Gary could have requested the change of beneficiary and change of ownership forms. Only Gary Lupiloff would know to return the forms and both forms were returned and are dated the same day. And, since the Lupiloff expert admits that the change of beneficiary form was signed by Gary Lupiloff, only the change of ownership form would have relieved Gary from the obligation to pay on the policy. And, the next month after Gary signed the change of beneficiary form, he stopped receiving a monthly bill from Nationwide. We also know that he did not receive a notice that the policy was being cancelled for non payment. So, the only logical conclusion is that Gary Lupiloff knew full well that the

15

ownership of the policy was being transferred to Bill Keene and that Bill Keene was paying on the policy for over three years.  If Gary Lupiloff did not sign the change of ownership, he had to know that someone did, as he had just had that very form mailed to him and he stopped receiving a bill for the premiums. And now, having not paid the premium for over three years, his daughters still get to argue that they are entitled to the proceeds of the policy because poor Gary had his name forged.  So, either Gary Lupiloff signed the change of ownership form or he was a master con man, having someone forge his name so his daughter could claim benefits for what he long ago stopped paying.

It has long been the law in Michigan that the Courts will not permit these types of shenanigans. More than a century ago (there have always been con men) the Michigan Supreme Court stated:

> The general rule is that estoppel arises against one who, with knowledge of the fact, fails to give notice until an opportunity of recovery on the forged instrument, which would have been available if prompt notification had been given, is lost:
>
> "If a man's name be forged, and after himself becoming aware of the fact he refrain from advising the holder of the document, and by reason of such inaction the holder's position is changed (by the death, escape, or bankruptcy of the forger, or otherwise), there will be estoppel of the man whose name was forged." Ewart on Estoppel, p. 135.
>
> [*Brown v. People's Nat'l Bank*, 170 Mich. 416, 422, 136 N.W. 506, 508, 1912 Mich. LEXIS 836, 11 (Mich. 1912)]

It has long been the law in Michigan that if one is aware of a fraud or forgery, you may not remain silent and then later complain when others have been prejudiced. The Michigan Supreme Court articulated this proposition as follows:

16

> It thus clearly appears that the plaintiff was worse off when he was told by the defendants that their signatures were forgeries than he was at the time the promise to pay was made. By their silence they allowed Fred, Jr., to carry out his fraud, and, having remained silent when they should have spoken, they should not now be allowed to complain; for as a result of their silence they prejudiced the plaintiff in his rights. We are of the opinion that under these facts it was no error to submit the question of estoppel to the jury. [*Kole v. Lampen*, 191 Mich. 156, 160, 157 N.W. 392, 394, 1916 Mich. LEXIS 653, 7-8 (Mich. 1916)]

The Michigan Court of Appeals has previously ruled that the defense of forgery can be waived if the person that could assert the defense is aware of the forgery, says nothing and allows others to rely upon the forgery. Since Lupiloff unquestionably received the change of ownership forms and had to know these forms were returned to Nationwide, because he stopped receiving a bill, Lupiloff allowed Keene to pay on the policy for over three years, knowing he did not sign the change of ownership form. In not permitting this type of sharp dealing, the Michigan Court of Appeals stated:

> It may be true that defendant did have defenses of usury, lack of consideration, and forgery as to his "friend", Krause, and that these defenses might have validity against an assignee depending upon whether the notes were negotiable or non-negotiable or whether plaintiff was aware of the defenses. But this is of no importance here where suit was brought, not upon the notes, but on the theory of an account stated and upon the additional theory of estoppel.
>
> From the record and the trial judge's findings, it is absolutely clear that the trial court did not consider the doctrine of equitable estoppel which may prevent an obligor from setting up defenses as against an assignee. That such a theory has legal validity is indicated in respectable encyclopedic authority:
>
> "The debtor, by his representations or conduct, may preclude himself from asserting against the assignee of a non-negotiable instrument, defenses which would otherwise have been available to the debtor against the assignor. For example, a debtor may be estopped by representations or

17

>recitals in * * * a separate certificate or statement relating to the assigned instrument, * * * by express waiver, or by such conduct as inducing the assignee to take the assignment of the instrument by admitting the validity of the debt or declaring that he has no defense, * * * making payments to the assignee * * *. However, where an assignee does not exercise good faith in the transaction, as where he has knowledge of a possible defense by the debtor against the assignor * * * he is precluded from asserting estoppel." 6 Am Jur 2d, Assignments § 103, p 285, 286.
>
>Since equitable estoppel is a valid theory, how much an estoppel is created is well stated in 4 Corbin, Contracts, § 899, p 604-605;
>
>>"To create such an estoppel, the obligor must have so conducted himself as to induce the assignee to believe that the defense or counterclaim that is later asserted did not exist and to change his position materially in reasonable reliance thereon. Also, the obligor must have had reason to foresee some such change of position in reliance."
>
>An examination of defendant's admitted conduct could well support a conclusion that the defendant is equitably estopped from asserting the defenses claimed. Therefore this Court must reverse and remand this case for a new trial wherein the theory of estoppel is recognized.  [Subia v. Boone, 14 Mich. App. 304, 306-307, 165 N.W.2d 511 (1968)]

It has also been the law in Michigan that one cannot come in to court seeking equity, if he has unclean hands.  The Lupiloffs are asking this court to allow Gary Lupiloff to let Bill Keene pay the policy for 39 months, knowing he is not getting a bill each month, and then after he is dead to have his daughters claim under the policy on the allegation that Gary had no idea that he no longer owned the policy.   Clearly, by not objecting to Keene paying the policy, Lupiloff has ratified the change of ownership and to allow his daughters to argue otherwise is to ignore Gary Lupiloff's unclean hands:

18

> Our Supreme Court held that the plaintiffs' claims of fraud and misrepresentation were "barred by the bedrock principle that the preservation of the judicial system means no court acting in equity can allow its conscience to be moved to give such a plaintiff relief." Id. at 462. The Court noted that "the maxim that one 'who comes into equity must come with clean hands' is 'the expression of one of the elementary and fundamental conceptions of equity jurisprudence.'" Id. (citation omitted). Citing earlier decisions, the Court went on to describe the purpose of the clean hands doctrine as "a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief however improper may have been the behavior of the defendant." Id. at 463 (emphasis in the original; citation omitted). The Court added that "even underhanded conduct that does not rise to the level of being legally prohibited can nevertheless require the application of the clean hands doctrine[.]" Id. at 466. [*ROBINSON,* 2002 Mich. App. LEXIS 2210, 1, 2002 WL 31956967 (Mich. Ct. App. Dec. 20, 2002)]

The Lupiloff defendants cannot come forward with any evidence to rebut the facts that Gary Lupiloff allowed Bill Keene to pay the life insurance policy, knowing full well someone else signed the change of ownership form. If someone else truly signed the change of ownership form, Lupiloff had an obligation to speak up, and pay the policy himself if he truly wanted to retain ownership of the policy.

## CONCLUSION

It is very obvious what happened in this case. Keene quilted Lupiloff to buy a life insurance policy and Lupiloff immediately regretted having to pay for the policy. Even though Lupiloff had agreed to pay for the policy, he reneged on this promise and assigned the policy to Keene, which also obligated Keene to pay the premiums. Even though the Lupiloffs have an expert that has opined that the change of ownership form "was probably not signed by Gary Lupiloff" this cannot sustain their burden of proof by

19

clear and convincing evidence.  The evidence is overwhelming that Gary Lupiloff voluntarily transferred ownership of the policy to Bill Keene.

And, even if someone other than Gary Lupiloff signed the change of ownership form, it is clear that Gary knew that ownership of the policy had transferred and he acquiesced to this change of ownership by allowing Keene to pay.

WHEREFORE, this court should grant summary judgment to Nationwide and dismiss the counter claims of the Lupiloffs.

                                  Respectfully submitted,

                                  s/  John H. Bredell
                                  John H. Bredell (P36577)
                                  Attorney for Plaintiff
                                  Bredell & Bredell
                                  119 North Huron Street
                                  Ypsilanti, Michigan 48197
Date:  August 29, 2014          (734) 482-5000

## CERTIFICATE OF SERVICE

     I hereby certify that on August 29, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Michigan, Southern Division by using the CM/ECF system.   I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

                                  s/  John H. Bredell
                                    John H. Bredell (P36577)
                                    119 N. Huron Street
                                    Ypsilanti, Michigan  48197
                                    Phone:  (734) 482-5000
                                    E-mail:  jbredell@bredell.com
                                    P36577