# EXHIBIT H

# Marlo Beauty Supply, Inc. v. Farmers Ins. Group of Cos.

Court of Appeals of Michigan
May 26, 2005, Decided
No. 247224

**Reporter:** 2005 Mich. App. LEXIS 1354; 2005 WL 1249249

MARLO BEAUTY SUPPLY, INC a Michigan corporation and ALLIED BARBER AND BEAUTY SUPPLY, INC, a Michigan corporation Plaintiffs-Appellees/Cross-Appellants, v FARMERS INSURANCE GROUP OF COMPANIES and TRUCK INSURANCE EXCHANGE, a foreign corporation authorized to engage in general insurance business in the State of Michigan, Defendants-Appellants/Cross-Appellees.

**Notice:** [*1] THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**Subsequent History:** Reversed by, in part, Appeal denied by, in part *Marlo Beauty Supply v. Farmers Ins. Group of Cos., 2006 Mich. LEXIS 721 (Mich., Apr. 26, 2006)*

**Prior History:** Wayne Circuit Court. LC No. 93-308567-CK.
*Marlo Beauty Supply v. Farmers Ins. Group of Cos., 227 Mich. App. 309, 575 N.W.2d 324, 1998 Mich. App. LEXIS 2 (1998)*

**Disposition:** Affirmed in part and reversed in part and remanded for proceedings consistent with this opinion.

**Judges:** Before: Meter, P.J., and Wilder and Schuette, JJ. WILDER, J., dissenting.

**Opinion**

PER CURIAM.

In this insurance case, defendants, Farmer's Insurance Group and Truck Insurance Exchange appeal as of right the trial court's findings of fact and resulting judgment for plaintiffs Marlo Beauty Supply, Inc. and Allied Barber and Beauty Supply, Inc. Plaintiffs cross-appeal on the issue of damage calculations. We affirm in part and reverse in part and remand for proceedings consistent with this opinion.

## I. FACTS

In 1989, defendant William D. Abraham, an agent for defendant Farmers Insurance Group, sold plaintiffs a liability insurance policy. In 1991 and 1992, two women (formerly underlying plaintiffs) brought actions against plaintiffs, alleging that they were injured when acetone that they had purchased from plaintiffs ignited when they used it to clean their floors. Defendants [*2] refused to defend or indemnify plaintiffs in these suits because of two policy endorsements which restricted products liability coverage, ET-114 [1] [*3] (products liability

---

[1] This exclusion read:

> It is agreed that such insurance as is afforded by the Bodily Injury Liability Coverage and the Property Damage Liability Coverage for the operations described in this endorsement does not apply to bodily injury or property damage arising out of
>
> (1) the named insured's products, or
>
> (2) reliance upon a representation or warranty made with respect thereto;

exclusion) and ET-343 [2] (products and completed operations exclusion). In addition, defendants claimed that coverage was precluded by the exclusion in § IV(4)(b) of the insurance policy. [3] Plaintiffs brought an action for a declaratory judgment that defendants were obligated to defend plaintiffs. In addition, plaintiffs brought a claim for negligence against Abraham, alleging that Abraham had negligently failed to provide plaintiffs with adequate insurance coverage.

[*4] Plaintiffs moved for summary disposition claiming that there was no genuine issue of material fact that the signatures of plaintiffs' president, Michael Asher, on the two policy restriction endorsements were forgeries. In addition, they claimed that the exclusion in § IV(4)(b) of the insurance policy was not applicable. Finally, they argued that defendants should be estopped from denying coverage because plaintiffs reasonably believed that they had purchased products liability coverage. Defendants filed a cross-motion for summary disposition.

The first trial court held that defendants had failed to create a question of fact concerning the authenticity of the signatures on the two policy restriction endorsements and granted plaintiffs partial summary disposition on that issue. The first trial court also found that the exclusion in § IV(4)(b) was not applicable because the acetone which allegedly injured the underlying plaintiffs was not manufactured by plaintiffs. Instead of granting plaintiffs' motion for summary disposition in full or defendants' cross-motion for summary disposition, the first trial court ordered a trial to determine whether plaintiffs reasonably expected coverage [*5] under the policy. Following a bench trial, the first trial court found that plaintiffs could not have reasonably expected coverage, and denied declaratory relief. In addition, because the first trial court found no special relationship between plaintiffs and Abraham, it denied plaintiffs' negligence claim.

Plaintiffs appealed. In a published per curiam opinion, *Marlo Beauty Supply, Inc v Farmers Ins Group, 227 Mich. App. 309, 320; 575 N.W.2d 324 (1998)* (*Marlo I*), this Court determined that: 1) the first trial court did not err in concluding that Abraham was not negligent because no special relationship existed between Abraham and Asher, and Abraham owed no duty to plaintiffs; 2) the first trial court did err in finding that plaintiffs did not have a reasonable expectation of coverage because, without considering the exclusions, the policy

---

if the bodily injury or property damage occurs after physical possession of such products has been relinquished to others whether bodily injury or property damage occurs on premises owned by or rented to the named insured or elsewhere.

[2] This restriction read:

In consideration of the reduced premium, it is agreed that this policy affords no coverage for Bodily Injury or Property Damage arising out of any matter encompassed within the definitions of "Products Hazards" or "Completed Operations Hazards" including but not limited to causes of action based upon:

1. Breach of any express or implied warranty;

2. Defects or negligence in design, inspection, testing, or manufacture;

3. Failure to warn;

4. Failure to properly instruct in the use of a product; or

5. Any other alleged defects, negligence, or failure of whatsoever kind or nature in relation to a product or completed operation.

[3] The exclusion stated in (IV)(b)(4) of the policy was applicable only to "bodily injury or property damage resulting from a *failure* of the named insured's products . . . *to perform the function or serve the purpose intended by the named insured*, if such failure is due to a mistake or deficiency in any design, formula, plan, specifications, advertising material or printed instructions prepared or developed by the insured."

language would have led plaintiffs to reasonably expect defendants would defend them in the underlying suit; 3) the first trial court reached the right result, albeit for the wrong reason, in determining that the exclusion in § IV(4)(b) did not apply because it did not explicitly disallow coverage for damages resulting [*6] from a failure to warn; 4) the first trial court erred in granting plaintiffs' motion for summary disposition on the issue of applicability of the two policy restriction endorsements because a genuine issue of material fact remained regarding the authenticity of the signatures of Asher; and 5) the first trial court did not err in finding that the element of a promise in estoppel was not satisfied and even if the terms of the insurance policy excluded products liability coverage, plaintiffs were not led to believe that defendants would provide them the same coverage as plaintiffs carried with their prior insurance company. This Court remanded for a determination of whether Asher did sign the two policy restriction endorsements and instructed that a finding that Asher did sign the restriction would mean plaintiffs could not have reasonably expected coverage.

On remand, the trial court found that neither policy restriction endorsement (ET-114 ET-343, referred to by the trial court as exhibits 35 and 36) were signed by Asher or at Asher's direction. It also found, by a preponderance of evidence that whoever signed the policy restrictions, also filled out exhibits 34 and 56. Defendants [*7] appeal these findings of fact arguing that the trial court applied the preponderance of the evidence standard when it should have applied the clear and convincing evidentiary standard.

Based on these findings, the trial court determined plaintiffs were entitled to coverage in the underlying lawsuit. The parties stipulated that plaintiffs were entitled to damage payments toward the settlement of the underlying case and fees and costs paid to plaintiffs' attorneys in the amount of $ 100,000 plus expert witness fees. While the appeal was pending, the parties settled the underlying cases. The parties could not agree, however, on how to calculate pre-judgment interest on costs and attorney fees. Plaintiffs asserted that judgment interest should run on the total damages from the date of the filing of the complaint. Defendants argued that interest should be calculated on each of the individual or periodic payments of attorney fees and interest from the date on which the payment was made. The trial court awarded damages based on defendants' method of computation.

II. LAW OF THE CASE DOCTRINE

Defendants argue that this panel should reinstate the first trial court's decision in light of two [*8] intervening cases dealing with extrinsic evidence. We disagree.

A. Standard of Review

Whether law of the case doctrine applies is a question of law subject to review de novo. *Kalamazoo v Dep't of Corrections (After Remand), 229 Mich. App. 132, 135; 580 N.W.2d 475 (1998)*.

B. Analysis

The law of the case doctrine holds that a ruling by an appellate court on a particular issue binds the appellate court and all lower tribunals with respect to that issue. *Driver v Hanley (After Remand), 226 Mich. App. 558, 565; 575 N.W.2d 31 (1997)*. Thus, a question of law decided by an appellate court will not be decided differently on remand or in a subsequent appeal in the same case. *Id.* The primary purpose of the doctrine is to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit. *Bennett v Bennett, 197 Mich. App. 497, 499-500; 496 N.W.2d 353 (1992)*. However, the doctrine does not preclude reconsideration of a question if there has been an intervening change of law. *Freeman v DEC Int'l, Inc, 212 Mich. App. 34, 38; 536 N.W.2d 815 (1995)*. [*9] For this exception to apply, the change of law must occur after the initial decision of the appellate court. *Id.*

For purposes of analysis of this issue we set aside the issue of the two restrictive endorsements ET-114 and ET-343 and their alleged forgery. However, the first trial court's findings regarding the inapplicability of the exclusion in § IV(4)(b) are relevant and will be addressed within this issue. The first trial court determined that plaintiffs had no reasonable expectation of coverage because a premium was never paid for such coverage, and plaintiffs' representative admitted he had never read any of the policies. The *Marlo I* panel rejected this conclusion. *Marlo I, supra at 315-317*. The *Marlo I* panel

determined that the trial court should never have reached the issue of reasonable expectation given its determination that the plain language of the general contract would have granted plaintiffs coverage in this situation and given its determination, as discussed below, that the exclusion found in § IV(4)(b) did not apply to this situation. The *Marlo I* panel determined the first trial court reached the right result in its § IV(4)(b) analysis, [*10] but for the wrong reason.

> The exclusion found in § IV(4)(b) does not explicitly disallow coverage for damages resulting from a failure to warn. The wording of this exclusion has caused confusion and ambiguity. *W T Grant Co v USF & G Ins Co, 279 Pa Super 591; 421 A.2d 357, 360 (1980)*. This is not a case where the underlying plaintiff alleged that a product actively malfunctioned. See *id.* Similarly, this is not a case where a product failed to perform its function. Compare *Pittway Corp v American Motorists Ins Co, 56 Ill. App. 3d 338; 370 N.E.2d 1271, 1276, 13 Ill. Dec. 244 (1977)*; *Kyllo, supra*, pp 632-633. To the contrary, the evidence showed that it was known that acetone was extremely flammable, and that its vapors could ignite. Strictly construing the exclusion's ambiguity against defendants, we hold that the exclusion in § IV(4)(b) does not unambiguously encompass an allegedly negligent failure to warn. *Scarborough v Northern Assurance Co, 718 F.2d 130, 136 (CA 5, 1983)*. Accordingly, the trial court reached the correct conclusion when it determined that the exclusion listed in § IV(4)(b) [*11] of the insurance policy did not apply.

The *Marlo I* panel found that the general contract language provided coverage to plaintiffs in this situation and found that the § IV(4)(b) exclusion did not apply to this case. We will now address whether this determination is inconsistent with the two intervening cases as advocated by defendants.

In *Klapp, supra*, an insurance agent brought an action against an insurance company, alleging that the company failed to pay renewal commissions to which the agent was entitled pursuant to his contract. The circuit court denied the insurance company's motion for summary disposition, and entered judgment in favor of the agent. This Court reversed. Our Supreme Court held that: (1) irreconcilable conflict between the vesting schedule in the agent's agreement and the definition of retirement in the agent's manual rendered the agreement ambiguous; (2) extrinsic evidence was admissible in interpreting agreement's ambiguous language; and (3) failing to inform jury that it could only apply rule of contra proferentem [4] if it was unable to discern parties' intent from extrinsic evidence was harmless error. *Id.*

[*12] In *Wilkie, supra*, the case involved a dispute between Auto-Owners Insurance Company and its insured, Frank and the decedent, Wilkie, regarding underinsured-motorist coverage. The defendant Auto-Owners argued that the plaintiffs Frank and Wilkie's recoveries from Auto-Owners were limited under the terms of the policy to $ 50,000 each. Frank and Wilkie argued that they were each owed $ 75,000. The trial court and this Court agreed with Frank and Wilkie. Our Supreme Court reversed. Our Supreme Court rejected this Court's reliance on the argument that to allow the construction advocated by the defendant would defy the insured's reasonable expectations, stating:

> This approach, where judges divine the parties' reasonable expectations and then rewrite the contract accordingly, is contrary to the bedrock principle of American contract law that parties are free to contract as they see fit, and the courts are to enforce the agreement as written absent some highly unusual circumstance, such as a contract in violation of law or public policy. This Court has recently discussed, and reinforced, its fidelity to this understanding of contract law in *Terrien v Zwit, 467 Mich. 56, 71;* [*13] *648 N.W.2d 602 (2002)*. *Wilkie, supra* at 51-52.

Our Supreme Court then concisely stated the

---

[4] In interpreting a contract whose language is ambiguous, the jury should also consider that ambiguities are to be construed against the drafter of the contract. *Herweyer v Clark Hwy Services, Inc, 455 Mich. 14, 22; 564 N.W.2d 857 (1997)*.

current status of the rule of reasonable expectations in Michigan:

> The rule of reasonable expectations clearly has no application to unambiguous contracts. That is, one's alleged "reasonable expectations" cannot supersede the clear language of a contract. Therefore, if this rule has any meaning, it can only be that, if there is more than one way to reasonably interpret a contract, i.e., the contract is ambiguous, and one of these interpretations is in accord with the reasonable expectations of the insured, this interpretation should prevail. However, this is saying no more than that, if a contract is ambiguous and the parties' intent cannot be discerned from extrinsic evidence, the contract should be interpreted against the insurer. In other words, when its application is limited to ambiguous contracts, the rule of reasonable expectations is just a surrogate for the rule of construing against the drafter. *Wilkie, supra* at 60.

We find that the first trial court's decision should not be reinstated. With regard to the general policy [*14] language, the *Marlo I* Court found the language to be clear. Although the Court discussed this matter within the framework of plaintiffs' "reasonable expectations," the *Marlo I* panel's ultimate analysis was that the reason plaintiffs could reasonably have expected coverage was because the general policy language was so clear. This is in contrast to *Klapp*, where the contract language was ambiguous and required analysis of extrinsic evidence to determine the parties' intent, and in contrast to *Wilkie* where determination of the parties' reasonable expectations was improper because the language of the contract was unambiguous.

With regard to the § IV(4)(b) exclusion, the *Marlo I* panel determined that this exclusion did not specifically disallow coverage for failure to warn. The panel cited a Pennsylvania case involving an insurance contract with language identical to the § IV(4)(b) exclusion and acknowledged that this language caused "confusion and ambiguity." However, the *Marlo I* panel then distinguished this case from the Pennsylvania case and went on to construe the language of the contract against defendants. "It is already well established that ambiguous [*15] language should be construed against the drafter, i.e., the insurer." *Wilkie, supra* at 62. However, that rule is applicable only where all conventional means of contract interpretation fail to resolve the ambiguity. *Klapp, supra* at 471. This aspect of the contract interpretation is more similar to *Klapp* because there is ambiguity in the contract language. However, *Klapp* instructs us that:

> 'Where a contract is to be construed by its terms alone, it is the duty of the court to interpret it; but where its meaning is obscure and its construction depends upon other and extrinsic facts in connection with what is written, the question of interpretation should be submitted to the jury, under proper instructions.' *Id.* at 469, citing, <u>O'Connor v March Automatic Irrigation Co, 242 Mich. 204, 210; 218 N.W. 784 (1928)</u>

Here, the interpretation of the § IV(4)(b) exclusion can easily be construed by its terms alone. The exclusion was applicable only to "bodily injury or property damage resulting from a *failure* of the named insured's products . . . *to perform the function or serve the purpose intended by the* [*16] *named insured,* if such failure is due to a mistake or deficiency in any design, formula, plan, specifications, advertising material or printed instructions prepared or developed by the insured" (emphasis added). It was not, as defendants seem to argue, a blanket exclusion for all injury and damage resulting from use of the insured's products. Rather, it excluded coverage only where the party suing the insured sought compensation for damages arising from the failure of the product to serve the purpose intended.

In this case, the personal injury plaintiffs sought compensation for was an injury sustained from the failure of plaintiffs to warn them that the product should not be used for a certain purpose under certain conditions. There has been no allegation that the acetone was intended for use as a cleaning product, or that the personal injury plaintiffs suffered damages from was the result of the acetone's failure to serve

its intended purpose. The exclusion was therefore not applicable and this interpretation is readily discernable from a close reading of the language. This interpretation would not be aided by extrinsic evidence of the intent of the parties. There is no indication [*17] from the opinion that the *Marlo I* panel performed an analysis that would be contrary to *Klapp*.

In fact, defendants' request that this Court reinstate the first trial court's decision could actually be considered contrary to *Wilkie*. The first trial court determined that the general policy language was unambiguous and that the § IV(4)(b) exclusion did not apply. Thus, for the first trial court to proceed to trial to determine the reasonable expectations of plaintiffs when it had already concluded that the contract language supported plaintiffs would have been an approach where the judge divined the parties' reasonable expectations and then rewrote the contract accordingly, "contrary to the bedrock principle of American contract law that parties are free to contract as they see fit, and the courts are to enforce the agreement as written absent some highly unusual circumstance, such as a contract in violation of law or public policy." *Wilkie, supra* at 51.

III. CLEAR AND CONVINCING EVIDENCE

Defendants argue that the trial court erred by using the wrong standard when it found by a preponderance of evidence that the signatures on the two restrictive endorsements [*18] were forgeries committed by defendants where the proper standard was clear and convincing evidence. We agree.

A. Standard of Review

The determination of the proper standard of proof is an issue of law. This Court reviews questions of law de novo. *Burba v Burba, 461 Mich. 637, 647; 610 N.W.2d 873 (2000)*.

B. Analysis

The trial court was required to determine whether Asher's signatures had been forged. Forgery may be defined as the making of a false document, with the intent to deceive in a manner which exposes another to loss. *People v Susalla, 392 Mich. 387, 392-393; 220 N.W.2d 405 (1974)*; *Matter of Loyd, 424 Mich. 514, 526; 384 N.W.2d 9 (1986)*. Intent to defraud is the gist of the offense of forgery. *People v Gill, 8 Mich. App. 89, 92-93; 153 N.W.2d 678 (1967)*.

Generally, fraud must be proved by "clear and convincing" evidence rather than by the preponderance of the evidence. *Foodland Distributors v Al-Naimi, 220 Mich. App. 453, 459; 559 N.W.2d 379 (1996)*. This Court has rejected claims that our Courts have established "no definitive [*19] standard for the burden of proof" in fraud cases. Both *Campbell v Great Lakes Insurance Co, 228 Mich. 636; 200 NW 457 (1924)* and *Mina v General Star Indemnity Co, 218 Mich. App. 678; 555 N.W.2d 1 (1996)*, rev'd in part on other grounds *455 Mich. 866 (1997)*, involved insurers that used fraud and false swearing as an affirmative defense to preclude recovery under insurance policies. Our Supreme Court and this Court have clearly stated that a plaintiff must prove a tort claim of fraud by clear and convincing evidence. *Flynn v Korneffel, 451 Mich. 186, 199, 201-202; 547 N.W.2d 249 (1996)*.

Therefore, the proper standard in analyzing the signatures in this case is clear and convincing evidence. In *Wayne Co Prosecutor v Parole Bd, 210 Mich. App. 148; 532 N.W.2d 899 (1995)*, the trial court, in vacating the parole board's decision, applied a higher standard of review than was warranted. Despite the development of a complete record, this Court remanded, requiring the trial court to apply the appropriate standard of review in light of the record and statutory requirements. [*20] *Id. at 152-153*. Similarly, where a trial court applied the preponderance-of-the-evidence standard to a juvenile proceeding, this Court remanded the matter for application of the proper and stricter beyond-a-reasonable-doubt standard of proof. *In re Weiss, 224 Mich. App. 37, 42; 568 N.W.2d 336 (1997)*. In both cases, remand was appropriate because the reviewing court could not guess whether the outcome would have been different had the trial court applied the proper standard in the first instance.

Thus, on remand the trial court should examine the elements of a claim of forgery and scrutinize them in light of the clear and convincing standard of proof and issue findings of fact consistent with this review. Given that an element of fraudulent intent must be shown by clear and convincing evidence and the trial court did not require proof of this element during its fact finding, on remand, the trial court should allow

additional testimony to establish this element if so desired by the parties.

## IV. FINDINGS OF FACT

Defendants also argue that the trial court clearly erred in ruling that the signatures on the restrictive endorsements were not signed by [*21] or at the direction of Asher. We decline to find clear factual error, but given our determination that the trial court did not apply the proper standard of proof, will leave to the trial court on remand the issue whether the evidence of forgery is sufficient under the correct standard of clear and convincing evidence.

## V. LOSS OF EXHIBITS

Defendants argue that the loss of trial exhibits bearing the signatures in question following the hearing renders the trial court's findings of fact void. We disagree.

### A. Standard of Review

Defense counsel requested a hearing on the record when he discovered the original exhibits missing. However, defense counsel never specifically inquired as to whether the trial court had been able to review the documents before issuing its findings of fact. Thus, we will treat this issue as an unpreserved evidentiary issue. This Court reviews unpreserved evidentiary issues to determine whether there was plain error affecting a party's substantial rights. *Hilgendorf v St John Hosp & Medical Center Corp, 245 Mich. App. 670, 700; 630 N.W.2d 356 (2001)*.

### B. Analysis

On October 2, 2000, the trial court held a hearing regarding the original [*22] trial exhibits in this case. The testimony of both plaintiff's counsel and defendant's counsel indicates that following the July 2000 hearing, each party divided up their respective exhibits and took them in order to organize them for the trial court. Defense counsel stated that he mailed the exhibits back to the trial court along with a cover letter. Defense counsel called and confirmed that the exhibits had been received by the trial court. Later, when defense counsel visited the courthouse in an attempt to retrieve the exhibits, they were nowhere to be found. At the October 2 hearing, the trial court stated that it would make a "herculean effort" to search for the original documents. However, it appears the trial court was unsuccessful. The record does not contain the originals of the trial exhibits, only copies.

Defendants argue that the missing documents should render the trial court's findings of fact void because *MRE 1003* provides:

> A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original.

Defendants [*23] assert that the authenticity of the signatures on the original documents was the sole subject of the trial and as a result, the trial court should have had the opportunity to examine those documents to reach its conclusion. Defendants cite *People v Drake, 64 Mich. App. 671, 679-680; 236 N.W.2d 537 (1975)* for the proposition that where prejudice results from the unavailability of lost exhibits, and said exhibits are necessary to prepare or determine an appeal, an error may have occurred. However, *Drake* was a criminal case wherein this Court determined that the defendant did not demonstrate prejudice from the loss of trial exhibits between the end of trial and the appeal.

The *Drake* Court extrapolated its rule from cases wherein a transcript of the lower court proceedings was unavailable. It noted that this Court has held that the failure to file a transcript or settled record will not automatically require a new trial. *People v Carson, 19 Mich. App. 1, 172*; N.W.2d 211 (1969). The failure of the State to provide a transcript when, after good faith effort, it cannot physically do so, does not automatically entitle a defendant to a [*24] new trial. *Id. at 7*, citing *Norvell v Illinois, 373 U.S. 420, 83 S. Ct. 1366, 10 L. Ed. 2d 456 (1963)*; *United States ex rel Smart v Pate, 318 F.2d 559, 562 (CA 7, 1963)*; contrast *United States v Randolph, 259 F.2d 215 (CA 7, 1958)*.'

The *Drake* Court then asked, "has plaintiff's failure to file all the required exhibits so prejudiced defendant that the enjoyment of his constitutional

right of appeal has been impeded?" *Drake, supra at 680*. The Court concluded that it had not because the defendant had cited no prejudice from the unavailability of the exhibits. *Id.* The Court concluded that the testimony was so complete and concise on the record that the exhibits were not necessary to the preparation of defendant's appeal or this Court's resolution of that appeal. *Id.*

Defendants have not demonstrated prejudice here either. The trial court issued its findings of fact and conclusions of law on September 1, 2000. Defense counsel did not discover the exhibits were missing until October 2, 2000. At the October 2 hearing, the trial court gave no indication that it did not review the originals in [*25] making its decision. Testimony of defense counsel indicates that the court confirmed receipt of the originals at some point. Additionally, the originals were submitted at trial, giving the trial court the opportunity to review them at that time. Also, the expert testified that his opinions were based upon his examination of the original documents. Thus, defense counsel has not demonstrated that the trial court was without the originals when it made its findings of fact and conclusions of law. The loss of these documents, while plainly an error, did not affect defendant's substantial rights.

VI. PUBLIC POLICY

Defendants argue that the trial court's decision was contrary to public policy. We disagree.

A. Standard of Review

Whether the trial court's failure to enforce the restrictive endorsements in this matter is contrary to public policy is a question of law that this Court reviews de novo. *Vicencio v Ramirez, 211 Mich. App. 501; 536 N.W.2d 280 (1995)*.

B. Analysis

Michigan law undoubtedly supports the enforcement of restrictive endorsements. In *Marlo I*, this Court stated:

> An insurer is free to define or limit the scope of coverage as long [*26] as the policy language fairly leads to only one reasonable interpretation and is not in contravention of public policy. *Zurich-American [Co v Amerisure Ins Co*, 215 Mich. App. 526; 547 N.W.2d 52 (1996)] *supra*, at 531. Appellate courts strictly construe against an insurer exemptions that preclude coverage for the general risk. However, courts cannot create ambiguity where none exists. *Pacific Employers[v Michigan Mut Ins Co*, 452 Mich. 218, 224, 549 N.W.2d 872 (1996)] *supra*, at 224; *Diehl [Fire Ins Exchange v Diehl*, 450 Mich. 678; 545 N.W.2d 602 (1996)], *supra*, at 687. Clear and specific exclusions must be given effect. *Pacific Employers, supra*, at 224. [*Marlo I, supra at 317-318*.]

Here, the trial court predicated its decision to not enforce the restrictive endorsements on its determination that Asher never signed the restrictive endorsements. A decision supporting the enforcement of forged restrictive endorsements would unmistakably be in contravention of public policy. Defendants' assertion that the forged endorsements should be enforced because [*27] plaintiffs never paid premiums for products liability coverage is unpersuasive. Testimony and depositions indicate plaintiffs believed their premiums did cover products liability. Further, the *Marlo I* panel concluded that without these two restrictive endorsements, the contract would have covered plaintiffs in the underlying suit.

In short, public policy does favor the enforcement of restrictive endorsements, but not where they have been forged. Defendants' argument that the trial court's decision was contrary to public policy is without merit

VII. PRE-JUDGMENT INTEREST

Plaintiffs argue on cross-appeal that the trial court erred in its method of pre-judgment interest calculations on costs and attorney fees. We disagree.

A. Standard of Review

This Court reviews de novo an award of interest pursuant to *MCL 600.6013*." *Everett v Nickola, 234 Mich. App. 632, 638; 599 N.W.2d 732 (1999)*. "Entitlement to interest on a judgment is purely statutory and must be specifically authorized by statute." *Dep't of Transportation v Schultz, 201 Mich. App. 605, 610; 506 N.W.2d 904 (1993)*.

B. Analysis

In *Ayar v Foodland Distributors*, 263 Mich. App. 105; [*28] 687 N.W.2d 365 (2004), this Court determined that statutory interest on costs and mediation sanctions accrued from the date costs and mediation sanctions were awarded rather than the date that the original complaint was filed. *Id. at 114*. This Court was not persuaded that the Legislature would have intended a situation where the trial court could award interest for a period during which there was no fund in existence upon which to calculate interest. *Id. at 113-114*. Therefore, in the present case, the trial court correctly awarded damages based on each of the individual or periodic payments of attorney fees and properly calculated interest from the dates on which the payments were made.

Affirmed in part and reversed in part and remanded for proceedings consistent with this opinion.

/s/ Patrick M. Meter

/s/ Bill Schuette

**Dissent by:** Kurtis T. Wilder

Dissent

WILDER, J., *dissenting*.

I respectfully dissent. I would reinstate the judgment of the first trial court in favor or defendants, rendered based on that trial court's finding that there was no products liability coverage under the policy in question.

First, I disagree with the majority's [*29] conclusion that the law of the case doctrine operates to prevent this panel from reconsidering the decision made by this Court in *Marlo Beauty Supply v Farmers Ins Group*, 227 Mich. App. 309, 323; 575 N.W.2d 324 (1998) ("*Marlo I*"). The *Marlo I* panel stated that "temporarily ignoring the policy's exclusions, [the] general policy language [at issue] would have led plaintiffs reasonably to expect that defendants were obligated to defend them against the suits brought by the underlying plaintiffs." *Id. at 317*. The *Marlo I* panel went on to find in part that as a matter of law, "unless other policy language excluded coverage, the trial court erred in finding that plaintiffs did not have a reasonable expectation of coverage." *Id*. The *Marlo I* panel later repeated its legal conclusion that "the general terms of the policy would have led plaintiffs to reasonably expect that they had products liability coverage," *id. at 323*, in concluding that a question of fact remained as to whether the plaintiffs' president, Michael Asher, signed the endorsements that restricted policy coverage.

The majority concludes that the *Marlo I* panel [*30] did not employ a reasonable expectations doctrine analysis in reaching its decision because its remand for further proceedings was prefaced on a finding that the general policy language was clear and unambiguous. I disagree with this conclusion, because had it intended to determine that the insurance policy was clear and unambiguous, the *Marlo I* panel could not have excluded from consideration the endorsements to the contract. See, *McKusick v Travelers Indemnity Co*, 246 Mich. App. 329, 332-333, 340; 632 N.W.2d 525 (2001) (holding (1) "an insurance policy is a contract that should be read *as a whole* to determine what the parties intended to agree on . . . "; (2) "clear and specific exclusionary clauses must be given effect . . . ."; and (3) "conflicts between the terms of an endorsement and the form provisions of an insurance contract are resolved in favor of the terms of the endorsement") (Emphasis added). Because the *Marlo I* panel made no effort to consider the language of the endorsements before determining that the language of the policy was clear, it is apparent that the legal analysis employed by the *Marlo I* panel was inextricably [*31] dependant upon the application of the reasonable expectations doctrine [1] which, of course, was rendered wholly inapplicable to the interpretation of insurance contract language by the Michigan Supreme Court in *Wilkie v Auto Owners Ins Co*, 469 Mich. 41, 63; 664 N.W.2d 776 (2003). As such, *Marlo I* is not controlling on this panel due to the intervening change of law. *Freeman v DEC Int'l, Inc*, 212 Mich. App. 34, 38; 536 N.W.2d 815 (1995).

Because I would conclude that *Marlo I* is not controlling on this panel, I would further conclude that the findings by the first trial court, that the

---

[1] "Under the rule of reasonable expectations, a court finds coverage under a policy if "the policyholder, upon reading the contract language, is led to a reasonable expectation of coverage."" *Marlo I, supra* at 316, quoting *Fire Ins Exch v Diehl*, 450 Mich. 678, 687; 545 N.W.2d 602 (1996).

evidence in the case established [*32] that "there was not any products liability insurance in effect, even from the beginning," was not clearly erroneous, and that the judgment of the first trial court in favor of the defendants should be reinstated.

The first trial court found that the declaration sheet for the policy at issue indicated that there was no product liability coverage, that plaintiffs never paid premiums for product liability coverage, and that while plaintiffs may have expected that the policy provided product liability coverage, defendants, through their agent, William Abraham, did not understand that plaintiffs had requested product liability coverage when the policy was issued. As such, the trial court found there was no meeting of the minds on the provision of product liability coverage, and found that no such coverage existed. Plaintiffs have failed to demonstrate that these findings are clearly erroneous, and this failure is, in my judgment, fatal to plaintiff's claims on appeal.

To this extent, whether the evidence shows that plaintiff did or did not sign the endorsements in question is irrelevant under *Wilkie*. As noted by the panel in *Marlo I*, whether or not Asher signed the policy [*33] restriction endorsements was relevant only for purposes of determining whether plaintiffs could have reasonably expected coverage under the policy. *Marlo I, supra at 323*. The *Marlo I* panel remanded the case for a second trial only so that the trial court could make complete findings concerning plaintiffs' reasonable expectations. Under the reasonable expectations doctrine, a finding that Asher signed the endorsements would have negated plaintiffs' argument that plaintiffs had a reasonable expectation of coverage under the general policy language of the contract, whereas a finding that Asher did not sign the endorsements would support the plaintiffs' claims that they has such a reasonable expectation of coverage.

Under *Wilkie*, however, whether Asher did or did not sign the endorsements does not by itself determine the existence of coverage under the policy. Rather, well-settled principles of contract construction apply to the interpretation of an insurance contract, including the principle that an enforceable contract is not created unless there has been an offer, an acceptance, and mutual assent by the parties on all essential terms. *Eerdmans v Maki, 226 Mich. App. 360, 364;* [*34] *573 N.W.2d 329 (1997)*. The essential terms of a contract, or in other words, the terms on which the minds of both parties must meet and agree, include (1) the subject matter of the policy; (2) the insured risk; (3) the duration of the risk; (4) the amount of indemnity; and (5) the premium to be paid (which must be paid at the time of the contract, or exist as a valid legal charge against the insured). *Martin v Lincoln Mut Cas Co, 285 Mich. 646, 649; 281 NW 390 (1938)*, citing 1 Wood on Insurance, § 5. The term premium has been defined as the "consideration paid an insurer for undertaking to indemnify the insured against a specified peril." 5 Couch, Insurance 3rd, § 69:1, p 69-5.

Here, the first trial court made a definitive finding, not challenged by plaintiffs, that plaintiffs paid no premiums for product liability coverage and that there was no meeting of the minds on this essential term of the contract. Thus, the first trial court found that no product liability coverage existed and on that basis entered judgment in favor of defendants. As the record before us does not show this finding of the trial court to be clearly erroneous, [*35] the judgment of the first trial court in favor of defendants should be reinstated.

/s/ Kurtis T. Wilder